UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C. A. NO. 05-11709 NMG

BOWEN INVESTMENT, INC. and HONEY
DEW ASSOCIATES, INC.,
                              Plaintiffs,

v.

CARNEIRO DONUTS, INC., and MANUEL
M. CARNEIRO,
                              Defendants.

<u>PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT AS TO LIABILITY ONLY AS TO THE COMPLAINT AND AS TO
DEFENDANTS' COUNTERCLAIMS</u>

This is an action by a franchisor against a franchisee following termination for the

franchisee's failure to timely meet payment obligations, and failure to complete contractual

reinstatement agreements.  As payment defaults and the failure to cure are not disputed, Plaintiffs

seek summary judgment.

Defendants have filed a series of counterclaims, substantively asserting that the

termination of the Defendants as a franchisee was in bad faith.  As the termination arose out of

the Defendants own misconduct, which is not disputed, summary judgment is appropriate as to

all counterclaims.

I.     <u>BACKGROUND</u>

Plaintiff Bowen Investment, Inc. ("BII") is a Massachusetts corporation, engaged in the

franchising of Honey Dew Donuts® Shops in Rhode Island.  <u>Verified Complaint</u> ¶¶2.  BII

licenses such franchises pursuant to an arrangement with Honey Dew Associates, Inc., a

Massachusetts corporation, which owns the Honey Dew proprietary marks (the "Marks") and the

system by which the franchisees operate. <u>Verified Complaint</u> at ¶¶3, 6 and 7.  Defendant

Carneiro Donuts, Inc. ("CDI") is a Rhode Island corporation which was a franchisee of BII. Verified Complaint at ¶¶ 4 and 8.

On or about June 1, 2004, CDI purchased the business of a then-current BII franchise for a Honey Dew Donuts® Shops operating at 460 Allens Avenue, Providence, Rhode Island (the "Premises"). Id. at ¶8. In connection with said purchase CDI and BII executed a Franchise Agreement and related documents (collectively, the "Franchise Agreement"), copies of which are attached to the Verified Complaint. Id. The owner of CDI, defendant Manuel M. Carneiro ("Carneiro") agreed to be jointly and severally liable to BII for the obligations of CDI, pursuant to a Liability Agreement. Id. at ¶9.

This action involves BII's termination of the Franchise Agreement and efforts to obtain damages and possession of the underlying Premises, which it owns. On October 7, 2005, this Court issued a Preliminary Injunction ordering closure of the business pending further order of the Court, upon a finding that Plaintiffs are likely to succeed on the merits and would otherwise suffer irreparable harm. An expedited trial has been scheduled for January, 2006.

This Summary Judgment motion seeks to avoid trial as to claims for which no material facts are in dispute. Summary Judgment is requested as to Count I of the Verified Complaint, which seeks damages for Defendants' failure to pay sums due prior to termination, Count II, which seeks return of the premises to BII[1], and Count III which seeks contractual post-termination damages. As to Counts I and III, judgment is sought as to liability only and damages will be assessed separately.[2] The relevant issue underlying this entire dispute is whether CDI

---

[1] Count II also seeks damages for trademark infringement for Defendants post-termination operations. Summary Judgment has not been requested on that issue, as disputed questions of fact exist.

[2] Since damages are computed based on the Defendants' own gross sales, it is possible that there will be no dispute as to the sums due. As specified in the Complaint, damages are requested as of the date of assessment. For now, however, judgment is sought on liability only, with damages to be assessed at trial.

was properly terminated as BII's franchisee. As no material facts are in dispute, summary judgment is appropriate.

Defendants have asserted a six count Counterclaim, alleging claims against BII and HDA for breaches of contract (Count I), breaches of the warranty of good faith and fair dealing (Count II), fraud through material misrepresentation (Count III), fraud through failure to disclose material facts (Count IV), violations of the Rhode Island Franchise Investment Act (Count V) and violations of Mass. G.L. c. 93A (Count VI).[3] For the reasons set forth herein, summary judgment is appropriate as to each of the counterclaims.

