UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BOWEN INVESTMENT, INC. ) <br> HONEY DEW ASSOCIATES, INC. ) <br>     Plaintiffs and Counterdefendants ) <br> ) <br> v. ) <br> ) <br> CARNEIRO DONUTS, INC and ) <br> MANUEL M. CARNEIRO ) <br>     Defendants and Counterclaimants ) | C.A. No. 05 – 11709 NMG <br><br> Judge Nathaniel M. Gorton |

## AFFIDAVIT OF ATTORNEY KEVIN R. McCARTHY

Now comes Attorney Kevin R. McCarthy and deposes and states as follows:

1. I represent the Defendants Carneiro Donuts, Inc. and Manuel M. Carneiro in this action.

2. Attached hereto at Tab 1 are true and accurate copies of excerpts from the Deposition of Robert P. Bowen taken on November 10, 2005.

3. Attached hereto at Tab 2 are true and accurate copies of excerpts from the Deposition of Jose E. Garcia taken on November 7, 2005.

4. Attached hereto at Tab 3 are true and accurate copies of excerpts from the Deposition of Donal W. Smith taken on November 25, 2005.

5. Attached hereto at Tab 4 are true and accurate copies of excerpts from the Deposition of Manuel M. Carneiro taken on November 22, 2005.

6. Attached hereto at Tab 5 are true and accurate copies of excerpts from the Deposition of Mario Carneiro taken on November 17, 2005.

7. Attached hereto at Tab 6 are true and accurate copies of excerpts from the Deposition of Richard J. Bowen taken on November 28, 2005.

Signed under the penalties of perjury this 22nd day of December, 2005.

Attorney Kevin R. McCarthy





EXHIBITS: See Index

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
*****************************************
BOWEN INVESTMENT, INC., HONEY DEW        )
ASSOCIATES, INC.,                        )
    Plaintiffs and Counterdefendants,    )
                                         )      Case No.
            Vs.                          )      05-11709NMG
                                         )
CARNEIRO DONUTS, INC., and MANUEL        )
M. CARNEIRO,                             )
    Defendants and Counterclaimants.     )
*****************************************
```

        DEPOSITION OF ROBERT P. BOWEN, a Witness called
by and on behalf of the Defendants, taken pursuant to the
applicable Massachusetts Rules of Civil Procedure, before
Vincent Martino, a Notary Public within and for the Comm.
Of Massachusetts, held at the Law Office of Kevin McCarthy,
No. 155 Fairoaks Lane, Cohasset, Mass., 02025, on Thursday,
November 10, 2005, commencing at 10:30 a.m

                    COPLEY COURT REPORTING
                      101 Tremont Street
                  Boston, Massachusetts 02108
                        (617) 423-5841

```
1    four stores in the morning, talk to as many franchisees as

2    I can or managers and around noon I hit the office, make a

3    few calls, and about three o'clock I'm usually done.

4          Then in addition to that I'm always looking for

5    locations to put new Honey Dew Donut shops up.

6    Q.   Are you full-time?

7    A.   ---

8    Q.   Are you a full-time employee of Bowen Investment?

9    A.   I don't believe I'm even an employee but I do work

10   probably thirty or thirty-five hours a week.

11   Q.   You work full-time at Bowen Investment?

12   A.   Yes.

13   Q.   But you are not an employee. Do you draw a salary,

14   a weekly salary?

15   A.   No from Bowen Investment, no.

16   Q.   Where do you draw your weekly salary?

17        MR. MIKELS: Objection.

18        THE WITNESS: RB Donuts.

19   Q.   And describe RB Donuts, please?

20   A.   RB Donuts is a company that I had in Franklin when

21   I was a franchisee and their role is a manager, supervisor,

22   if you will, for Bowen Investment.

23   Q.   That is a separate company from Bowen Investment,

24   is that what you are saying?

25   A.   Yes.
```

1      Q.   RB Donuts?

2      A.   Yes.

3      Q.   And explain that relationship. I don't understand

4    what you are saying there. What is RB Donuts role with

5    Bowen Investment?

6      A.   They are the management company that manages Bowen

7    Investment, Inc.

8      Q.   And do they get paid to manage Bowen Investment,

9    Inc.?

10     A.   Yes.

11     Q.   And who pays them to manage Bowen Investment, Inc.?

12     A.   Bowen Investment.

13     Q.   And how many employees are in RB Donuts?

14     A.   Just two.

15     Q.   And they are full-time employees?

16     A.   No. I'm full-time and my daughter Rebecca is

17   part-time.

18     Q.   What is your position in RB Donuts?

19     A.   President.

20     Q.   And does RB Donuts have an interest in any donut

21   shops currently?

22     A.   I don't recall.

23     Q.   Is RB Donuts main function to manage Bowen

24   Investment, Inc.?

25     A.   Yes.

1       than what is the name of this company again?

2            A.    Applied Security Technology.

3            Q.    Anybody else?

4            A.    I know about a year ago, maybe six months ago, I

5       forget, Honey Dew Associates had secret shoppers going out.

6       It was part of a promotional contest if you will.

7            Q.    Do you ever do secret shopper reports?

8            A.    Personally?

9            Q.    Yes.

10           A.    No.

11           Q.    You never did a secret shopper report for 460

12      Allens Avenue or have you ever done a secret shopper report

13      at 460 Allens Avenue?

14           A.    I don't recall.

15           Q.    Now what is your business relationship to Richard

16      Bowen?

17                MR. MIKELS: Objection.

18                THE WITNESS: My brother Dick is the President of

19      Honey Dew Associates which is the parent company for Honey

20      Dew Donuts.

21           Q.    Do you report to him?

22           A.    Can you rephrase that.

23           Q.    Do you report to him?

24                MR. MIKELS: Objection.

25                THE WITNESS: He is the boss.

1    behind than others, what are some of the reasons?

2        A.    Over the years I have worked with many people that

3    have been struggling with financial problems and are still

4    doing a good job running their donut shop and also their

5    evaluations and the standards are very high and so it is on

6    a case by case basis.

7        Q.    But is there a company policy regarding default

8    letters, of when default letters are sent out for financial

9    reasons?

10        A.    No. Again, it is a case by case basis.

11        Q.    Is there a company policy regarding when default

12    letters are sent out for standards violations?

13        A.    Again, there is no formal policy. It is on a case

14    by case basis.

15        Q.    Did you provide for the training of Manny Carneiro

16    before he took over his store?

17        A.    I arranged for Mr. Carneiro to train with Joe

18    Garcia who was a franchisee on Warwick Avenue.

19        Q.    And how did that occur?

20        A.    I don't understand the question.

21        Q.    Did you call Mr. Garcia or did ---

22        A.    I did. I called Mr. Garcia.

23        Q.    What did you say?

24        A.    I asked him to work with Mr. Carneiro, explained

25    Mr. Carneiro had seven years of Dunkin Donuts experience

1    and Joe Garcia is one of the best franchisees I have ever

2    seen and he agreed to do it.

3        Q.    Was there a program or schedule for training Mr.

4    Carneiro that Mr. Garcia used?

5        A.    I left that up to Mr. Garcia.

6        Q.    Did you provide him a program or schedule on what

7    you wanted Mr. Carneiro trained on?

8        A.    Mr. Garcia and I talked. I told Mr. Garcia that,

9    and we talked about it and I wanted to make sure that Mr.

10   Carneiro understood the donut business and understood the

11   Honey Dew Donut business system.

12       Q.    Okay.

13       A.    Other than that, Mr. Garcia had a free hand in

14   training Mr. Carneiro.

15       Q.    Now are there any documents that reflect your

16   directions to Mr. Garcia on how you wanted Mr. Carneiro

17   trained?

18       A.    I don't believe so.

19       Q.    It was all done verbally between yourself and Mr.

20   Garcia, is that correct?

21       A.    Yes.

22       Q.    Did you compensate or pay Mr. Garcia to do this

23   training?

24       A.    I did.

25       Q.    What did you pay him?

COPLEY COURT REPORTING - (617) 423-5841