## II.    <u>DEFENDANTS VIOLATED THEIR PAYMENT OBLIGATIONS</u>

### A.    **It is Undisputed that Defendants Defaulted**

No material facts are in dispute as to Defendants repeated breaches of the reporting and payment obligations of the Franchise Agreement and their failure to timely cure their defaults following notice, as permitted by the Franchise Agreement.

Pursuant to the Franchise Agreement, the Defendants were required to report gross sales and make weekly payments, each Friday, based on gross sales for the week ending the preceding Sunday, with payments in the amounts of: (i) 7% of gross sales as a royalty, (ii) 2% of gross sales as a contribution to the Honey Dew Advertising Fund (the "Fund"), and (iii) 10% of gross sales plus $200.00 for rent. <u>Verified Complaint</u>, ¶¶11-13.

During the term of its operations as a franchisee, CDI was <u>never</u> up to date on payments to BII. <u>Second Affidavit of Robert P. Bowen</u> ("<u>Robert Bowen Aff.</u>") at ¶7. It is undisputed that Defendants were consistently in violation of their payment obligations and that, even now,

---

[3] The Defendants' counterclaim was filed on October 3rd. Thereafter on October 19th, Defendants moved to amend the counterclaim. The motion to amend was assented to by the Plaintiffs but the Defendants failed to file the amended counterclaim as a separate pleading and the motion to amend has not been allowed. Thus, no Reply has been filed.

reporting and payments remain in arrears. Id..  The Defendants admit that they routinely failed

to make timely payments. <u>Defendants' Deposition</u>[4], Affidavit of Michael A. Wirtz ("<u>Wirtz</u>

<u>Aff.</u>"), Tab A at page 228, lines 4 – 24.

###     B.     BII Properly Terminated the Franchise Agreement

There are no material facts in dispute as to whether BII properly terminated the Franchise

Agreement.  The Franchise Agreement permits termination for CDI's (i) failure to cure payment

defaults after written notice of default and (ii) receipt of three or more Notices of Default in a

one year period[5].  The Franchise Agreement expressly provides:

> A.     By written Notice of Termination delivered to you, we may
> immediately terminate the Franchise Agreement and Lease, for the
> following reasons:
>
> 3.     If you fail in your obligation to timely make any
> payment due to us pursuant to the Franchise Agreement, Lease, or
> any other contract (a "Payment Default").  However, in the
> event of a Payment Default, we will, prior to termination, forward to you
> a Notice of Default, specifying each payment overdue.  You may
> cure your Payment Default within seven (7) days of receipt of a
> Notice of Default by tendering in good funds the following: (i) all
> overdue payments specified in the Notice of Default; (ii) all
> payments which have come due since issuance of the Notice of
> Default; (iii) all "late fees" or, if the contract does not provide for a
> "late fee", interest at a rate of eighteen (18%) percent per annum
> on any late payment running from the due date to the date of
> payment; and (iv) our reasonable fees and costs resulting from the
> late payment(s) including, without limitation, reasonable counsel
> fees and other costs of collection . . .
>
> 5.     If you receive three Notices of Default in any
> twelve month period, regardless of whether or not the defaults
> specified were corrected;

---

[4] By Agreement, Mr. Carneiro's deposition, individually, was combined with the deposition of CDI, of which he was the sole owner and officer.

[5] Within the one year period, CDI also received two Notices of Default and one Notice of Termination for failing inspections for which a passing grade is required.  <u>Verified Complaint</u> ¶¶23, 24 and 29.  As the inspectional failure may have contested issues of material fact, they have been deliberately excluded from summary judgment consideration.

Case 1:05-cv-11709-NMG      Document 32      Filed 12/09/2005      Page 5 of 18

<u>Franchise Agreement, Section XX, Exhibit B to Verified Complaint.</u>

Defendants' late payments resulted in (i) a Notice of Default on January 27, 2005 for nonpayment of sums due which was not timely cured. <u>Verified Complaint</u> at ¶25 and <u>Robert Bowen Aff</u>. at ¶7(a); (ii) a Notice of Default to CDI on February 22, 2005 for nonpayment of sums due, <u>Verified Complaint</u> at ¶26, which was not timely cured and resulted in a May 27, 2005 Notice of Termination. <u>Verified Complaint</u> at ¶28 and <u>Robert Bowen Aff.</u> at ¶7(b); and (iii) a Notice of Default on May 27, 2005 for non-payment of sums due, <u>Verified Complaint</u> at ¶27, which was not timely cured and resulted in a June 8, 2005 Notice of Termination. <u>Verified Complaint</u> at ¶31 and <u>Robert Bowen Aff.</u> at ¶7(c). In addition, on August 1, 2005, BII issued a Notice of Termination to CDI for its issuance of three Notices of Default within a one year period. <u>Verified Complaint</u> at ¶32 and <u>Robert Bowen Aff.</u> at ¶7(e).