```
 1      A.    I believe it was $2,000.

 2      Q.    When did you pay him that?

 3      A.    I don't recall.

 4      Q.    Did you pay him the $2,000 within the last six

 5   months?

 6      A.    I don't recall.

 7      Q.    Did you pay him by check?

 8      A.    I don't recall.

 9      Q.    But you did pay him the money, the $2,000, is that

10   correct, or did you pay him $2,000 from yourself to him?

11           MR. MIKELS: Well ---

12           THE WITNESS: I don't understand the question.

13      Q.    Did you provide him with $2,000 at some point that

14   went from you Bowen Investment to Mr. Garcia directly?

15      A.    Yes, I believe so.

16      Q.    But you have no recollection of when that was or in

17   what form, is that what you are saying?

18      A.    I don't recall.

19      Q.    Why did you send Mr. Carneiro to Mr. Garcia's shop?

20      A.    To learn the Honey Dew Donut system. Mr. Garcia is

21   one of the best franchisee donut operators that I have ever

22   seen. His shop is immaculate. His donuts are great. He has

23   double digit increases all the time.

24           I thought he was more than capable of working with

25   someone with Mr. Carneiro's background in making sure and
```

1       A.   I don't know.

2       Q.   About how many shops do you have, does Bowen

3    Investment have as franchisees?

4       A.   Approximately twenty-five.

5       Q.   And this financing arrangement whereby you order

6    equipment, pay for it and the shops pay you on these notes,

7    about how many of those stores are currently paying you

8    money as a result of these kinds of transactions?

9            MR. MIKELS: Objection.

10           THE WITNESS: There is just one I can think of.

11   There may be more. I can't remember. I know I helped the

12   people in Westerly, Rhode Island, get two thermalizers.

13           There is one in the Westerly store on Franklin

14   Street and there's another one in the Westerly store on

15   Post Road and they are paying me weekly for that.

16      Q.   Okay.

17      A.   Other than that I can't remember anything else off

18   the top of my head.

19      Q.   There are no others of the twenty-five stores?

20      A.   Not that I can recall at this time.

21      Q.   Are there any other stores making note payments to

22   you at all?

23      A.   I don't know. I don't remember.

24      Q.   Does Mr. Garcia make any note payments to you?

25      A.   Off the top of my head I don't recall.

1    Q.    Has he ever had a note payment or has he ever made

2    weekly payments to you other than his franchise and

3    advertising fees?

4    A.    I believe I helped Joe with signage on one of his

5    stores.

6    Q.    Was it a similar arrangement as to this whereby you

7    paid for it and he made payments to you?

8    A.    Yes.

9    Q.    Any other debt between you and Mr. Garcia?

10    A.    I don't recall at this time.

11    Q.    Did you ever help him pay his rent?

12    A.    I don't recall.

13    Q.    Did you ever defer his $200 a week override?

14    A.    I think many years ago on Post Road I helped him

15    out.

16    Q.    About how much did he owe on that, do you know?

17    A.    I don't recall.

18    Q.    Is he making payments currently on that?

19    A.    I'm not sure if he is still making payments on it

20    or not or it is all paid off.

21    Q.    Okay.

22    A.    I don't know.

23    Q.    Who does your books that would know that?

24    A.    Roberta Porter is my bookkeeper and Mark Cohen is

25    my accountant.

130

1

2

3

4                                    CERTIFICATE

5

6    COMMONWEALTH OF MASSACHUSETTS

7    NORFOLK, SS.

8

9         I, Vincent R. Martino, Shorthand Reporter and

10   Notary Public within and for the Commonwealth of

11   Massachusetts, do hereby Certify:

12        That ROBERT P. BOWEN, the witness whose deposition

13   is hereinbefore set forth, was duly sworn by me and that

14   such deposition is a true record of the testimony given by

15   the said witness to the best of my skill and ability.

16        IN WITNESS WHEREOF, I have hereunto set my hand and

17   Notarial Seal this 15th day of November, 2005.

18

19                                                            _____

20                               Vincent R. Martino

21                               Shorthand Reporter

22

23

24

25

O TAB 2

Volume:    1
Pages:     1 - 88
Exhibits:  None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11709NMG

BOWEN INVESTMENT, INC. and        )
HONEY DEW ASSOCIATES, INC.,       )
                  Plaintiffs,     )
                                  )
            v.                    )
                                  )
CARNEIRO DONUTS, INC. and         )
MANUEL M. CARNEIRO,               )
                  Defendants.     )

DEPOSITION OF **JOSE E. GARCIA**, a Witness
called on behalf of the Defendants, taken
pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure, before
Maureen Nashawaty, a Notary Public within and for
the Commonwealth of Massachusetts, held at the
Law Office Kevin R. McCarthy, 155 Fairoaks Lane,
Cohasset, MA, on Monday, November 7, 2005,
commencing at 10:05 a.m.

*COPLEY COURT REPORTING, Inc.*
101 Tremont Street
Boston, Massachusetts  02108
(617) 423-5841

**DISK ENCLOSED**

17

1       Q.      You had him for one night of training?

2       A.      Yes, yes.

3       Q.      And how did he get there?  Did he ask

4    to come there or who asked you to train him?

5       A.      That was between me and him.

6       Q.      Okay.

7       A.      Because I was supplying the donuts.  I

8    don't know if you are familiar with Westerly and

9    it is way out and I put a stop because my baker

10   didn't show up for one night and I said I was

11   going to stop my wholesale and he was one of my

12   customers and so he said I will go up with you

13   tomorrow to see how the donuts are made and he

14   said it is going to be different how I make and

15   you make because I want it to be as close to you

16   as possible so he came up and trained with me.

17      Q.      It was between you and Mr. Blanchard?

18      A.      Yes.

19      Q.      It had nothing to do with Bowen or

20   Honey Dew Associates?

21      A.      No.

22      Q.      Had you ever trained any other

23   associates?

24      A.      No.

18

1          Q.    And the only other person you trained

2     as a franchise operator was Manny Carneiro, is

3     that correct?

4          A.    Yes.

5          Q.    Why in this instance did you end up

6     training Manny Carneiro?  How did you end up

7     training him?

8          A.    I was approached by Mr. Bowen if I

9     could train -- he had a new franchisee coming in

10    and if I would like to train him.  I said I don't

11    have any problem with training Mr. Carneiro.

12         Q.    When was that roughly?

13         A.    That was sometime in June -- June or

14    July -- June, I think.  That was just before he

15    opened the stores.  He was there with me.

16         Q.    June of 2004?

17         A.    Yes.

18         Q.    What did he say to you that he needed

19    done or did he say that he needed anything done?

20               Tell me about what Mr. Bowen said to

21    you when he approached you -- was it on the

22    phone?  Was it physically in person --

23         A.    No, he was there.  Once in a while he

24    goes around and he said I have this new franchise

22

1        A.    Yes.

2        Q.    Is that what you are saying?

3        A.    Yes.

4        Q.    Well, did you give him a written

5    schedule that said these are the hours?

6        A.    No, I give him the hours that my bakers

7    are working and the hours that I was working.  I

8    said you want to come at night to the bakers,

9    this is the time that they start and if you want

10   to come in the morning, this is the time when I

11   start.

12            I know he went a couple of nights with

13   the bakers and he came to work with me in the