It is also undisputed that, following termination, Defendants continued to operate upon the Premises, in violation of the Franchise Agreement. <u>Robert Bowen Aff.</u> at ¶8. There is no dispute that Defendants breached the contract and were properly defaulted and terminated in accordance with the terms of the Franchise Agreement. There is no dispute that Defendants continued to operate post-termination, until enjoined by this Court. Plaintiffs are entitled to summary judgment as to liability only as to Count I (pre-termination damages) and Count III (Post-termination damages), with damages to be assessed separately.

### C.     Per Count II, BII is entitled to Possession of the Premises

The Franchise Agreement, in relevant part, provides:

A.      Upon expiration or termination of this Agreement:

1.      (CDI) must immediately discontinue the use of all Proprietary Marks. (CDI's) continued use of the Proprietary Marks licensed hereunder including, without limitation, the name

"Honey Dew Donuts®" shall constitute willful trademark
infringement by (CDI);

      2.      If (BII is CDI's) lessor . . . (CDI) must peaceably
and forthwith give up to (BII) the Premises, as set forth in the
Sublease Agreement, Conditional Assignment of Lease or any
other agreement pertaining to this issue. . .

<u>Franchise Agreement, Section XXI, Exhibit B to Verified Complaint.</u>

BII is entitled to summary judgment on Count II of the Verified Complaint for injunctive

relief as to possession of the Premises.  It is undisputed that CDI continued operations until the

issuance of the Court's injunction on October 7, 2005, well after Notices of Termination had

issued.   It is undisputed that BII is entitled to possession of its own Premises.  Regardless of

Defendants' recently fabricated counterclaims and affirmative defenses, it is held that "under

basic contract principles, when one party to a contract feels that the other contracting party has

breached its agreement, the non-breaching party may either stop performance and assume the

contract is avoided, or continue its performance and sue for damages. Under no circumstances

may the non-breaching party stop performance and continue to take advantage of the contract's

benefits."  <u>S & R Corp. v. Jiffy Lube Int'l, Inc.</u>, 968 F.2d 371, 376 (3rd Cir. 1992) (holding that

franchisee's continued operations and use of the franchisor's trademarks was an infringement

where franchise agreement was properly terminated for franchisee's failure to pay royalties.) <u>see</u>

<u>also</u> <u>Burger King Corp. v. Majeed</u>, 805 F. Supp. 994, 1002  (S.D. Fla. 1992) (noting the "well-

settled doctrine that a terminated franchisee's continued use of its former franchisor's

trademarks, by its very nature constitutes trademark infringement"). Although damages remain to

be assessed, BII is entitled to all of the injunctive relief requested in Count II of the Verified

Complaint.

III.    **AS A MATTER OF LAW, PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THE COUNTERCLAIMS**

Defendants have alleged a potpourri of counterclaims.  For the reasons set forth herein, none have merit.

A.    **Claims for Wrongful Termination Have no Merit**

Defendants assert that the termination was predicated on manufactured and fictitious grounds, First Amended Defendant's [sic] Answer, Counterclaims and Jury Demand ("Counterclaim") at ¶19[6] These claims form a portion of the basis of Count I (breach of contract) and Count II (breach of warranty of good faith and fair dealing).

As demonstrated in Section II, supra., the termination was caused by CDI's own failure to adhere to the required payment schedule, even after multiple notices and opportunities to cure. Defendants have failed to identify any "pretext" hidden behind the notices, other than the desire of BII to receive the payments to which it was entitled when it was entitled to them.