14   morning.

15       Q.    So about how many days of training did

16   he get in this two-week period of time would you

17   say?

18       A.    I would say it was about three days

19   each week in the two weeks he was there.

20       Q.    Six days?

21       A.    Yes.

22       Q.    Full days, part days?

23       A.    I don't say eight hours because you

24   don't do enough work in eight hours.

25

1       this training?  Was it on the phone?

2            A.    Yes.

3            Q.    How many times did he contact you?

4            A.    I don't recall.  Is Manny ready?  And I

5       would say in my opinion I think he was because he

6       knew all of the stuff that we were doing over

7       there.

8            Q.    Okay.  Did you get any compensation

9       from Bowen Investments to do the training?

10           A.    Yes, I did.

11           Q.    What was the compensation?

12           A.    I got paid $2,000.00.

13           Q.    To train Manny Carneiro?

14           A.    Yes.

15           Q.    And you had a choice to accept or

16      refuse to do the training?

17           A.    Yes.

18           Q.    What would happen if you had refused to

19      do the training?

20           A.    I don't know.  Because that was --

21           Q.    You would just decline?

22           A.    Yes.

23           Q.    And you have already been paid this

24      $2,000.00?

26

1      A.    Yes.

2      Q.    When did you get paid $2,000.00?

3      A.    It was after.  I don't know like three

4   or four weeks later.

5      Q.    After Manny's training?

6      A.    Yes, after Manny took over.

7      Q.    Did you send them a bill?

8      A.    No, that was -- he said what are you

9   going to charge, and I said I charge $2,000.00.

10     Q.    And he gave you a check?

11     A.    Yes.

12     Q.    From Bowen Investments?

13     A.    Yes.

14     Q.    Did you give Manny Carneiro any tests

15  while he was in your store, any tests to see what

16  he knew or didn't know?

17     A.    No, because I show Manny how things

18  were done.  I said if you have any questions, ask

19  me, you know, as we went along.

20     Q.    Did you give any evaluations of his

21  skills, what he was doing good, what he was not

22  doing good?  Did you do any evaluations?

23     A.    No.

24     Q.    You were his principal trainer?

28

1    trainers or the night bakers other than that?

2        A.    No.

3        Q.    Can you say to me what specific areas

4    that Manny Carneiro was trained in when he was

5    being trained in your store?

6        A.    I mean we went through everything, you

7    know, the baking process, he worked with the

8    front one morning with the girls, he saw me make

9    my stuff, the muffins, pastries, I work with him.

10   That is mostly the stuff that we did.

11       Q.    Who usually did the training with him?

12       A.    It was me.  Whatever days he was there

13   during the day, it was with me.

14       Q.    Can you tell me anything more about

15   Manny's training at your shop in June of 2004

16   that we have not yet discussed today?

17       A.    No, the only thing, I know Manny was

18   very anxious to take over his stores because he

19   was saying I need to get in there as soon as

20   possible -- as soon as possible.  Those are the

21   things that we discussed, you know.

22       Q.    Did you use any manuals in training

23   Manny?

24       A.    No.

54

1    building, I don't pay rent but because my

2    franchise, whoever owns the building so I have to

3    pay the rent for Bowen Investments, and they in

4    that process they pay the rent for them.

5         Q.    How did they train you on the weekly

6    fees?

7         A.    You pay based on your net sales.

8         Q.    How much percentage do you pay?

9         A.    10, 5 and 4.  That is the way I was

10   trained.

11        Q.    Who do you pay the 5 percent to?

12        A.    The 5 percent to Bowen Investments.

13        Q.    What is that for?

14        A.    That is for the royalty fee.

15        Q.    Who do you pay the 4 percent to?

16        A.    To Honey Dew Associates.

17        Q.    That is the way that you were trained

18   at the training store at Honey Dew Associates?

19        A.    Yes.

20        Q.    Who trained you back then?

21        A.    Back then it was Bruce.

22        Q.    Did Robert Bowen ever ask you or train

23   you to pay fees himself?

24        A.    No.

1    the front training.

2         Q.    Did you see what he got for training as

3    far as customer service?  Did you see yourself

4    what he got for customer service training?

5         A.    No.

6         Q.    What training was provided Manny

7    Carneiro in cleanliness, shop cleanliness that

8    you know of?

9         A.    That is the way that I clean my shops.

10   I kept my store clean all of the time.  That is

11   what they expect, the store to be clean, common

12   sense.

13        Q.    Did he get any training that you know

14   of?  Did anyone show him?  Did he get any

15   training regarding shop cleanliness that you know

16   of?

17        A.    No, my store was clean all of the time

18   when he was there.  We just showed the way we

19   keep our stores clean.

20        Q.    But there was no training, is that what

21   you are saying?

22        A.    No -- yes.

23        Q.    Was training provided in administrative

24   management?

72

1      A.    Yes, I showed him how to do it and we

2   went to the store and setup some paper work in

3   the computer the way I did my paperwork.  We

4   never finished that.

5      Q.    You never finished the administrative

6   training?

7      A.    I showed him this is the way that we

8   pay our fees, and this, and then we wanted to go

9   to like a stuff in the computer to be a lot

10  easier to do the paperwork.

11     Q.    Yes.

12     A.    He went to his store and with his

13  program he had in he computer was not compatible

14  with mine so he was supposed to change that.  But

15  we never did that again -- that wasn't part of

16  the training.

17     Q.    I am not interested in what is between

18  what you and Manny.  Let's go back then.

19        What administrative training when Manny

20  was training in your store during the six days

21  that he was training there, what administrative

22  training did you do then?

23     A.    I showed him how we paid Honey Dew

24  Associates and how we do the daily balance

COPLEY COURT REPORTING

88

1              C E R T I F I C A T E

2

3     COMMONWEALTH OF MASSACHUSETTS

4     Norfolk, ss.

5

6              I, Maureen Nashawaty, a Registered

7     Professional Reporter and Notary Public in and

8     for the Commonwealth of Massachusetts, do hereby

9     certify that the foregoing transcript of the

10    deposition of **JOSE E. GARCIA**, having been duly

11    sworn, on Monday, November 7, 2005, is true and

12    accurate to the best of my knowledge, skill and

13    ability.

14             IN WITNESS WHEREOF, I have hereunto set

15    my hand and seal this 17th day of November, 2005.

16

17

18             Maureen R. Nashawaty
               Registered Professional Reporter

19

20

21    THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
      DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
22    ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
      DIRECTION OF THE CERTIFYING REPORTER.
23

24

COPY

TAB 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * *
                               *
BOWEN INVESTMENT, INC. and     *
HONEY DEW ASSOCIATES, INC.,    *
                               *
     Plaintiffs,               *
                               *
v.                             *   Civil Action
                               *   No. 05-11709 NMG
CARNEIRO DONUTS, INC. and      *
MANUEL M. CARNEIRO,            *
                               *
     Defendants.               *
                               *
* * * * * * * * * * * * * * *
```