For the reasons set forth herein, no material issue of disputed facts exist as to the Defendants' own failures to make timely payments, BII's compliance with contractual notice requirements, Defendants' failure to timely cure its defaults, and the termination.  Summary Judgment is appropriate on those portions of the Counterclaim which assert wrongful termination.

B.    **Defendants' Claim of Improper Payments have no Merit**

The Franchise Agreement required that CDI pay BII 7% of gross sales as royalties and 2% of gross sales for the Honey Dew Advertising Fund (the "Advertising Fund").  The Franchise Agreement also required BII to pay a matching contribution of 2% of CDI's gross sales to the

---

[6] This same claim is stated a variety of ways.  It is alleged that BII illegally defaulted and illegally terminated the Franchise Agreement, id. at ¶29,  pretextually defaulted CDI, id. at ¶30, sent illegal cease and desist notices, id. and terminated the Franchise Agreement for wrongful and bad faith purposes.  Id.  As BII's termination was justified, these claims must fail, as a matter of law.

Advertising Fund.  For convenience, CDI was requested to cut two checks, a 5% royalty check to

BII and a 4% check to the Advertising Fund, consisting of both CDI's and BII's contribution.

Defendants assert that this method of payment was improper and illegal.[7]  These allegations are

repeated in Count I (breach of contract), Count II (breach of warranty of good faith and fair

dealing), Count III (misrepresentation), Count IV (failure to disclose), Count V (violation of R.I.

Stat. c. 19-28.1), and Count VI (violations of Mass. G.L. c. 93A).  This claim is **frivolous**.

The express provisions of the Franchise Agreement provide as follows:

> B.    (CDI) will pay to (BII), so long as this Agreement
> shall be in effect, a Continuing Services and Royalty Fee (the
> "Royalty" or "Royalties") equal to seven percent (7%) of your total
> gross sales, payable weekly in the manner set forth below.

> C.    (CDI) will pay (BII), so long as this Agreement shall
> be in effect, a contribution to the Honey Dew Associates, Inc.
> Advertising Fund (the "Advertising Fund") equal to two percent
> (2%) of your total gross sales (the "Advertising Fee"), payable
> weekly in the manner set forth below.  For each such contribution
> (CDI) make(s) to the Advertising Fund, (BII) or HDA will allocate
> a matching amount to be utilized for advertising, public relations
> and/or marketing activities, which sums may, in whole or in part,
> be contributed to the Advertising Fund or applied to advertising,
> marketing and public relations activities including, without
> limitation, grand opening expenses, payment of personnel for
> advertising, marketing and/or public relations activities, product
> development costs, market research, local advertising contributions
> to assist one or more franchisees and the like.

Franchise Agreement, Section XXI, Exhibit B to Verified Complaint.  This same payment

scheme is described in BII's Offering Circular.  Robert Bowen Aff. at ¶5.

The total payment required of the CDI for royalties and advertising fees is 9% of gross

sales: 7% to BII as a royalty and 2% to the Honey Dew Advertising Fund (the "Advertising

---

[7] This claim is also stated a number of different ways.  Defendants assert that Plaintiffs demanded payments in amounts not required under the Franchise Agreement, changed the terms and rates of required payments, demanded payments in excess of amounts required to be paid, and required CDI to pay sums owed by BII to HDA, Counterclaim at ¶¶16-18, 25-26, failed to make legally required accurate representations and disclosures as to such fees, id. at ¶43, misrepresented fees to be paid, id. at ¶44, and failed to accurately disclose fees to be paid, id. at ¶¶61-62, 67, 83, 84, 87, 91 and 92.

Fund"). As described, the franchisee would write two checks, one to BII for 7% and one to the Advertising Fund for 2%. BII would receive and deposit a 7% check and then write a 2% check to the Advertising Fund. The Advertising Fund would receive two checks, a 2% check from CDI and a 2% matching check from BII.