Deposition of **DONAL W. SMITH, JR.**,
taken on behalf of the Plaintiffs, pursuant to
Notice under the applicable Rules of the Federal
Rules of Civil Procedure, before Rochelle D.
Baron, a Professional Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Jack Mikels &
Associates, LLP, 1 Batterymarch Park, Quincy,
Massachusetts on Friday, November 25, 2005,
commencing at 2 p.m.

```
 1              Associates?
 2                   MR. WIRTZ:  Objection.
 3     A    Yeah.
 4     Q    Why don't you correct that if it needs
 5          correcting.
 6     A    I don't recall who the check was
 7          written to, but to me Bowen
 8          Investments, Honey Dew.  It was one or
 9          the other.
10     Q    And that was for advertising and
11          franchise fees?
12     A    Yes.
13     Q    Now, do you know what your franchise
14          agreement said in terms of how those
15          percentages were to be paid?
16                   MR. WIRTZ:  Objection.
17     A    No.
18     Q    Are you aware that your franchise
19          agreement said 7 percent is the percent
20          you pay in weekly fees to Bowen
21          Investment and the 2 percent is what
22          you pay to the advertising fund?
23                   MR. WIRTZ:  Objection.
24     Q    Are you aware of that?
```

```
 1    A     Yes.

 2    Q     And being aware of that, why were you

 3          paying 5 percent and 4 percent instead

 4          of 7 percent and 2 percent?

 5                MR. WIRTZ:  Objection.

 6    A     That's what Bob said to do.

 7    Q     And when did he tell you to do that?

 8                MR. WIRTZ:  Objection.

 9    A     When I first took over.

10    Q     And who did you take over the shop

11          from?

12    A     I don't remember his name.

13    Q     Was it a franchise operator?

14    A     Yes.

15    Q     So tell me about when Bob told to you

16          pay the fees that way?  Was that during

17          a training session or what?

18                MR. WIRTZ:  Objection.

19    A     I don't remember.

20    Q     Do you remember the place?

21                MR. WIRTZ:  Objection.

22    A     Park Avenue.

23    Q     So he personally told you this?

24                MR. WIRTZ:  Objection.
```