It is undisputed that, for convenience, BII requested that its franchisees issue two checks, 5% to BII and 4% to the Advertising Fund. <u>Robert Bowen Aff.</u> at ¶6. In part, this request was made in response to franchisee concerns that their franchisor might not promptly make the required 2% matching payment. <u>Robert Bowen Aff.</u> at ¶6. By having the franchisee cut checks for 5% and 4%, instead of 7% and 2%, the franchisee had absolute certainty that the Advertising Fund received everything to which it was entitled. This system made absolutely no difference to CDI (which was required to write two checks totaling 9%, in any event), nor changed the amounts received by any party (for the Advertising Fund, it received one check for 4% instead of two checks for 2%; for BII it received one check for five percent, instead of a check for 7%, less issuance of a check for 2%). <u>Id.</u>

It is outrageous for Defendants to claim that this request caused them any damages,[8] required special disclosure, or defrauded them in any way. Similarly, a claim that HDA improperly administered and managed the Advertising Fund by demanding payments in excess of 2%, <u>Counterclaim</u> at ¶¶25 and 26, fails for the same reason. These claims are without merit and frivolous. Summary Judgment is appropriate.

**C.    Defendants' Claim relating to Advertising Fund Statements<br>has no Merit**

---

[8] In fact Defendants' accountant, Mario Carneiro, testified that the Defendants were in no way damaged by this. Mario Carneiro's deposition transcript was not available from the stenographer at the time of filing this motion.

Defendants assert that they were not provided with an annual audit of the receipts and expenditures of the Advertising Fund by BII. Counterclaim at ¶¶24-26. They claim entitlement to such audits for 2003 and 2004. Id. at ¶¶25 and 26. They make the same claim against HDA, contending that they are third party beneficiaries of the Advertising Fund that that HDA has "breached a legal obligation to make available a sufficient, timely and proper annual audit of the Advertising Fund receipts and expenditures . . ." Id. at ¶¶23-24. This claim forms a portion of the basis of Count I (breach of contract) and Count II (breach of warranty of good faith and fair dealing). No such statement was required from BII. There was no contract nor any legal obligation running between HDA and Defendants as to the Advertising Fund statements. Summary Judgment is appropriate.

The reporting requirements of the Franchise Agreement relating to the Advertising Fund are as follows:

> We (BII) will obtain from HDA and provide to you periodic statements, as (sic) least annually, as to the receipts and expenditures of the Advertising Fund.

Franchise Agreement, Section X(D), Exhibit B to Verified Complaint.

BII's Offering Circular says the same thing:

> The Advertising Fund is the sole property of and is administered by HDA. The HDAC[9] is intended to have oversight of the use of the Advertising Fund and statements are provided, at least annually, as to the Fund's receipts and expenditures.

It is undisputed that HDA had no contract with Defendants and no obligation to provide them with any documentation. BII agreed to obtain from HDA and provide to Defendants certain data. HDA had no and breached no obligations to Defendants.

---

[9] The HDAC is the Honey Dew Advertising Committee, consisting of volunteer and/or elected franchisees who oversee use of the Advertising Fund.

As for BII, no such statements were ever due. CDI became a franchisee by Franchise Agreement dated June 1, 2004. Franchise Agreement, Exhibit B to Verified Complaint. CDI was terminated as a franchisee by notice dated February 22, 2005. Verified Complaint at ¶26. CDI was not a franchisee for one year. It had no contractual entitlement to the statement which was promised annually. By the time the statement would have been due, the contract had been terminated. No viable claim exists. Summary Judgment is appropriate.

**D.    Defendants' Claim relating to BII Offering Circular Deficiencies has no Merit**

Defendants assert that BII is liable for its failure to make adequate disclosures in its Offering Circular. Counterclaim ¶¶12, 13. This claim forms the basis of Count III (misrepresentation), Count IV (failure to disclose), Count V (violation of R.I. Stat. c. 19-28.1), and Count VI (violations of Mass. G.L. c. 93A). Id. Carneiro testified at deposition that he never read the Offering Circular. Defendants' Deposition, Wirtz Aff., Tab A at page 118, line 16. Consequently, the Defendants' purported claims of a material misrepresentation are not reasonable and fail for a lack of reliance. Coddington Enterprises, Inc. v. Werries, 54 F.Supp. 2d 935, 943 (D. Mo., 1999), citing Houlihan v. Offerman & Co., Inc. 31 F.3d 692, 695 (8th Cir., 1994).