55

```
 1    A    Yes.

 2    Q    And then what did he say to the best of

 3         your memory?

 4              MR. WIRTZ:  Objection.

 5    A    Write the check out for 4 percent and

 6         the other for 15 percent.

 7    Q    And what was the 15 percent for?

 8              MR. WIRTZ:  Objection.

 9    A    Rent.

10    Q    And what else?

11              MR. WIRTZ:  Objection.

12    A    The franchise fee.

13    Q    So the rent and franchise fee was 15

14         percent?

15    A    Right.

16              MR. WIRTZ:  Objection.

17    Q    And then 4 percent for advertising

18         fees.  Did I hear that correctly?

19              MR. WIRTZ:  Objection.

20    A    Yes.

21    Q    Now, did he tell you that that was the

22         way you had to do it?

23              MR. WIRTZ:  Objection.

24    A    Yes.
```

```
 1                COMMONWEALTH OF MASSACHUSETTS

 2     Norfolk, ss.

 3              I, Rochelle D. Baron, a Shorthand
       Reporter and Notary Public duly commissioned and
 4     qualified within and for the Commonwealth of
       Massachusetts, do hereby certify that there came
 5     before me on the 25th day of November 2005, at 2
       p.m., the person hereinbefore named, who was
 6     duly sworn by me to testify to the truth and
       nothing but the truth of his knowledge touching
 7     and concerning the matters in controversy in
       this cause; that he was thereupon carefully
 8     examined upon his oath and his examination
       reduced to typewriting; and that the deposition
 9     is a true record of the testimony given by the
       witness, to the best of my skill and ability.  I
10     further certify that I am not interested in the
       event of the action.

11
                IN WITNESS WHEREOF, I have hereunto
12     set my hand and affixed my notarial seal this
       6th day of December 2005.

13

14

15                                     _____
                                       Rochelle D. Baron
16
```



```
17

18
       PLEASE NOTE:
19
       THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
20     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME
       BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
21     AND/OR DIRECTION OF THE CERTIFYING REPORTER.

22

23

24
```

COPY

# TAB 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                           *
BOWEN  INVESTMENT,  INC. and               *
HONEY  DEW  ASSOCIATES,  INC.,             *
                                           *
      Plaintiffs,                          *
                                           *
v.                                         *    Civil Action
                                           *    No. 05-11709 NMG
CARNEIRO  DONUTS,  INC. and                *
MANUEL  M.  CARNEIRO,                      *
                                           *
      Defendants.                          *
                                           *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

Deposition of **MANUEL  M.  CARNEIRO**,
taken on behalf of the Plaintiffs, pursuant to
Notice under the applicable Rules of the Federal
Rules of Civil Procedure, before Rochelle D.
Baron, a Professional Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Jack Mikels &
Associates, LLP, 1 Batterymarch Park, Quincy,
Massachusetts on Tuesday, November 22, 2005,
commencing at 11:10 a.m.

ROCHELLE D. BARON
6 MARCUS ROAD
SHARON, MASSACHUSETTS 02067
(781) 784-6542

```
 1              sir?
 2    Q    Sure.  What's the basis of your
 3         allegations with respect to certain
 4         equipment that was sold to you in
 5         connection with the Allens Avenue shop?
 6              MR. McCARTHY:  Objection.
 7    A    Well, sir, at that time when I getting
 8         forced by Mr. Bob Bowen to buy the
 9         equipment, which pretty much right
10         after when I put all my money to it of,
11         you know, finances, I cannot afford to
12         do that, but Mr. Bowen is forcing me to
13         buy the equipment, yes, that's -- you
14         know, they really hurt me with
15         financing.  That's the probably the
16         reason leads to when I get behind a
17         week or two weeks is payment for the
18         company.
19    Q    Okay.  With regards to Mr. Bowen, what
20         Mr. Bowen are you referring to?  There
21         are two Mr. Bowens involved in this.
22              MR. McCARTHY:  Objection.
23    A    I'm talking about Bob Bowen.
24    Q    And when did Mr. Bob Bowen force you to
```

28

```
 1            buy equipment?
 2                   MR. McCARTHY:  Objection.
 3      A     Mr. Bob Bowen right -- right after I
 4            bought the franchisee, he force me --
 5            he wants me buy the headset and the
 6            piece of equipment, the Thermalizer,
 7            and I told him I cannot afford and I
 8            have no money, and he's keep say,
 9            you're going to need it, you need them,
10            don't worry I pay you -- you pay me a
11            hundred dollars a week, and then he
12            forcing me to go for that.
13      Q     Okay.  Let me see if I can break this
14            down a little bit.  With respect to the
15            headsets that you referred to, when did
16            Mr. Bowen approach you about headsets?
17                   MR. McCARTHY:  Objection.
18      A     Well, if I recall, Mr. Bob Bowen, one
19            day he walks -- those things happened
20            right after I bought the store.  He
21            walk into the -- to my store and he
22            heard that noise from the -- from the
23            headset and he wished to have the speak
24            inside the shop, what the shop has been
```

29

```
 1            doing the business ever since for, I
 2            believe, for ten or twelve years with
 3            that system.  He force me -- he told me
 4            to buy the headsets, and I told him
 5            again, I says there's no way I can buy
 6            those, I'm not in a position
 7            financially, I don't have money to buy
 8            the headsets.  And he says, well, we're
 9            going to buy and then you going to pay
10            me a hundred dollars a week.
11    Q       Okay.  So there was an existing
12            drive-thru system, is that correct?
13    A       Yes.
14    Q       Okay.  And it's your allegation that
15            that was working fine and you did not
16            need to improve it in any way?
17    A       That's correct.
18                MR. McCARTHY:  Objection.
19    Q       And with respect to the time period in
20            which Mr. Bowen came and told you that
21            you should be purchasing the headsets,
22            how long after you opened the shop did
23            this occur?
24                MR. McCARTHY:  Objection.
```

1          COMMONWEALTH OF MASSACHUSETTS

2     Norfolk, ss.

3              I, Rochelle D. Baron, a Shorthand
      Reporter and Notary Public duly commissioned and
4     qualified within and for the Commonwealth of
      Massachusetts do hereby certify that there came
5     before me on the 22nd day of December 2005 at
      11:10 a.m. the person hereinbefore named who was
6     duly sworn by me to testify to the truth and
      nothing but the truth of his knowledge touching
7     and concerning the matters in controversy in
      this cause; that he was thereupon carefully
8     examined upon his oath and his examination
      reduced to typewriting; and that the deposition
9     is a true record of the testimony given by the
      witness to the best of my skill and ability.  I
10    further certify that I am not interested in the
      event of the action.

11

12             IN WITNESS WHEREOF, I have hereunto
      set my hand and affixed my notarial seal this
13    2nd day of December 2005.