**1.    Alleged Deficiencies Regarding Disclosure of Royalties and Advertising Fees**

Defendants claim that BII failed to properly disclose the amounts of its Royalties and Advertising Fees because of its request that payments be made 5% and 4% instead of 7% and 2%, Counterclaim at ¶¶20 and 43, has no merit for the reasons set forth in Section III(B), supra.. Summary Judgment is appropriate as to this issue, as set forth in Count I (breach of contract) and Count III (fraud through material misrepresentation).

2.    <u>Alleged Deficiencies Regarding BII's Litigation History</u>

Defendants claim that BII has failed to disclose material litigation in its Offering Circular dated February 6, 2004.  <u>Counterclaim</u>, ¶¶48-52, 58, 59, 70, and 88.  This claim is set forth in Count III (fraud through material misrepresentation), Count IV (fraud through failure to disclose), Count V (violation of Rhode Island Franchise Law) and Count IV (violation of Mass. G.L. c. 93A) of the Counterclaim.  <u>Id</u>.

Rhode Island law requires franchisors to provide prospective franchisees with the Uniform Franchise Offering Circular as adopted and amended by the North America Securities Administrators Associates, Inc. ("NASAA").  <u>See</u>, R.I. Stat. §§19-28-1-3(f) and §19-28.1-8(a). The relevant portion of the NASSA requirements relating to litigation provide as follows:

> Disclosure whether the franchisor . . .
>
> A.    Has an administrative, criminal or material civil action pending against that person alleging a violation of a franchise, antitrust or securities law, fraud, unfair or deceptive practices, or comparable allegations.  In addition, include actions other than ordinary routine litigation incidental to the business which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.  If so, disclose the names of the parties, the forum, nature, and current status of the pending action. . .
>
> B.    Has during the 10 year period immediately before the date of the Offering Circular been  . .  held liable in a civil action by final judgment or been the subject of a material action involving violation of a franchise, antitrust or securities law, fraud, unfair or deceptive practices, or comparable allegations.  If so, disclose the names of the parties, the forum and date . . . judgment was entered, penalty or damages assessed and/or terms of settlement. . .
>
> <u>Item 3 Definitions</u>
>
>  . . . Omit actions that were dismissed by final judgment without liability of or entry of an adverse order against the franchisor.

iii. included in the definition of material as an action or an aggregate of actions if a reasonable prospective franchisee would consider it important in making a decision bout the franchised business.

iv.    In this Item, settlement of an action does not diminish its materiality if the franchisor agrees to pay material consideration or agrees to be bound by obligations which are materially adverse to its interests.

v. "Ordinary routine litigation" means actions which ordinarily result from the business and which do not depart from the normal kinds of actions in the business.

Although Defendants assert omissions in BII's February, 2004 Offering Circular, Defendants began their arrangements to purchase their franchises in December, 2003 and, in connection therewith, they received the February, 2003 Offering Circular (the "2003 Circular"), not the February, 2004 Offering Circular (the "2004 Circular").  Robert Bowen Aff. at ¶3.  Defendants admit that the only Offering Circular in their possession custody and control is the 2003 Circular. See Defendants' First Supplemental Response to Plaintiffs' Request for Production Of Documents, Response No. 2, Witz Aff. at Tab B.  No omissions are alleged as to the 2003 Circular.[10]  Summary judgment is appropriate as to the claim of omissions of material litigation.

---

[10] Defendants allege an omission in failing to disclose the case of Honey Dew Associates, Inc. v. Yazbek. Counterclaim at ¶49.  According to the Counterclaim, that action was filed approximately nine months *after* the 2003 Circular was drafted.  Obviously, it was not an omission if the case did not exist.  Defendants also allege a failure to disclose Honey Dew Associates, Inc. v. M&K Food Corp., and cite to a 2000 decision of the Federal District Court for the District of Rhode Island in that action.  This is deliberately misleading.  That decision was reversed by 241 F.3d 243 (1st Cir. 2001).  The matter was eventually settled, with no adverse finding against HDA or BII.  No disclosure was required.  Similarly, Honey Dew Associates, Inc. v. A&F Management, Inc. was also settled in 2001, with no adverse finding against HDA or BII.   A settlement which is not adverse need not be disclosed.