14

15                _____

16                               Rochelle D. Baron

17

18    PLEASE NOTE:

19
      THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
20    DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME
      BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
21    AND/OR DIRECTION OF THE CERTIFYING REPORTER.

22

23

24

TAB 5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * * * *
                                *
BOWEN INVESTMENT, INC. and      *
HONEY DEW ASSOCIATES, INC.,     *
                                *
      Plaintiffs,               *
                                *
v.                              *   Civil Action
                                *   No. 05-11709 NMG
CARNEIRO DONUTS, INC. and       *
MANUEL M. CARNEIRO,             *
                                *
      Defendants.               *
                                *
* * * * * * * * * * * * * * * *
```

Deposition of **MARIO CARNEIRO**, taken on behalf of the Plaintiffs, pursuant to Notice under the applicable Rules of the Federal Rules of Civil Procedure, before Rochelle D. Baron, a Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Jack Mikels & Associates, LLP, 1 Batterymarch Park, Quincy, Massachusetts on Thursday, November 17, 2005, commencing at 10:10 a.m.

ROCHELLE D. BARON
6 MARCUS ROAD
SHARON, MASSACHUSETTS 02067
(781) 784-6542

```
 1    Q     And there's an entry there for -- it's

 2          the -- under "current liabilities,"

 3          it's the fourth line down, loan

 4          payable, Bowen Investment?

 5    A     Right.

 6    Q     And the amount is $8,069.20.  What was

 7          that for?

 8    A     That's the financing of the Thermalizer

 9          and the headsets.

10    Q     Okay.

11    A     Because, you know, you book the

12          equipment and that's either come out of

13          cash or it's a loan from somebody,

14          right.  So we booked a loan to Bowen

15          Investment.

16    Q     Okay.  What, if anything, do you know

17          about that loan from Bowen Investment?

18          Did Mr. Carneiro tell you anything

19          specifically?

20    A     Specific to -- I know that apparently

21          they do that once in a while with other

22          stores.  You know, they'll require them

23          to get a piece of equipment, they won't

24          have the money, they'll finance it for
```

```
 1                them usually at no interest over a

 2                short period of time, you know, a year

 3                or.  I've seen it done with others.

 4      Q    What are you referring to "they usually

 5                finance it"?

 6      A    Bowen usually -- Bowen Investment

 7                usually will -- when there's a piece of

 8                equipment that that need to get that

 9                they, the franchisee, doesn't have the

10                funds, they will buy it for him and

11                then finance it for a short period of

12                time.

13      Q    And what are you referring to when you

14                say you know that they do this for

15                other people?  What other people are

16                you referring to?

17      A    I have other franchisees where they

18                sometimes have to buy things, and Bowen

19                Investment finances it.

20      Q    And what other franchisees are you

21                referring to?

22      A    Well, you asked me before if I did

23                other Honey Dew franchises, right?

24      Q    Yes.
```

```
1    A     So --

2    Q     And now I'm asking you specifically,

3          because you've made this statement:

4          What other franchisees are you

5          referring to?

6    A     Specifically, the one that I do now.

7    Q     And that is?

8    A     That is Maciel Donuts.

9    Q     Maciel Donuts?

10   A     Yeah.

11   Q     And where is that location?

12   A     Pawtucket.

13   Q     Okay.  And what equipment are you

14         referring to had been financed by

15         Mr. Bowen for Maciel equipment?

16   A     Recently a new menu board.

17   Q     And how much was that financed for?

18   A     I don't know.  I forget, thousands.

19   Q     Was that something that Maciel Donuts

20         did not have the funds to purchase?

21   A     I believe so.

22   Q     And do you know what the terms of that

23         transaction was?

24   A     It's usually short time like within a
```

```
 1              year, you know, usually doesn't involve
 2              interest.  We never know -- like we
 3              never know about it until when I'm
 4              doing his P and L a month later, I
 5              notice that he's making a payment all
 6              of a sudden to Bob Bowen for 250 a
 7              month and I inquire, what is this, you
 8              know, because see, you have to
 9              understand these franchisees, it's not
10              like Dunkin' Donuts where -- usually
11              Dunkin' Donuts, we pay all their bills.
12              We do.  With Honey Dew they pay their
13              bills and then we see -- we see their
14              bank statements a month later.  And as
15              we're posting their account doing the
16              write-up, all of a sudden, I'll
17              encounter a check to Bowen Investment
18              for 250, which is something I didn't
19              see the previous month.  So I'll say,
20              what is this check as a result of?  Oh,
21              I bought a new Thermalizer.  Now, when
22              a client gets a new piece of equipment,
23              we, as accountants, have to get a copy
24              of that invoice because that is an
```

103

```
 1              asset has to be depreciated.  So I say,
 2              can I have the details of that.  And
 3              then the detail is usually a letter
 4              from some vendor and then indicating
 5              that they're going to pay Bob Bowen or
 6              Bowen Investment so much a month.  It's
 7              just I see this check and I have to ask
 8              questions, what is this check for, oh,
 9              I bought this, Bowen Investment
10              finances it, just happens.
11    Q        In terms of the Maciel Donuts instance,
12              is that the instance that you were
13              referring to that was 250 a month for
14              the menu board?
15    A        Something like that.
16    Q        What other franchisees are you
17              referring to in which equipment was
18              purchased and financed?
19    A        I believe -- I believe that these prior
20              -- I believe they had one also.  I've
21              seen it before.  I mean I --
22    Q        Mr. Smith and Mr. Balasco had purchased
23              equipment through Mr. Bowen?
24    A        Well, I don't know if they purchased
```

```
 1              through Bowen.  I mean they did somehow
 2              have to buy a piece of equipment, and
 3              then, instead of paying it right to the
 4              vendor, they pay so much a month to
 5              Bowen.
 6    Q         Do you recall what the equipment was
 7              that Mr. Smith and Mr. Balasco --
 8    A         No, no, I don't recall.  That was
 9              already a few years back.  I mean it
10              does happen, you know.  I see a new --
11              as an accountant, I'm doing their
12              monthly P and L or their quarterly
13              P and L, and I see a new check other
14              than -- because, normally, the
15              franchisees make out two checks, one to
16              Honey Dew ad fund for the advertising
17              and the other one to Bowen Investment,
18              which includes, if their rent is paid
19              to Honey Dew, the percentage of the
20              rent, the royalty, any real estate tax.
21              That's all included in there.  So I
22              only see two checks every month, one to
23              Bowen and one to -- then, all of a
24              sudden, if I see another check for 250
```

105

```
 1              or 300, I inquire, what is this.  So

 2              then they tell me, and I ask for

 3              documentation because I got to have it

 4              because they bought a piece of

 5              equipment.  So that's how I find out.