### 3.    Alleged Deficiencies Regarding Equipment Financing

Defendants claim that BII failed to make required disclosures pertaining to equipment financing by BII.  Counterclaim, ¶¶45, 46, 53, 63, 64, 68, 69, 89, 90. This claim is set forth in Count III (fraud through Material Misrepresentation), Count IV (fraud through failure to disclose), Count V (violation of Rhode Island franchise law), and Count VI (violation of Mass.G.L. c. 93A).

The relevant portion of the NASSA requirements relating to financing provides: "Disclose the terms and conditions of each financing arrangement that the Franchisor, its agent or affiliates offers directly or indirectly to the franchisee . . ."  BII's 2003 Circular provided: "BII does not offer direct or indirect financing . . .".

It is undisputed that by written agreement signed by Carneiro on or about August 2, 2004, the Defendants agreed to repay BII for certain equipment that was purchased by Defendants and paid for by BII. Robert Bowen Aff. at ¶9.   According to the parties' agreement, BII allowed the Defendants to pay back the sum over time, *interest free*.  Robert Bowen Aff. at ¶9.   BII did not provide "equipment financing", as such, nor did the Defendants purchase any equipment from BII.  Id. at ¶10.  There is no element of the transaction which made any disclosure by BII incorrect, nor was any disclosure required for a negotiated portion of the transaction.

### 4.    Alleged Non-Registration by HDA

Defendants allege that HDA failed to register as a franchisor in Rhode Island. Counterclaim ¶¶27, 71.  This claim is a portion of Count I (breach of contract) and Count V (violation of Rhode Island franchise law).

Summary Judgment is appropriate as to the claim of non-registration because the Defendants have no contractual relationship with HDA and thus have no private right of action

against HDA under the Rhode Island Franchise Investment Act (the "Act").  According to R.I.

Gen. Laws Section 19-28.1-5, "it is unlawful for any person to offer or sell a franchise unless the

offer is registered under the Act or is exempt from registration under § 19-28.16." CDI obtained

a franchise from BII and had no direct relationship with HDA.  Since, as to CDI, HDA did not

engage in offering or selling a franchise, no claim exists.  Summary judgment is proper as to

Defendant's claim that HDA failed to register as a franchisor in Rhode Island.

E.    **Defendants' Claim Pursuant to Mass. G.L. c. 93A has no Merit**

CDI was incorporated and does business in Rhode Island.  The individual defendant

resides and does business in Rhode Island.  The underlying Franchise Agreements relates to a

business which operated in Rhode Island.

Mass. G.L. c. 93A, §11 expressly provides: "No action shall be brought or maintained

under this section unless the actions and transactions constituting the alleged unfair method of

competition or the unfair or deceptive act or practice occurred primarily and substantially within

the Commonwealth".  The claim relates to inspections which occurred in Rhode Island, offering

circulars promulgated under Rhode Island law, and coercion to enter into an agreement in Rhode

Island.  It is undisputed that all of the actions complained of occurred in Rhode Island and related

to assets in Rhode Island.  For this reason, by its terms, Mass. G.L. c. 93A is not applicable to

this transaction.  See e.g., M&I Heat Transfer Products, Ltd. v. Gorchev, 141 F.3d 21, 23 (1st Cir.

1998) (company allegedly injured by letters generated in Massachusetts were not subject to

statute, since the impact and harm occurred in Tennessee); Bushkin Assocs., Inc. v. Raytheon

Co., 393 Mass. 622, 638, 473 N.E.2d 662, 672 (Mass. 1985)(no 93A claim where

misrepresentations made in Massachusetts were alleged to have been received in New York and

all damages occurred in New York).   Plaintiffs are entitled to summary judgment on Count VI.

F.    **Alleged Deficiencies Regarding Training**

Defendants assert that they did not receive "proper training" as required by Section V of the Franchise Agreement.  Counterclaim at ¶28.  This claim is a portion of Count I (breach of contract).