 6    Q         Other than the instances that we talked

 7              about, do you have any knowledge of any

 8              other instance that you're referring

 9              to?

10    A         Not really.  Like I said, I only do a

11              few Honey Dews.

12    Q         With regards to the Maciel Donuts

13              matter, do you know what the terms of

14              that equipment purchase was?

15    A         No.  I just know that -- I don't know.

16              I mean I have it, but I don't know.  I

17              can't recall what it is.  I mean

18              it's -- I think it's 250 a month for

19              one, two years.  No, no, I'm sorry.

20              It's 250 a week.  That's what it is,

21              250 a week.  So it's probably less than

22              a year, yeah, 250 a week, not a month

23              on that particular one.  But, like I

24              said, I didn't know you were going to
```

```
 1              ask me about anything else or if I knew

 2              about this, but it happens.  I mean

 3              I've seen it.

 4     Q        Do you know the terms of how that

 5              occurred with respect to the Maciel

 6              Donuts?

 7     A        Well, I never really see like a formal

 8              note or anything.  It's just this was

 9              purchased by Bowen Investment so much a

10              week or so much a month.  That's what

11              it is.  There usually -- there's no

12              promissory note or anything.  I don't

13              think I've ever seen an instance where

14              there was interest attached to it, you

15              know.  So I guess it's just a way of

16              helping a purchase.  I don't know.

17     Q        So it's a courtesy?

18     A        I don't know.  I mean it's just.

19     Q        Does Mr. Bowen in your --

20     A        I don't know if it's a courtesy, if Bob

21              Bowen insists on it.  All I know is

22              when I do the P and L, I find a check,

23              I ask what it is, I get the

24              documentation.  That's all.  That's all
```

```
1              COMMONWEALTH OF MASSACHUSETTS

2     Norfolk, ss.

3              I, Rochelle D. Baron, a Shorthand
      Reporter and Notary Public duly commissioned and
4     qualified within and for the Commonwealth of
      Massachusetts, do hereby certify that there came
5     before me on the 17th day of November 2005, at
      10:10 a.m., the person hereinbefore named, who
6     was duly sworn by me to testify to the truth and
      nothing but the truth of his knowledge touching
7     and concerning the matters in controversy in
      this cause; that he was thereupon carefully
8     examined upon his oath and his examination
      reduced to typewriting; and that the deposition
9     is a true record of the testimony given by the
      witness, to the best of my skill and ability.  I
10    further certify that I am not interested in the
      event of the action.

11
               IN WITNESS WHEREOF, I have hereunto
12    set my hand and affixed my notarial seal this
      6th day of December 2005.

13

14
```



```
15       "Notary Public"              _____
         Rochelle D. Baron
16    Commonwealth of Massachusetts   Rochelle  D.  Baron
      My Commission Expires on Jan. 12, 2012

17

18
      PLEASE NOTE:
19
      THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
20    DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME
      BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL
21    AND/OR DIRECTION OF THE CERTIFYING REPORTER.

22

23

24
```



TAB 6

```
                              VOLUME:  I
                              PAGES:  1 through 203
                              EXHIBITS:  See Index
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
********************************
BOWEN INVESTMENT, INC.,              )
HONEY DEW ASSOCIATES, INC.,          )
              Plaintiffs and         )
              Counterdefendants,)
     VS.                             ) C.A. No.:
CARNEIRO DONUTS, INC. and            ) 05-11709 NMG
MANUEL M. CARNEIRO,                  )
              Defendants and         )
              Counterclaimants.  )
********************************
```

ORIGINAL

**DEPOSITION OF RICHARD J. BOWEN,**

a witness called on behalf of the Defendants,

taken pursuant to the provisions of the Federal

Rules of Civil Procedure, before Sheila M. Duffy,

a Registered Professional/Certified Shorthand

Reporter (#146199) and Notary Public in and for

the Commonwealth of Massachusetts, at the Law

Offices of Kevin R. McCarthy, 155 Fairoaks Lane,

Cohasset, Massachusetts, on Monday, November 28,

2005, commencing at 10:09 a.m.