Pursuant to the Franchise Agreement, no training was required to be provided.  The relevant provision of the Franchise Agreement provided:

> A.    Prior to the opening of the Premises for your Franchise, **unless waived by us**, you must complete training provided by us at HDA's Honey Dew Training Facility in Plainville, Massachusetts, or at such other site or sites as we may reasonably determine.  The training is intended to provide the basics of all areas of your responsibilities under the Franchise Agreement:  Baking (cooking and finishing), customer service, cleaning, and administrative management. . .

Moreover, even where training was provided, the extent and nature of the training was within BII's discretion.  The Franchise Agreement provided:

> We (BII) reserve the right to tailor or limit the required training to suit your individual needs, based on such factors as (i) the type of operation being considered and (ii) the business and/or donut shop experience of you or your trainee. . .
>
> You acknowledge that successful completion of our training is not a guaranty of the success of your business or of your ability to operate the business, but is merely our certification that you or your trainee have been provided with and have demonstrated the ability to utilize the basic information and techniques necessary for operating a successful Honey Dew Donuts® Shop.

Since no training in specific areas was required, and was offered to the Defendants at BII's discretion with no specific promises made as to any relationship between completion of training and the success of the franchise, no breach of this agreement could have occurred. Carneiro was familiar with donut shop operations due to his experience operating other shops.

<u>Robert Bowen Aff.</u> at ¶4.  No reasonable claim exists that Defendants were unaware of how to write timely checks or maintain a clean shop.  Summary Judgment is appropriate.

**IV.    <u>Summary of Applicable Law</u>**

"Summary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'"  <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795, 806 (1999)(quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)).  The Plaintiff "may not rest upon the mere allegations or denials of the pleadings, 'but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'"  <u>R. R. Isla Verde Hotel Corp. v. Howard Johnson Int'l, Inc.</u>, 121 Fed. Appx. 870, 870 (1st Cir. 2005) (quoting Fed. R. Civ. P. 56(e)).  Where "the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the onus is on the nonmoving party to present facts that show a genuine issue for trial."  <u>Feliciano v. Rhode Island</u>, 160 F.3d 780, 784 (1st Cir. 1998).  The nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986)).  "'Conjectural allegations, conclusory assertions, and inconsequential evidence' do not suffice to establish a genuine issue of fact."  <u>Roger Edwards, LLC v. Fiddes & Sons, Ltd.</u>, 387 F.3d 90, 94 (1st Cir. 2004) (quoting <u>Nicolo v. Philip Morris, Inc.</u>, 201 F.3d 29, 33 (1st Cir. 2000)).  Neither do "improbable inferences" or "unsupported speculation."  <u>Medina Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).  The nonmoving party must introduce more than a scintilla of evidence to overcome the summary

judgment motion.  Street, 866 F.2d at 1479.  It is not sufficient for the nonmoving party merely to "show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In satisfying the burden thus shifted to it, the nonmoving party – in this case the plaintiffs –  "must set forth specific facts showing that there is a genuine issue for trial."  Id. (quoting Liberty Lobby, Inc., 477 U.S. at 256); see also Fed. R. Civ. P. 56(e).  Moreover, the Plaintiffs cannot satisfy this burden merely by showing the existence of *some* factual dispute between the parties, but rather must show the existence of a dispute over a *material* fact that, under the applicable substantive law, governs the outcome of the litigation or particular claim. See Liberty Lobby, Inc., 477 U.S. at 247-48.

Because the Plaintiffs cannot demonstrate the existence of a valid claim, summary judgment for the Defendants is appropriate.

## V.    CONCLUSION

For all the reasons above, the Plaintiffs should be granted summary judgment as to liability on all issues of the Verified Complaint and on all issues of Defendants' Counterclaims.

The Plaintiffs,

BOWEN INVESTMENT, INC.
HONEY DEW ASSOCIATES, INC.,
By their Attorneys,

Date: December 9, 2005          /s/ Michael A. Wirtz
                                _____
                                Jack J. Mikels, BBO# 345560
                                Michael A. Wirtz, BBO# 636587
                                Janell E. De Gennaro, BBO #656306
                                JACK MIKELS & ASSOCIATES, LLP
                                1 Batterymarch Park, Suite 309
                                Quincy, MA  02169-7454
                                Tel:  617.472.5600

BII/Litigation/Carneiro/Pleadings/SJ/MemoSJ.doc