```
           COPLEY COURT REPORTING
              101 Tremont Street
          Boston, Massachusetts 02108
              (617) 423-5841
```

20

1          Q.     You maintained 100 percent ownership,
2     just you?
3          A.     Yes.
4          Q.     And you didn't add any affiliates or
5     make any changes in the structure of your
6     business?
7          A.     No.
8          Q.     Let's just go right on up to 2005?
9          A.     All right.
10          Q.     Anything different there?
11          A.     Except I'm a lot older since 1973,
12     there is no changes.
13          Q.     No changes?
14          A.     I am still 100 percent owner.
15          Q.     100 percent.
16                 Talking about Bowen Investment,
17     Incorporated, what is the relationship of Bowen
18     Investment, Incorporated, to Honey Dew Associates?
19          A.     Bowen Investment is a subfranchisor in
20     Rhode Island.
21          Q.     Just Rhode Island?
22          A.     Yes.
23          Q.     Now, how long have they been a
24     subfranchisor?

21

1       A.     I'd be guessing if I told you the date.

2       Q.     Do you know roughly how long they have

3  been a subfranchisor?

4       A.     No.

5       Q.     Do you have an agreement between Honey

6  Dew Associates and Bowen Investments?

7       A.     Yes.

8       Q.     Where they are a subfranchisor?

9       A.     Yes.

10       Q.     Where is that agreement?

11       A.     I don't know.

12       Q.     And would you -- is it a subfranchise

13  agreement?

14       A.     Yes.

15       Q.     So, what are the contents of it and

16  what are the -- what are the main contents of the

17  agreement?

18       A.     The main contents of the agreement I

19  couldn't tell you except that it is an agreement

20  between Honey Dew Associates and Bowen Investment;

21  and without having it in front of me I can only

22  tell you that it is an agreement that stipulates

23  compliance with the rules and regulations and all

24  of that that Honey Dew Associates has.

49

1    a statute.  He is not a lawyer.

2         A.    We will be here a long time to review

3    it.

4         Q.    Okay.  Is Honey Dew Associates,

5    Incorporated, registered with the state of Rhode

6    Island under Rhode Island Franchise Investment

7    Act?

8         A.    No.

9         Q.    Is Honey Dew Associates required to be

10   registered with the Rhode Island Department of

11   Business Regulation under the Rhode Island

12   Franchise Investment Act?

13        A.    I do not know.

14        Q.    So, you may be, you may not be?

15        A.    May be or may not be what?

16        Q.    Required to be registered in the state

17   of Rhode Island under the Rhode Island Franchise

18   Investment Act?

19        A.    I'm simply saying I haven't the

20   faintest idea.

21        Q.    At this point?

22        A.    Correct.

23        Q.    Is Honey Dew Associates exempt from any

24   of the provisions of the Rhode Island Franchise

58

1        Q.     And is that the two percent or is that

2    the four percent of sales?

3        A.     I'm sorry, sir.  What?

4        Q.     What percentage of their sales is that

5    indicating is owed, do you know?

6        A.     According to the letter, it represents

7    a two percent figure of sales and that an

8    additional.

9        Q.     So, that is in addition to the

10   two percent that they've already paid, is that

11   right?

12       A.     Yeah.  It says here that Manny sent a

13   check in for two percent and it should have, in

14   fact, been four.

15       Q.     Okay.  And who was Roberta Porter?

16       A.     She works for Bowen Investment Inc.

17       Q.     And what does she do, do you know?

18       A.     I don't know everything she does, but I

19   do know that she does bookkeeping.

20       Q.     And who is Monica Kiefer?

21       A.     She works for Honey Dew Associates.

22       Q.     And what does she do?

23       A.     She's a bookkeeper.

24       Q.     Is she full-time?

71

1              (Document entitled,

2       "Confidential-2005" was marked Exhibit No. 8

3       for identification.)

4          Q.    Can you review that and then when you

5       are done reviewing it, take you can time, let me

6       know?

7          A.    (Witness complies.)  Okay.

8          Q.    This is the -- what is this document?

9          A.    It's a document that provides

10      information to the franchisees with regards to

11      receipts and expenditures of the Honey Dew

12      advertising fund for time period January through

13      December of 2003.

14         Q.    And on the second page, is that your

15      signature as president, Richard Bowen?

16         A.    Yes.

17         Q.    And who is the other individual?

18         A.    Brian Paulson.

19         Q.    Is he a franchisee?

20         A.    Yes.

21         Q.    Now, have you -- how long has the

22      advertising fund been in existence that this

23      document refers to?

24         A.    This document refers to the period

72

1    between January through December, 2003.

2    Advertising fund itself, I believe, started in

3    1998.

4         Q.    Have you provided -- and you've sent

5    this to franchisees, is that correct?

6         A.    Yes.

7         Q.    Who is the franchisees who got that,

8    the whole entire system?

9         A.    That's correct.

10        Q.    Bowen Investment franchisees as well as

11   Honey Dew Associates franchisees?

12        A.    To my knowledge all franchisees with --

13   the franchisees with Honey Dew donuts received

14   one.

15        Q.    Have you ever produced annual reports

16   like this before this report?

17        A.    Yes.

18        Q.    And for what years, do you remember?

19        A.    No.

20        Q.    About how many, do you remember?

21        A.    No.

22        Q.    Did you provide annual reports for

23   every year from '98 to 2003, do you know?

24        A.    I don't recall.

73

1       Q.      Might you have not in one of those

2   years?

3       A.      I'm sorry?

4       Q.      Might you have not provided an annual

5   report in one of those years?

6       A.      I just don't recall if we did it every

7   single year.  I'm thinking we did, but --

8       Q.      But, you don't know or you do know?

9       A.      I just do not know, not at this time.

10      Q.      Did you provide up, until the time of

11  this report, which is December, 2003, periodic

12  reports or any other financial reports of receipts

13  and expenditures of the advertising fund to

14  franchisees generally, who you have provided any

15  periodic ones other than annual ones?

16      A.      Not to my knowledge.

17      Q.      It would just have been annual ones?

18      A.      I believe that to be the case.

19      Q.      Now, this concludes December, 2003.

20  Now, another one would be due then after December

21  of 2004, is that correct?

22      A.      That's correct.

23      Q.      And has that not been produced yet?  I

24  mean, up to today has one been sent out?

COPLEY COURT REPORTING

74

1          A.    Not to my knowledge.

2          Q.    Will one be coming out, do you know, or

3     can you say when?

4          A.    Definitely one will be coming out.

5          Q.    Do you know when?

6          A.    No, I don't.

7          Q.    You said there's two franchisees?

8          A.    Yes.

9          Q.    And what do they do with it, to the

10    best of your knowledge, what do franchisees do

11    with this report?

12         A.    I do not know.

13         Q.    Is it useful to them?  Is it useful to

14    them in your view?

15         A.    In my view?  In my view?  If I were a

16    franchisee, I would very much like to receive this

17    report.

18         Q.    And if you were a franchisee, what --

19    Honey Dew franchisee, what would you do with this

20    report?

21         A.    Myself, I'd read it.

22         Q.    Would it help you manage your business?

23         A.    I don't believe it would help me manage

24    my business.

203

1                      C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS

4    SUFFOLK, SS.

5              I, Sheila M. Duffy, a Notary Public

6    in and for the Commonwealth of Massachusetts,

7    do hereby certify:

8              That RICHARD J. BOWEN, the witness whose

9    testimony is hereinbefore set forth, was duly

10   sworn by me and that such testimony is a true and

11   accurate record of my stenotype notes taken in

12   the foregoing matter, to the best of my knowledge,

13   skill and ability.

14             IN WITNESS WHEREOF, I have hereunto

15   set my hand and Notarial Seal this 10th day of

16   December, 2005.

17

18             SHEILA M. DUFFY
               RPR/CSR #146199
19             Notary Public

20

21   My Commission Expires:  January 17, 2008

22   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
     DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME by
23   ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
     DIRECTION OF THE CERTIFYING REPORTER.

24

COPLEY COURT REPORTING