UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
                                      )
BOWEN INVESTMENT, INC. and            )
HONEY DEW ASSOCIATES, INC.            )
            Plaintiffs                )
                                      )
v.                                    )
                                      )        C.A. No. 05 – 11709 NMG
CARNEIRO DONUTS, INC and              )
MANUEL M. CARNEIRO                    )
            Defendants                )
_____)
```

### SECOND AFFIDAVIT OF MANUEL M. CARNEIRO

I, Manuel M. Carneiro, being under oath depose and state as follows:

1.  I am the individual defendant in the present case.

2.  Carneiro Donuts Inc. ("CDI)" is a Rhode Island corporation with a place of business as a Honey Dew franchise shop at 460 Allens Ave., Providence, RI, 02905.

3.  I am the owner and principal of CDI.

4.  I deny that I have failed to properly cure any material and legitimate defaults which were in my ability and were my responsibility to cure since June 1, 2004 with regard to my Honey Dew franchise.

5.  I deny that I and/or CDI have been routinely late in making payments required by my franchise agreement.

6.     I deny that I and/or CDI have been routinely late in making payments required by my franchise agreement and then failed to cure legitimate defaults.

7.     I dispute the legality of the plaintiff's defaults and termination notices sent to CDI regarding monetary payments.

8.     I and CDI have timely cured any defaults that could justify termination.

9.     I and CDI deny that the plaintiff's have legitimately defaulted or legitimately terminated my franchise agreement.

10.     Within 2 weeks after entering the Honey Dew system I was told by Robert Bowen, President of BII, that I had to buy some new equipment for my shop which consisted of new speaker system headsets and new donut production equipment.

11.     I did not ask for this new equipment noted in # 10 above  – Robert Bowen, President of BII, pressured me and told me I had to purchase it.

12.     Robert Bowen then presented me with a contract note for $ 9,428.00, payable to BII, for the equipment mentioned in # 10 and # 11 above that called for me to pay BII an additional $100.00 a week for about 94 weeks which considerably increased my debt and strained me financially – thus making it much more difficult to meet my financial obligations.

13.     BII failed to provide me the training called for in section V of my franchise agreement or to properly train me to be a Honey Dew franchise owner.

14.    During my training at Joseph Garcia's shop, before I took over my franchise, I was trained on how to produce some of the baked goods, muffins and other pastries but I received little or no training beyond that.  I was not trained on how to manage, maintain or administer a Honey Dew franchise shop by Joseph Garcia or by BII.

15.    The inadequate training I received from BII seriously inhibited my efforts to properly manage and administer a Honey Dew franchise shop.

16.    I used all my savings to purchase my Honey Dew franchise for approximately $150,000.00 on June 1, 2004.

17.    I paid my weekly royalty, rent, service and tax fees within the 7 day cure period allowed for in the 2/22/05 alleged default notice noted in the <u>Verified Complaint</u> ¶ 26.  See Exhibit A, attached hereto, which are copies (front and back) of the actual checks dated 1/30/05 and 2/06/05 which are for the royalty, rent, service fees and taxes that were the subject of the 2/22/05 default notice.  These checks are signed by me and the fronts show the bank's stamp showing that they were deposited on 3/01/05.  A calculation sheet showing what the checks were for is also enclosed with this Exhibit.

18.    I authorized my accountant to send the four (4) checks enclosed herein as Exhibit B to the Plaintiffs' attorney as payment for the royalties, service fees, advertising fees, taxes  and rent due for the weeks 2/13/05 and 2/20/05 along with the enclosed accompanying letter from me.   All four (4) of the enclosed checks are dated 2/24/05 or 2/25/05 and are signed by me.

19.   I authorized my accountant to send the two (2) checks enclosed herein as Exhibit C to the Plaintiffs' BII and HDA as payment for the royalties, service fees, advertising fees, taxes and rent due for the week of 5/15/05.  Both of the enclosed checks are dated 5/26/05 and are signed by me.

20.   I authorized my accountant to send the two (2) checks enclosed herein as Exhibit D to the Plaintiffs' BII and HDA as payment for the royalties, service fees, advertising fees, taxes and rent due for the week of 5/22/05.  Both of the enclosed checks are dated 6/01/05 and are signed by me.

21.   I authorized my accountant to send the two (2) checks enclosed herein as Exhibit E to the Plaintiffs' BII and HDA as payment for the royalties, service fees, advertising fees, taxes and rent due for the week of 1/09/05.  Both of the enclosed checks are dated 1/20/05 and are signed by me.

22.   On or about August 1, 2005, I received the attached Notice of Termination dated August 1, 2005 which is enclosed herein as Exhibit F.

23.   On or about August 2, 2005, I reviewed with and authorized my attorney to send the letter attached as Exhibit G to the Plaintiffs' attorney.  As well, I am copied on this letter as indicated on the second page and I received my copy.

24.   Enclosed as Exhibit H is a copy of the 2/06/03 BII Uniform Franchise Offering Circular which the Plaintiffs' disclosed to me.   This UFOC copy includes Addendums A and  C ( "Honey Dew Associates, Inc. Advertising Policy Statement") – but not the other voluminous addendums and exhibits not referenced in Defendants' summary judgment opposition.

4

25.   Enclosed as Exhibit I is the July 26, 2004 document sent me from Robert Bowen, President of BII, which is the financing note for two pieces of shop equipment totaling approximately $ 9,428.00 (a thermalizer and DMX headsets).  My signature is on the bottom.  Also, in this Exhibit is the invoice for the thermalizer showing Bob Bowen as the buyer and the DMX invoice addressed to Bowen Investments with my shop at 460 Allens Ave. shown as the delivery site.

26.   Enclosed as Exhibit J is a copy of the 2/23/04 letter, from Plaintiffs' attorney to my attorney, disclosing the updated 2/06/04 Uniform Franchise Offering Circular to me (through service on my attorney).

27.    Enclosed as Exhibit K is a copy of the 2/06/04 BII Uniform Franchise Offering Circular which the Plaintiffs' disclosed to me, via the 2/23/04 letter from Plaintiffs' attorney to my attorney as noted in # 26 above of this affidavit.   This UFOC copy includes Addendums A and  C ("Honey Dew Associates, Inc. Advertising Policy Statement") – but not the other voluminous addendums and exhibits not referenced in Defendants' summary judgment opposition.

28.   If I had been disclosed, in BII's UFOCs, the BII/HDA litigation history styled *Honey Dew Associates, Inc.* v. *Yazbek*, *Cohen Maria Rocha  et al v. Honey Dew Associates, Inc* , *Honey Dew Associates, Inc. and Bowen Investments, Inc. v. A&F Management, Inc.* and  *Honey Dew Associates, Inc. et al. v. M & K Food Corp.* then I never would have signed a BII franchise agreement.

5

29.    If I had been disclosed, in BII's offering circulars, any one of the four (4) cases noted in # 28 above of this affidavit that would have been a significant and important disclosure to me and it would have negatively influenced my decision whether or not to sign my BII franchise agreement.   Disclosure to me of any one of these litigation cases, or similar litigation cases involving the Plaintiffs, would have discouraged me from signing a BII franchise agreement.

30.    Enclosed as Exhibit L is an e-mail letter sent to me from a  Roberta Porter (I am addressed in the handwritten portion) advising me that I am to pay an extra $127.37 over and above the 2% called for in my franchise agreement and which I had already paid to Honey Dew Associates.

31.    On or about July 25, 2005, I reviewed with and authorized my attorney to send the letter attached as Exhibit M to the Plaintiffs' attorney.  As well, I am copied on this letter and I received my copy.

Signed under the penalties of perjury this    23nd  day of December, 2005.


Manuel M. Carneiro

Exhibit A

CARNEIRO DONUTS, INC
460 Allens Avenue
Providence, RI 02905

DomesticBank
57-7483/2115

1364

PAY   **** ONE THOUSAND THREE HUNDRED FORTY TWO & 81/100 DOLLARS

TO THE
ORDER OF

| DATE | AMOUNT |
|------|--------|
| 02/10/05 | $  **1342.81 |

03/01/05  E1986  T2000  P02  0612699839

BOWEN INVESTMENT, INC.

W/E 1/30/05

AUTHORIZED SIGNATURE

⑈000⒈364⑈ ⑆2⒈⒈574833⑆ 0⒈ 0364669⑈        ⑈0000⒈3428⒈⑈

---

CARNEIRO DONUTS, INC
460 Allens Avenue
Providence, RI 02905

DomesticBank
57-7483/2115

1385

PAY   **** ONE THOUSAND THREE HUNDRED FIFTY FOUR & 72/100 DOLLARS

TO THE
ORDER OF

| DATE | AMOUNT |
|------|--------|
| 02/20/05 | $  **1354.72 |

03/01/05  E1986  T2000  P02  0612699841

BOWEN INVESTMENT, INC.

W/E 2/6/05

AUTHORIZED SIGNATURE

⑈000⒈385⑈ ⑆2⒈⒈574833⑆ 0⒈ 0364669⑈        ⑈0000⒈35472⑈



## CARNEIRO DONUTS, INC.

**Bowen Investment, Inc.**

| Rent | Net Sales | $ 5,373.47 | X | 10% = | $ | 537.35 |
|------|-----------|------------|---|-------|---|--------|
| Override | | | | | $ | 200.00 |
| R/E Tax | | | | | $ | 348.70 |
| Royalties | Net Sales | $ 5,373.47 | X | 5% = | $ | 268.67 |
| | | | | | $ | 1,354.72 |

**Honey Dew Advertising**

| Adv | Net Sales | $ 5,373.47 | X | 4% = | $ | 214.94 |
|-----|-----------|------------|---|------|---|--------|

## CARNEIRO DONUTS, INC.

**Bowen Investment, Inc.**

| Rent | Net Sales | $ 5,294.09 | X | 10% = | $ | 529.41 |
|------|-----------|------------|---|-------|---|--------|
| Override | | | | | $ | 200.00 |
| R/E Tax | | | | | $ | 348.70 |
| Royalties | Net Sales | $ 5,294.09 | X | 5% = | $ | 264.70 |
| | | | | | $ | 1,342.81 |

**Honey Dew Advertising**

| Adv. | Net Sales | $ 5,294.09 | X | 4% = | $ | 211.76 |
|------|-----------|------------|---|------|---|--------|

Exhibit B

# CARNEIRO DONUTS, INC.

460 Allens Avenue – Providence, RI  02905
(401) 785-4524

Attorney Jack J. Mikels
1 Batterymarch Park – Suite 309
Quincy, MA  02169

Dear Mr. Mikels:

Enclosed are checks in the amount of  $ 3,349.11.    These checks are for royalties, service fees and rent for the weeks ending 2/13/05 and 2/20/05 as you listed in your February 22, 2005 Notice of Default and hereby cures any remaining defaults noted in your letter.   Below is a list of each item being paid or which has been paid, and which you specified, along with the amount you noted.

The water and sewer bills noted in the Notice of Default in the amount of $121.28, $194.38 and $89.20 have already been paid.  Also, real estate taxes in the amount of $1,386.90 were mentioned as being delinquent.  I do not recall receiving this bill and would appreciate it if you could send me another copy so that I am aware of what these taxes are for and will immediately remit any payments I owe.

If you wish to discuss this matter please feel free to contact me at 401-225-6608 or my attorney Kevin R. McCarthy at 781-383-0639.   Thank you.

| Item | Amount Paid |
|---|---|
| Bowen Investments, Inc. – w/e 2/13/05 | $ 1,364.10 |
| Honey Dew Advertising – w/e 2/13/05 | 217.44 |
| Bowen Investments, Inc. – 21st Equipment Payment | 100.00 |
| Bowen Investments, Inc. – w/e 2/20/05 | $ 1,353.07 |
| Honey Dew Advertising – w/e 2/20/05 | 214.50 |
| Bowen Investments, Inc. – 22nd Equipment Payment | 100.00 |

Sincerely,


Manuel Carneiro
President


Cc:  Kevin R. McCarthy

CARNEIRO DONUTS, INC
460 Allens Avenue
Providence, RI 02905

DomesticBank
67-7483/2115

1388

PAY    **** ONE THOUSAND THREE HUNDRED SIXTY FOUR & 10/100 DOLLARS

TO THE
ORDER OF

DATE
02/24/05

AMOUNT
**1364.10
$

03/15/05  E1448  T1508  P02  0615685966

BOWEN INVESTMENT, INC.

W/E 2/13/05

AUTHORIZED SIGNATURE

⑈0001388⑈ ⑆211574833⑈ 01 0364669⑈          ⑈0000136410⑈

CARNEIRO DONUTS, INC
460 Allens Avenue
Providence, RI 02905

1388

PAY ****** ONE THOUSAND THREE HUNDRED FIFTY THREE & 07/100 DOLLARS

TO THE
ORDER OF

DATE
2005

AMOUNT
1353.07
$

03/15/05  E1448  T1508  P02  0615685970

BOWEN INVESTMENT, INC.

W/E 2/20/05

AUTHORIZED SIGNATURE

⑈0001399⑈ ⑆211574833⑈ 01 0364669⑈          ⑈0000135307⑈

CARNEIRO DONUTS, INC.
460 Allens Avenue
Providence, RI 02905

57-7483/2116

1387

PAY    **** TWO HUNDRED SEVENTEEN & 44/100 DOLLARS

DATE    02/24/05    AMOUNT    **217.44

TO THE
ORDER OF

HONEY DEW ADVERTISING

W/E 2/13/05

03/24/05  83512  T3532  P02  0517762476

AUTHORIZED SIGNATURE

⑊000 1387⑊ ⑊2115 74833⑊ 01 0364669⑊    ⑊00000 21744⑊

---

CARNEIRO DONUTS, INC.
460 Allens Avenue
Providence, RI 02905

57-7483/2116

1398

PAY    **** TWO HUNDRED FOURTEEN & 50/100 DOLLARS

DATE    02/25/05    AMOUNT    **214.50

TO THE
ORDER OF

HONEY DEW ADVERTISING

W/E 2/20/05

03/24/05  83512  T3532  P02  0517762477

AUTHORIZED SIGNATURE

⑊000 1398⑊ ⑊2115 74833⑊ 01 0364669⑊    ⑊00000 21450⑊


Exhibit C

---

**CARNEIRO DONUTS, INC**
460 Allens Avenue
Providence, RI 02905

DomesticBank
57-7483/211

1563

PAY ****ONE THOUSAND FOUR HUNDRED SEVENTY & 61/100 DOLLARS

| | DATE | AMOUNT |
|---|---|---|
| TO THE ORDER OF | 05/26/05 | $ **1470.61 |

06/21/05  E2175  T2175  P02  0816639575

BOWEN INVESTMENT, INC.

W/E 5/15/05

AUTHORIZED SIGNATURE

⑈0001563⑈ ⑈:211574833⑈: 01 0364669⑈        ⑈0000147061⑈

---

**CARNEIRO DONUTS, INC**
460 Allens Avenue
Providence, RI 02905

DomesticBank
57-7483/211

1564

PAY ****TWO HUNDRED FORTY FIVE & 84/100 DOLLARS

| | DATE | AMOUNT |
|---|---|---|
| TO THE ORDER OF | 07/05/05 | |

07/05/05  E7S56  T1611  P02  706118349

HONEY DEW ADVERTISING

W/E 5/15/05

614606

AUTHORIZED SIGNATURE

⑈0001564⑈ ⑈:211574833⑈: 01 0364669⑈        ⑈0000024584⑈

Exhibit D





Exhibit E

CARNEIRO DONUTS, INC
460 Allens Avenue
Providence, RI 02905

DomesticBank
57-7483/2115

1334

PAY    **** ONE THOUSAND THREE HUNDRED EIGHT & 63/100 DOLLARS

TO THE
ORDER OF

DATE
01/20/05          $        **1308.63
AMOUNT

BOWEN INVESTMENT, INC.

W/E 1/9/05

AUTHORIZED SIGNATURE

⑈'0001334⑈' ⑆:211574833⑆: 01 0364669⑈'          ⑈'000013081

CARNEIRO DONUTS, INC
460 Allens Avenue
Providence, RI 02905

DomesticBank
57-7483/2115

1333

PAY    **** TWO HUNDRED TWO & 65/100 DOLLARS

TO THE
ORDER OF

DATE
01/20/05
02/17/05  E3558 T3570 POS 0318122527          **202.65
AMOUNT

HONEYDEW ADVERTISING

W/E 1/9/05

AUTHORIZED SIGNATURE

5D66.17

⑈'0001333⑈' ⑆:211574833⑆: 01 0364669⑈'          ⑈'00000 2026

AUG. 1.2005    4:21PM    JACK MIKELS & ASSOC.

Exhibit F

# JACK MIKELS & ASSOCIATES, LLP

1 BATTERYMARCH PARK  •  SUITE 309  •  QUINCY, MASSACHUSETTS 02169-7454
*Telephone:* 617.472.5600  •  *Telecopier:* 617.472.5875  •  *E-Mail:* jmikels@gis.net

JACK J. MIKELS
MICHAEL A. WIRTZ
ROCHELLE NELSON MIKELS
JANELL E. DE GENNARO
*ATTORNEYS AT LAW*

August 1, 2005

**By Federal Express**
Manuel M. Carneiro, President
Carneiro Donuts, Inc.
c/o Honey Dew Donuts
460 Allens Avenue
Providence, RI 02905

## NOTICE OF TERMINATION

Dear Mr. Carneiro:

As you know, this office represents your Franchisor, Bowen Investment, Inc. ("BII"). Reference is made to the Franchise Agreement and Sublease dated June 1, 2004 for the Honey Dew Donuts Shop operating at 460 Allens Avenue, Providence, RI.

**YOU ARE HEREBY NOTIFIED THAT YOUR FRANCHISE AGREEMENT IS TERMINATED EFFECTIVE UPON RECEIPT OF THIS CORRESPONDENCE.** The basis for termination is:

You receipt of three Notices of Default in a one year period, as set forth in Section XX(A)(5) of your Franchise Agreement..

Section XX(A)(3) provides that your Franchise Agreement is terminated immediately on written notice as a result of such default. Your attention is respectfully directed to Section XXI of your Franchise Agreements which requires that you "immediately discontinue the use of all Proprietary Marks, trade marks, sign, structures, and forms of advertising" indicative of Honey Dew Donuts. See your Franchise Agreement regarding additional responsibilities and liabilities resulting from this termination.

Any payments received from this date forward will be accepted under protest, for use and occupancy only, and without waiver of this termination, any rights pursuant to the Franchise Agreement and Sublease, or any prior Notice of Default and/or Notice of Termination. This Notice of Termination is without prejudice to or waiver of our rights pursuant to any prior or subsequent Notice of Termination or Notice of Default.

Very truly yours,

Jack J. Mikels

cc: Robert P. Bowen, President- Via Facsimile;
    Kevin McCarthy, Esq.



**Kevin R. McCarthy**
**Attorney at Law**
**155 Fairoaks Lane**
**Cohasset, Massachusetts  02025**

| | | |
|---|---|---|
| **Telephone** | **E-mail** | **Fax** |
| **781-383-0639** | **kemccar68@comcast.net** | **781-735-0228** |

MAIL

August 2, 2005

Mr. Jack J. Mikels
1 Batterymarch Park
Suite 309
Quincy, MA  02169-7454

**Re:  Unorthodox and Irregular Advertising Fund Practices**

Dear Jack:

In response to your August 1, 2005 letter:

1.  Mr. Bowen's and BII's request and requirement that the weekly franchise and advertising fees be submitted in amounts and forms different than clearly designated in the franchise agreement is an accounting  practice I have never heard of.   The fact that Mr. Bowen would approach Mr. Carneiro or his accountant with this requirement soon after he has entered the system and on a verbal basis is a disturbing business practice.   This accounting procedure was not disclosed in the UFOC presented to Mr. Carneiro which, as you well know, is an equally serious matter.   Be certain, Mr. Carneiro wants no part of this unorthodox and irregular accounting practice and refuses to participate in it.

2.  If you are aware of some agreement, industry practice or case law that condones your Ad Fund accounting practice at issue please make that information available to me immediately.

3.  It's further disturbing that your letter was accompanied by a Notice of Termination. We reject your termination notice – which is another example of your attempt to punish Mr. Carneiro for asking legitimate business questions and for his refusal to participate in unorthodox accounting practices relative to the Honey Dew Advertising Fund.

Attorney Mikels                     Page 2                          8/2/2005

4. On June 3, 2005 Mr. Carneiro asked you for the periodic statement of receipts and
   expenditures of the Advertising Fund as required by Section X of the franchise
   agreement.   Pursuant to Section X please send him the most recent Ad Fund
   statement along with any Ad Fund statement issued by BII or HDA in the last twelve
   (12) months so that he can better understand how his monies are being spent and how
   his business is being marketed per the franchise agreement.   He has been a
   franchisee for more that a year and the franchise agreement states he will receive this
   report at least every 12 months.   **This is Mr. Carneiro's second request for the
   periodic statement of receipts and expenditures of the Advertising Fund as
   required by Section X of the franchise agreement.**

As always, Mr. Carneiro reserves all his legal rights and feel free contact me anytime
to discuss this situation.

Sincerely,

Kevin R. McCarthy

cc:  Manuel Carneiro
     Robert P. Bowen, President BII

2

**Exhibit H**

# FRANCHISING OFFERING CIRCULAR



The Franchisor is Bowen Investment, Inc., a Massachusetts Corporation with a principal place of business at 2 Taunton Street, Plainville, MA 02762. The phone number is 508-695-3666. This is an offering of a franchise to operate a Honey Dew Donuts® Shop. The Franchisee will manufacture and sell donuts and other donut shop products to the general public.

The types of stores franchised are full producing stores, and, for owners of full producing stores, satellite stores, in which product is not cooked, and cart locations, smaller units for locations within convenience marts, gas stations and the like. The initial franchise fees are $35,000 for a full producing store, $20,000 for a satellite and $50.00 per week for a Cart. The estimated initial investment required ranges from approximately $240,000- $540,000 for a full producing store, $185,000-$475,000 for a satellite and approximately $50,000-$60,000 for a cart. These sums do not include rent for the business location. The cash investment does not represent the Franchisee's total investment. The Franchisee should refer to Disclosure Items 5-7 inclusive in the Offering Circular for further information regarding the investment.

Information comparing franchisors is available. Call the state administrators at the RI Dept. of Business Regulation, 233 Richmond Street, Suite 232, Providence, RI 02903-4232 or your public library for sources of information.

Registration of this franchise by a state does not mean that the state recommends it or has verified the information in this offering circular. If you learn that anything in the offering circular is untrue, contact the Federal Trade Commission and the RI Dept. of Business Regulation, 233 Richmond Street, Suite 232, Providence, RI 02903-4232.

THE FRANCHISE AGREEMENT PERMITS THE FRANCHISOR TO ELECT TO HAVE ANY LITIGATION WITH THE FRANCHISEE SUBMITTED TO THE COURTS OF THE COMMONWEALTH OF MASSACHUSETTS. OUT OF STATE LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST MORE TO SUE BOWEN INVESTMENT, INC. IN MASSACHUSETTS THAN IN YOUR HOME STATE. UNDER RHODE ISLAND LAW, THIS PROVISION MAY NOT BE APPLICABLE IN ALL CASES. SEE THE RHODE ISLAND ADDENDUM A ATTACHED HERETO.

THE FRANCHISE AGREEMENT STATES THAT MASSACHUSETTS LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS. EVEN THOUGH THE FRANCHISE AGREEMENT PROVIDES THAT MASSACHUSETTS LAW APPLIES, RHODE ISLAND LAW MAY SUPERSEDE THIS PROVISION. SEE THE RHODE ISLAND ADDENDUM A ATTACHED HERETO.

THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

The effective date of the offering circular is: February 6, 2003

i

OFFERING CIRCULAR TABLE OF CONTENTS

| Item | Heading | Page |
|---|---|---|
| 1. | The Franchisor, its Predecessors and Affiliates | 1 |
| 2. | Business Experience | 2 |
| 3. | Litigation | 2 |
| 4. | Bankruptcy | 3 |
| 5. | Initial Franchise Fee | 3 |
| 6. | Other Fees | 5 |
| 7. | Initial Investment | 6 |
| 8. | Restrictions on Sources of Products and Services | 8 |
| 9. | Franchisee's Obligations | 11 |
| 10. | Financing | 12 |
| 11. | Franchisor's Obligations | 13 |
| 12. | Territory | 19 |
| 13. | Trademarks | 20 |
| 14. | Patents, Copyrights and Proprietary Information | 21 |
| 15. | Obligation to Participate in the Actual Operation of the Franchise Business | 21 |
| 16. | Restrictions on What the Franchisee May Sell | 22 |

ii

| Item | Heading | Page |
|------|---------|------|
| 17. | Renewal, Termination, Transfer and Dispute Resolution | 22 |
| 18. | Public Figures | 26 |
| 19. | Earnings Claims | 26 |
| 20. | List of Outlets | 26 |
| 21. | Financial Statements | 29 |
| 22. | Contracts | 29 |
| 23. | Receipt | 30 |

Addendums

| Addendum A | Rhode Island Law Addendum | 31 |
| Addendum B | Honey Dew Associates, Inc. Expansion Policy | 32 |
| Addendum C | Honey Dew Associates, Inc. Advertising Fund Policy Statement | 33 |
| Addendum D | Table of Contents for Operational Excellence Procedure Manual and Counter Help Training Manual | 35 |
| Addendum E | Trademark and Service Mark | 39 |

Exhibits

| A. | Actual, Average, Projected or Forecasted Franchisee Sales, Profits or Earnings | 40 |
| B. | Financial Statements (Internal Pages are not numbered) | 43 |
| C. | Franchise Agreement | 44 |
| D. | Sublease | 79 |
| E. | Covenant Not to Compete | 98 |
| F. | Covenant to Protect Trade Secrets and Proprietary Information | 100 |
| G. | Liability Agreement | 102 |
| H. | Release and Waiver | 104 |
| I. | Sample Equipment List (Internal pages are not numbered) | 106 |
| J. | Conditional Assignment of Lease | 107 |
| K. | Liability and Cross Default Agreement | 113 |
| L. | Agreement Regarding Restrictive Covenant and Restrictive Covenant | 116 |

## 1. The Franchisor, its Predecessors and Affiliates

The Franchisor is Bowen Investment, Inc. To simplify the language in this Offering Circular, "BII" or "we" or "us" means "Bowen Investment, Inc." "You" means the person who buys the franchise.

BII franchises Honey Dew Donuts® Shops in Rhode Island. BII has no predecessors. BII operates in Rhode Island pursuant to an agreement with the owner of the "Honey Dew" name, Honey Dew Associates, Inc. ("HDA"). The owner of HDA is also an owner of BII. Although that owner is not an officer or director of BII, and although he is not involved in the management or day to day activities of BII, his partial ownership of BII may give him the right to do so. Accordingly, HDA and BII may be considered to be under "common control" and may be considered "affiliates" for the purposes of this offering circular. HDA operates and franchises "Honey Dew Donuts® Shops" but is not registered to franchise shops in Rhode Island.

BII does business only under its own name. BII has no predecessors.

BII's principal business address is 2 Taunton Street, Plainville, MA 02762. HDA's principal business address is 35 Braintree Hill Office Park, Braintree, MA. BII's agent for service of process within Rhode Island is CT Corporation System, 111 Westminster Street, Providence, Rhode Island 02903.

BII is a Massachusetts corporation incorporated November 1, 1985. We are engaged solely in the business of offering and selling Honey Dew Donuts® franchises, including all related activities such as overseeing the franchises we sell in accordance with the terms of the Franchise Agreement. Although BII does not generally operate donut shops, it may, from time to time do so, such as when a store is opened in advance of a franchise sale or if an owner is terminated, or otherwise. The general market for the products sold is the general public. Sales tend to be higher in fall and spring. You will have to compete with other donut, coffee and food-service shops, sandwich and take out food shops and bakeries, including both local and national businesses, which may possibly include other Honey Dew Donuts® Shops (company owned or franchised) which may draw some customers from the same area.

There are no specific regulations specific to the donut industry. As with any food store, appropriate licenses are required.

BII was incorporated solely to engage in the franchising of Honey Dew Donuts™ Shops, has been so engaged since its incorporation and has no prior business experience. HDA has operated Honey Dew Donuts™ Shops since 1974 and has sold Honey Dew Donuts™ franchise locations since 1974. Neither BII nor HDA has ever offered any other types of franchise for sale.

1

## 2. Business Experience

President, Treasurer and Director: Robert P. Bowen.

Mr. Bowen is the chief executive and chief operating officer and the financial, franchise marketing, training and service officer. He is the sole executive with management responsibility in connection with the operation of BII's business relating to the franchises offered by this Offering Circular. Since 1980, in addition to his duties for Bowen Investment, Inc., Mr. Bowen has, from time to time, been owner of and employed by Bowen Brothers, Inc., a Massachusetts corporation, operating donut shops known as Ole Fashioned Donuts, as well as Honey Dew Donuts<sup>TM</sup> Shops. He is also the owner and chief executive officer of R.B. Donuts, Inc., a Massachusetts corporation also involved in Honey Dew Donuts<sup>TM</sup> Shops.

Director: Kate Bowen

Kate Bowen, has served as a Director since October, 1995. Ms. Bowen is currently employed as a psychological counselor within the Massachusetts state prison system. She has worked, from time to time, in various areas of donut shop operations.

All franchises are sold directly by BII. Michael George Dutra of 70 Bittersweet Drive, Seekonk, MA 02771, a former franchisee, is a franchise broker. Mr. Dutra was a Field Representative for BII from March, 1997 to October, 1997, and has been an independent broker from March, 1997 to date. Prior to March, 1997, Mr. Dutra was a Honey Dew Donuts® franchisee for more than five years. He also owned a Honey Dew Donuts® franchise from March, 1998 to January, 1999. **Only Mr. Bowen, as President of BII, has authority to sell franchises. The franchise brokers may introduce prospective franchisees to Mr. Bowen and show prospective locations only.** Mr. Dutra is not an officer, director, shareholder or employees of BII and has no management responsibility for employee of BII. **Mr. Dutra has no authority to make representations to prospective franchisees on behalf of BII.**

## 3. Litigation

Neither BII, nor Robert P. Bowen nor Kate Bowen, nor Michael George Dutra, nor HDA:

A. Has any administrative, criminal or material civil actions pending against them alleging a violation of any franchise, antitrust or securities law, fraud, unfair or deceptive practices, or comparable allegations, except as follows: Litigation is pending in the Norfolk Superior Court, Dedham, MA, Honey Dew Associates, Inc. v. Creighton Muscato Enterprises, Inc. and Muscato Development Corporation, Civil No; 99-481. This was originally a suit for Declaratory Relief to determine if the Defendant-franchisees were required to contribute to HDA's Advertising Fund. Defendants have filed a counterclaim alleging fraud, misrepresentations, violation of franchise laws and unfair and deceptive trade practices in the sale of two franchises.

2

Other than routine litigation (such as personal injury claims by patrons for slipping and falling in a store, and the like) there is no other pending litigation which is significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

Other than as specified, no litigation is required to be disclosed in this offering circular.

B. Has ever been convicted of a felony nor pleaded <u>nolo contendere</u> to a felony charge nor been liable in a civil action by final judgment nor been the subject of a material action involving a violation of any franchise, antitrust or securities law, fraud, unfair or deceptive practices, or comparable allegations, except as follows: (1) Litigation was settled in the United States District Court for the District of New Hampshire, <u>J.K.S. Donut Shop, Inc., et al. v. Honey Dew Associates, Inc.</u>, Civil Action No. 1:96-CV-00448-M. Plaintiffs were J.K.S. Donut Shop, Inc., Edward J. Palmer and Gladys M. Tauriac, purchasers of a Honey Dew franchise, who alleged that HDA made misrepresentations and breached contracts regarding the sale of a Honey Dew franchise. HDA terminated the store for nonpayment and counterclaimed for damages. All claims of all parties were voluntarily dismissed. As part of the resolution, HDA purchased from the plaintiffs some of the equipment they had used in the store; and (2) claims by M&S Donuts, Inc., a franchisee, that HDA breached implied obligations of good faith and fair dealing, intentionally interfered with contractual relations and committed unfair and deceptive trade practices were voluntarily dismissed. The litigation was <u>M&S Donuts, Inc., et al. v. Honey Dew Associates, Inc., et al.</u> in the Plymouth Superior Court as Civil No: 96-0369B. The plaintiffs were M&S Donuts, Inc. and Maria R. Cohen, Trustee of Kingsley Street Realty Trust. The defendants were HDA, Fast Lane Foods, Inc. and Lawrence Leavitt. After the dismissal, the Plaintiff was allowed to buy out of its Franchise Agreement.

C. Is subject to any currently effective injunctive or restrictive order or decree relating to the franchise or under any federal, state, or Canadian franchise, securities, antitrust, trade regulation or trade practice law as a result of a concluded or pending action or proceeding brought by a public agency.

## 4. Bankruptcy

No person previously identified in Items 1 or 2 of this Offering Circular has been involved as a debtor in proceedings under the U.S. Bankruptcy Code required to be disclosed in this Item.

## 5. Initial Franchise Fee

BII offers several types of units, as follows:

(1) A Full Producing Store may be developed either by you or by us at your expense. Development includes leasing the subject premises and arranging for construction or remodeling of the premises into a Honey Dew Donuts® Shop. Whoever develops the store obtains all building and occupancy permits, licenses and approvals and prepares the shop for operation. The Franchise Fee for a Full Producing Store is $35,000;

3

(2)  A Satellite Store, a smaller version of a Honey Dew Donuts® Shop in which baking is not required and product is delivered from a full producing store, may be developed by you or by us at your expense. Development includes leasing the subject premises and arranging for construction or remodeling of the premises into a Honey Dew Donuts® Shop.  Whoever develops the store obtains all building and occupancy permits, licenses and approvals and prepares the shop for operation. The Franchise Fee for a Satellite Store is $20,000.  A Satellite Store is only available to owners of full producing units;

(3) A Cart Operation, a smaller sales location, usually within another business such as a gas station or in a convenience store, in which baking is not required and product is delivered from a full producing store, may be developed by you or us at your expense. The Franchise Fee for a Cart Operation is $50.00 per week of operations during the initial term.  A Cart Operation is only available to owners of full producing units;

*For full producing stores and satellites we develop, you must also reimburse us for the development costs, including rehabilitation and construction, at cost.  Such expenses are approximately $100,000- $350,000 for a full producing store or satellite.  Costs may vary depending on factors such as the amount of necessary sitework, such as raising or lowering the land, whether a sewer hookup is required, the existence of environmental contamination or the necessity of environmental test borings, zoning factors and legal fees*, or whether the location is merely an existing building which required renovation. *These amounts vary for each location and are provided in full detail on a store by store basis.*

Prior to the opening of your first Honey Dew Donuts® Shop, you are required to successfully complete our training program.  If you do not successfully complete the training program, the Franchise Agreement is terminated and we will refund all but $4,500 of the Franchise Fee you have paid.  There are no refunds under other circumstances.

We reserve the right to lower the amount due for the franchise fee on a store by store basis due to any special circumstances.  We do not offer payment terms for the franchise fee, but reserve the right to do so on a case by case basis, upon such terms as may be negotiated.  The franchise fee, including unpaid interest and principal if paid in installments, is non-refundable in whole or in part.

In our last fiscal year prior to the date of this Offering Circular (November 1, 2001 to October 31, 2002, one full producing store was sold for a franchise fee of $35,000, plus $265,000 for leasehold improvements, equipment and signage; One franchisee, which operated a previously closed full producing store on a trial basis, exercised a purchase option for $50,000 plus $10,000 for reimbursement of equipment; and one cart location closed.

All sums paid by you shall be deposited to the escrow account of our attorney.  Upon the opening of your Honey Dew Donuts® Shop, such sum and any accrued interest shall be paid to us.

Purchase of additional franchises by owners is governed by HDA's then-current Expansion Policy. A copy of the current Expansion Policy is included herein in Addendum B.

## 6. Other Fees

The other recurring or isolated fees or payments that you must pay to use are listed below. No fees or payments are required to be made by you to HDA, nor do we or HDA impose or collect any fees or payments on behalf of third parties. All the fees listed below are paid to BII and are not refundable.

As utilized below, gross sales include all sales at your business premises, whether at retail, wholesale or otherwise made. In the transfer fee, the gross sale price includes all sums incidental to the sale or in connection therewith including, without limitation, the cost of all equipment, goodwill, covenants not to compete, personal service contracts, and all other assets.

| Name of Fee | Amount | Due Date |
|---|---|---|
| Royalty | Seven (7%) percent on total gross sales | Weekly |
| Rent | Base rental of ten (10%) percent on total gross sales triple net | Weekly |
| Advertising Fee | Two (2%) percent on total gross sales | Weekly |
| Transfer Fee | The greater of $15,000 or ten percent (10%) of your gross sale price | At transfer |
| Renewal Fee | Full store- $10,000<br>Satellite- $ 5,000<br>Cart- $ 2,500 | At execution of Renewal Agreement |

Note 1: The rent figure only applies to stores we develop only. We have, from time to time, negotiated base rent amounts. Where you develop the location, you will be responsible for negotiating your own rent payable to your landlord.

Note 2: For a Cart Operation, as defined in Item 5, the transfer fee is the greater of $5000.00 or 10% of the gross sale price. No transfer fee is required if you are an individual and you transfer the franchise to an entity you own.

5

Note 3:  The usual term for a full producing store or satellite is 10 years with a 10 year renewal, but this may vary depending on the remaining term of the underlying Lease. The usual term for a Cart is 3 years with a three year renewal, but this may vary.  Franchise fees and the renewal fee, if any, may be increased or decreased if the term or renewal term is lengthened or shortened.  For all stores, the length of your term may be less than the usual where we have operated the store prior to your purchase, thereby utilizing a portion of the term of the underlying lease, or where you are not the first franchisee to purchase the location (such as where we have reacquired a location).  Where you develop your own site, our documentation requires that your landlord agree that we may take over as the tenant, at our option, in the event you default in either your lease or franchise obligations.  Also, if you are continuing in business at the site after expiration of your Franchise Agreement, you are required to either renew your existing Franchise Agreement or, if you have no renewal rights, enter into a new franchise arrangement at our then-prevailing terms. If you do not desire to continue as our franchisee, the site may not be used for the same purposes for one year.

Note 4: The Advertising Fee is contributed to the Honey Dew Advertising Fund, for uses as set forth in the Honey Dew Advertising Policy in effect from time to time.  A copy of HDA's currently effective Advertising Policy Statement is attached hereto as Addendum C.

Note 5:  Interest accrues on overdue payments at a rate of 18% per annum, from the date due to the date paid.  Costs of collection, including reasonable counsel fees, must also be reimbursed.

## 7.  Initial Investment

### YOUR ESTIMATED INITIAL INVESTMENT

| | AMOUNT | METHOD OF PAYMENT | WHEN DUE | TO WHOM PAYMENT IS TO BE MADE |
|---|---|---|---|---|
| Initial Franchise Fee | $35,000-Full* $20,000-Sat $50/wk-Cart | Lump sum | At closing | BII |
| Real Estate And Improvements | $100,000-$350,000 Full and Sat only | As incurred/ Lump Sum | Prior to Opening | BII/Vendors |
| Equipment | $75,000-$125,000- Full $35,000-$75,00- Satellite $20,000-25,000- Cart | Lump sum | Prior to opening | Vendor/BII |
| Signs | $20,000-$30,000-Full/Satellite $3,000-$10,000-Cart | Lump sum | Prior to opening | BII/Vendor |
| Misc. Opening Costs | $7,000- Full/Sat $1,000-Cart | As incurred | Prior to opening | Suppliers/Vendors Municipality, Etc. |

6

| | AMOUNT | METHOD OF PAYMENT | WHEN DUE | TO WHOM PAYMENT IS TO BE MADE |
|---|---|---|---|---|
| Opening Inventory | $3,000- Full/Sat $1,000-Cart | As incurred | Prior to opening | Vendors |
| Additional Funds 3 months | $75,000- Full/Sat $23,000-Cart | As incurred | As incurred | Employees/ Vendors/ Suppliers/Utilities |

*The franchise fee is nonrefundable except that, if you or your designated manager do not pass our training course, all but $4,500 of the franchise fee is refunded.

If we develop the store, all real estate and improvements costs, signage costs and equipment costs are reimbursed by you. If you develop the store, the real estate and improvement costs, equipment and signage costs will be paid by you.

Regardless of who develops the store, costs vary from site to site depending on factors such as the location, store size, layout, zoning ordinances, building codes, construction costs, necessary sitework, such as raising or lowering the land, whether a sewer hookup is required, the existence of environmental contamination or the necessity of environmental test borings, zoning factors, legal fees and other factors beyond our control. Depending on whether a site is leased or purchased, real estate and improvement costs vary depending on the arrangements made with landlords, contractors and the like including, without limitation, whether a building and fixtures are in place, whether a working hvac system exists, whether sufficient electrical service exists, and the condition of the building. If you purchase a site, your acquisition and carrying costs must be added to your expenses and are not included in the figures set forth above.

For stores you develop, you are required to retain an architect and present plans for our approval. In general, you are required to conform the premises to our specifications and all items of interior finish, including cases and counters, are subject to our approval. Prior to opening, your store must pass our final inspection and obtain approval for opening.

Honey Dew Donut Shops are generally in strip centers and in free standing buildings adjacent to malls, located in small and midsize towns. A store size of approximately 1600 square feet is required for a full producing store, 500-1000 square feet for a satellite store and 150-300 square feet for a cart. You are required to purchase or rent all equipment for the operation of the franchise. The costs will vary depending on the size of the store, the existence of a drive-thru window, requirements of landlords, requirements of governmental authorities and other factors beyond our control. As for signage, the placement, size and amount of signage is determined by us. Signs revert to BII upon termination or conclusion of the franchise.

7

Deposits include electric, gas and/or telephone security deposits, as well as the costs of obtaining necessary licenses and permits such as a milk license, common victular's license and occupancy permit. Additional costs will occur if you incorporate and if you utilize an attorney for these matters. Also included are the costs of a "grand opening", including advertising, special decorations, special appearances and the like.

***BII has relied on its experience in the donut shop business to compile these estimates. You should review these figures carefully with a business advisor before making any decision to purchase the franchise.***

BII cannot guarantee that you will not have additional expenses starting the business. Your costs will depend on factors such as: the extent to which you follow BII's methods and procedures, your management skill, your experience and business acumen, local economic conditions, the·local market for our product, the local wages required to be paid, competition and the sales level reached during the initial period.

Certain of your expenses will be based on the amount of sales you generate. The amount you purchase, your payroll, your advertising budget, your utility costs, your insurance costs, payroll taxes, rent, and royalties will all be directly impacted by your sales. For this section seven, we have estimated costs based on sales of $350,000. However, this should not be interpreted as a representation that your sales will be in any specific amount. To assist you in determining the projected costs, we have included in <u>Exhibit A</u> projected costs assuming sales of different levels. However, the projected costs are merely estimates, based on normal market conditions, of the relative allocation of expenses to which you should be working, and should not be considered as more than a guide. Various factors can significantly alter cost projections, such as labor shortages increasing labor costs or oil shortages increasing utility costs. On a store by store basis, you should consider economic factors and local conditions, as well as other factors, in preparing your own estimates. We recommend you utilize the services of a C.P.A. or similar advisor in determining whether a specific site is likely to be viable.

If you are financing the franchise fee or your purchase of equipment, signage or other business expenses, the costs of such financing must be included in your projections.

## 8. Restrictions on Sources of Products and Services

A.    For Franchisor Developed Stores (including satellite and cart locations we develop) only, we locate and lease a suitable location and arrange for leasehold improvements to our specifications. You are obligated to sublease the selected site from us. We receive income from the subleases. If we develop a Satellite or Cart location, you must reimburse us for our costs in doing so, including the costs of signage and equipment. We, Mr. Bowen, and/or a corporation or other entity owned in whole or in part by him may be the owner or lessee of the real estate and, if so, he and/or the entity will receive income from its lease with us and, indirectly, through your Sublease. For Franchisee Developed Stores, Satellite Stores and Cart Operations, you are responsible for the purchase or lease of real estate, upon terms you negotiate. We must approve all locations, but we receive no revenue or other consideration as a result of

8

your lease arrangements unless we are leasing the premises to you. All items of leasehold improvements must conform to our standards and are subject to our approval.

In general, every item within the store, from equipment and fixtures to paper goods to food products must be approved by us and purchased from suppliers approved by us.

You are required to purchase an equipment package, cash registers and signage from suppliers approved by us. A sample equipment package for a full producing store is set forth in Exhibit I, infra. The amount, content, colors and wording of signage must be approved by us. The quality and amount of equipment must be approved by us.

You must purchase cups, plates, paper goods, containers, bags, menus, flour, sugar and all other usual articles and ingredients used for or in connection with the sale, dispensing or display of donuts and donut shop products from a provider of such goods approved by us as conforming to our standards and specifications which, in turn, must conform to HDA's standards and specifications. You will deal directly with us regarding such standards and specifications. Insofar as ingredients and similar supplies are concerned, the specifications and standards are designed to insure quality control and uniformity of product. Insofar as paper, glass, equipment and signage and similar items and supplies are concerned, the specifications are designed to insure quality and uniformity and to promote goodwill by display of the name and/or symbols of HDA.

During the term of a franchise, your store may have to be renovated at our request and at your expense in accordance with our specifications. Without limiting our right to request renovations, it is anticipated that, by the end of ten years, the premises should have undergone at least one major renovation to conform to our current specifications and design requirements.

Approved suppliers have been selected through experience and have served and/or are currently serving other Honey Dew Donuts® franchisees or us. The names of approved suppliers will be provided to you. We will consider, but we are not required to approve, products or services of suppliers not approved by us.

B.    We are required to adhere to specifications and standards, and utilize suppliers, as mandated by HDA, as required to suit the purposes set forth in subparagraph A, supra. In 1998, HDA formed a Honey Dew Operations Committee (HDOC), consisting of franchisees and non-voting management members, to assist in making recommendations to HDA as to operational issues including, without limitation, standards, supplies and suppliers. All franchisees of HDA and BII were invited to participate and volunteers were appointed by HDA to serve specific terms or as alternates, with replacements to be appointed from future volunteers or, if the number of volunteers exceed the number of available positions, the replacements are to be determined by franchisee election. The Committee's work has included meeting with suppliers and potential suppliers to make recommendations as to suppliers to be utilized and negotiating prices.

9

Written specifications and standards, to the extent they exist, will be furnished to you upon written request therefor. You will be notified in writing of any modifications. Specifications and standards may be released to specific suppliers or potential suppliers only with our consent. Approval of the use of any non-approved supplier or product must be in writing by us. You are notified of all decisions in a reasonably prompt manner. Suppliers, potential suppliers and each article and ingredient are judged on quality of product and ability to meet and maintain the specifications and standards. We may not unreasonably withhold approval of any supplier or item, but ultimate approval rests with HDA.

To be considered as a supplier, a vendor must apply through HDA's supplier qualification program by which detailed data must be provided concerning the supplier's operation, quality control, production and delivery methods. In general, the supplier qualification program consists of an initial questionnaire, a follow up meeting to clarify issues and, where necessary, obtain supplemental information, and an examination of the supplier's facility for quality control purposes. Approved suppliers may be subject to additional inspections up to twice a year. The extent of the investigation may vary depending on the product(s) to be produced, with particular care devoted to food products.

· C.    Neither we nor anyone affiliated with us sells or leases any of the items set forth above, with the exception, in certain situations, of the real estate, as set forth above in subsection A; and from time to time, HDA or BII may obtain from suppliers labels or other materials involved in the store including, without limitation, advertising point of purchase materials. When labels or other such items are purchased from HDA or BII, HDA and BII sell such items at their cost.

D.    BII does not derive income from purchases made from approved suppliers, receive any payment as a result of or related to sales to you, or negotiate price terms or purchase arrangements with the approved suppliers. HDA has negotiated prices with certain suppliers so that every Honey Dew Donuts® Shop receives the same price. Commencing in 1998, the HDOC commenced participation in direct negotiation with some suppliers to negotiate price changes and make recommendations as to pricing matters. Most approved suppliers provide vendor rebates to HDA calculated by chain-wide sales, although payment of vendor rebates has not been a prerequisite to approval. A listing of the current vendor rebate schedule is available to prospective franchisees upon reasonable request and execution of the Covenant to Protect Trade Secrets and Proprietary Information, a copy of which is attached hereto as Exhibit F. HDA currently pays all such vendor rebates to the Honey Dew Advertising Fund, and is under contractual obligations to continue doing so in the immediate future. Other than the vendor rebates, neither we nor any affiliate derives income from purchases made from approved suppliers, or receives any payment as a result of or related to sales to you. HDA, BII, Richard Bowen or Robert Bowen may receive, from time to time, *de minimus* promotional items from approved suppliers, such as paid visits to restaurant shows, paid visits to plants, sports tickets, game travel arrangements and meals.

E.    The items to be purchased or leased which must conform to our standards will constitute every item within your business premises.

10

F.      No purchasing or distribution cooperatives currently exist.

## 9. Franchisee's Obligations

THIS TABLE LISTS YOUR PRINCIPAL OBLIGATIONS UNDER THE FRANCHISE AND
OTHER AGREEMENTS.  IT WILL HELP YOU TO FIND MORE DETAILED
INFORMATION ABOUT YOUR OBLIGATIONS IN THESE AGREEMENTS AND IN
OTHER ITEMS OF THIS OFFERING CIRCULAR

| Obligation | Section in Agreement | Item in Offering Circular |
|---|---|---|
| a. Site selection and acquisition/ lease | Section I/ Addendums | Sections 6 and 11 |
| b. Pre-opening purchases/ | Section I/ Addendums | Section 8 |
| c. Site development and other pre-opening requirements | Section I/ Addendums | Sections 6,7 & 11 |
| d. Initial and ongoing training | Section V | Section 11 |
| e. Opening | N/A | Item 11 |
| f. Fees | Sections II III and XIV | Sections 5 & 6 |
| g. Compliance with standards and policies/ Operating Manuel | Sections VI and VII | Section 11 |
| h. Trademarks and proprietary information | Sections VI and XII | Sections 13 & 14 |
| i. Restriction on products/services offered | Section VII | Section 16 |
| j. Warranty and customer service requirements | N/A | N/A |

| Obligation | Section in Agreement | Item in Offering Circular |
|---|---|---|
| k. Territorial development and sales quotas | N/A | N/A |
| l. Ongoing product/service purchases | N/A | N/A |
| m. Maintenance, appearance and remodeling requirements | Section VII | Section 11 |
| n. Insurance | Section XI | Sections 6 & 8 |
| o. Advertising | Section X | Section 11 |
| p. Indemnification | Sections VI & XIX | Section 13 |
| q. Owner's participation management/staffing | N/A | Section 15 |
| r. Records/reports | Section VIII | Section 11 |
| s. Inspections/audits | Sections VIII and IX | Section 11 |
| t. Transfer | Sections XIV, XV | Sections 6, 17 |
| u. Renewal | Section III | Section 6 |
| v. Post-termination Obligations | Section XXI | Section 17 |
| w. Non-competition covenants | Section XIII and XXIX | Section 17 and Ex. L |
| x. Dispute resolution | Section XXV | Section 17 |

## 10. Financing

BII does not offer direct or indirect financing, but may allow for payment of franchise fees over time, upon such terms and conditions as may be negotiated. BII does not guarantee your note, lease or obligation.

**11. Franchisor's Obligations**

Except as listed below, BII need not provide any assistance to you prior to the opening of your store:

A. Before you open your business, BII will provide the following services:

(i)  For stores we develop, we will research and locate a store location, lease the premises for sublease to you, make leasehold improvements to conform the premises to the design specified, and arrange, if necessary, for installation of any fixtures, and will conform the premises to local ordinances and building codes and obtain all required health, sanitation, building, driveway, utility and sign permits.  You will pay us rent, buy all the equipment and signage, and reimburse us for the land development costs including construction, rehabilitation, decoration  and finish work.  You will reimburse us for all signage and equipment, at cost. You must also purchase initial supplies and ingredients, all of which you must  purchase or lease from approved suppliers.  Franchise Agreement, Section I(C). There are no written specifications for the items to be purchased such as ingredients, but, generally, more than one approved supplier is provided, unless exclusivity within the chain of stores has been provided to a supplier in exchange for system-wide pricing concessions or to insure uniformity. The owner of the site may be an affiliate of HDA.  You or your designated trainee will undergo our training program.  As part of the training we provide a Counter Help Training Manual for use by your employees, but we do not hire or train your employees. See, subsection H, infra.  Franchise Agreement, Section VII.

For stores you develop, your proposed site requires our approval.  The development, construction, rehabilitation, licensing, decoration and finish work are your obligation, subject to our approval. Approval of the site is contingent upon the execution by you and your lessor of  our Conditional Assignment of Lease, Exhibit J, infra.. However, this requirement is not a limitation on our discretion to approve or disapprove of any site. Franchise Agreement, Addendum.  If necessary, HDA will attend a planning meeting with your Architect.

BII will provide any documents necessary for your Architect to prepare plans and specifications which will be acceptable to BII for your Honey Dew Donuts® Shop. At least two days prior to opening, BII will perform a final inspection and, if changes are required, will re-inspect your premises before they open.

(ii)  Prior to the opening of the store, BII will arrange to have you or, if you are an entity, your designated trainee, trained.  Franchise Agreement Section V. See Section E, infra.

13

B.       After your store is open, BII need not provide any assistance to you except as follows:

(i)  For full producing stores sold by us,  BII will pay up to $2500.00 in "Grand Opening" expenses related to your location by reimbursing you for one half of approved expenses you incur up to $5000.00.  Such expenses include special advertising, personal appearances, special decorations and a grand opening ceremony.  This provision applies to full producing stores, which are not resales, only.  Franchise Agreement Section V(E).

(ii)      HDA provides an Operational Excellence Procedure Manual, the provisions of which are, as amended from time to time, incorporated into the Franchise Agreement and other "operating standards" and we may, from time to time, advise you, either in writing or orally, of additional "operating standards" to which you must adhere.

(iii)     We will collect a 2% advertising fee from you, Franchise Agreement Section II(C), and contribute that money to an Advertising Fund which HDA administers.  HDA has set up a Franchisee Advertising Advisory Committee, currently made up of franchisee volunteers, to provide non-binding input into how the Advertising Fund should be spent and to serve as liaison between the franchisees and HDA as to promotional and product issues.  All franchisees of HDA and BII were invited to participate and all volunteers were appointed by HDA to serve specific terms, with replacements to be appointed from future volunteers or, if the number of volunteers exceed the number of available positions, the replacements are to be determined by franchisee election.  The monies in the Advertising Fund, plus any monies contributed to the Advertising Fund by HDA or BII, plus any advertising cooperative monies which HDA or BII receives and contributes to the Advertising Fund, is held in separate and segregated accounts and is used for promotional, marketing, public relations and advertising expenses, consistent with HDA's then-existing Advertising Fund Policy Statement, a current copy of which is attached hereto as Addendum C.  Franchise Agreement Section X(D).

C.       HDA presently advertises and utilizes print, billboard, radio and has, from time to time, used television advertising on local and/or regional stations and in local and/or regional media, produced by local advertising agencies, using funds contributed to the Advertising Fund. You and any other stores owned by you or, if you are an entity, any other store sharing common ownership, in whole or in part, with you, are required to participate in any promotional and/or marketing programs, we initiate.  See, items 6, 8 and 9.  For each such contribution you make to the Advertising Fund, BII will allocate a matching amount to be utilized for advertising, public relations and/or marketing activities, which sums may, in whole or in part, be contributed to the Advertising Fund or applied to other activities, including, without limitation, grand opening expenses, payment of personnel for advertising, marketing and/or public relations activities, product development costs, market research, local advertising contributions to assist one or more franchisees and the like.  Franchise Agreement Section II(C).

Owners of franchises may engage in their own advertising, subject to BII's prior written approval of the placement and content of all such advertising.  Franchise Agreement Section X(A).

14

In 1998, HDA established the Honey Dew Advertising Committee (HDAC), consisting of franchisees and, from time to time, non-voting management participants, to provide recommendations as to how the Advertising Fund should be utilized and to serve as liaison between the franchisees and HDA as to promotional and product issues. All franchisees were invited to participate and all volunteers were appointed by HDA to serve specific terms, with replacements to be appointed from future volunteers or, if the number of volunteers exceed the number of available positions, the replacements are to be determined by franchisee election. There are no other advertising councils, cooperatives or funds in which you participate or to which you contribute. there are presently no local or regional advertising cooperatives.

HDA reserves the right to divide the Honey Dew Advertising Funds into Regional Funds and to expand or contract any geographical area covered by any Regional Fund. HDA reserves the right to create a National Advertising Fund. HDA may determine to which of the Funds monies shall be contributed and in what proportion.

The HDAC does not have operational or decision making power and serves in an advisory capacity only. The HDAC has adopted its own operational by-laws and neither HDA nor BII has the power to form, change, or dissolve the HDAC.

As of the date of this Offering Circular, HDA and BII contribute 4% of gross sales of company owned stores to the Advertising Fund and also contribute all vendor rebates received to the Advertising Fund. When the Honey Dew Advertising Fund was established, in 1998, existing franchisees were requested to voluntarily amend their Franchise Agreements to participate in the Advertising Fund. To induce franchisee contributions, HDA and BII contractually committed to (i) match those franchisee's 2% commitment, (ii) contribute 4% of gross sales from company owned stores and (iii) contribute all vendor rebates to the Advertising Fund. These contractual commitments last until termination or expiration of the last of the Franchise Agreements which were so amended. Since initiation of the fund, all new franchisees are required to participate at the 2% level.

All BII franchised stores which contribute to the fund, contribute 2% of gross sales.

The Advertising Fund is the sole property of and is administered by HDA. The HDAC is intended to have oversight of the use of the Advertising Fund and statements are provided, at least annually, as to the Fund's receipts and expenditures. Franchise Agreement Section X(D). The Advertising Fund is not separately audited, but as it is an asset of HDA, it is audited as part of HDA's audit.

Expenditures of the Advertising Fund are confidential and proprietary, but will be provided to prospective franchisees upon reasonable request and execution of the Covenant to Protect Trade Secrets and Proprietary Information, a copy of which is attached hereto as Exhibit F.

Neither HDA, BII, nor any affiliate of either receives payment for providing goods or services to the Advertising Fund other than (a) reimbursement for its reasonable costs in administering the Advertising Fund; and (b) reimbursement for its costs of collecting any sums due to the Advertising Fund by franchisees. HDA's marketing personnel are paid from the Advertising Fund.

There are currently no requirements that Advertising Funds be spent in any particular geographic area or territory but, as the recommendation of the HDAC, the advertising agency planning HDA's media buy has been instructed to generally attempt to allocate the budget equitably to the various market areas, based on franchisee contributions.

Monies in the Advertising Fund at the end of HDA's fiscal year are carried over in the Fund to the following fiscal year.

Presently, all advertising is used for solicitation of customers for stores, but such advertising has an incidental effect in providing name recognition and thereby assists in solicitation for the sale of franchises. No portion of the Advertising Fund is currently utilized for advertising which is primarily intended as a solicitation for the sale of franchises.

D.     In connection with the purchase of the franchise, the equipment package you purchase or lease must include an electronic cash register, without resetting devices. Franchise Agreement, Section VIII(D). Presently, the only approved cash registers are (i) a CRS 3000 Quick Service System available only through Cash Register Sales, Inc., 2909 Anthony Lane, N.E. Minneapolis, Minnesota 55418 (800-333-4949), which owns the software program or (ii) a Samsung Model 5100, from Northeast ERC, 51 Commerce Way, Woburn, MA 01801 (800-830-9372; 617-937-1801) . The Cash Register package required from Cash Register Sales, Inc. has been in use in Honey Dew Donuts® stores since January, 1994. Northeast ERC has been an approved supplier since 1996. The cash register package is included in the costs of your equipment. Included is a standard Honey Dew Donuts® program which tracks the various items sold. The cash registers will accumulate sales and provides a statistical analysis of sales and taxes by product sold. BII has the right to independent access to all information therein. Id. BII may utilize your financial and operating information as we may elect, but we will not use your name or specific location without your permission. Franchise Agreement, Section VIII(B).

E.     It is currently the policy of BII to engage in periodic inspections of the franchised locations and to assist franchisees in operating problems they encounter. Franchisees are provided with our current Operational Excellence Procedure Manual and our operational standards, and stores which do not pass our inspections are assisted in improving and given an opportunity to improve their performance.

F.     For Franchisor Developed Stores, the franchise is granted for a specific location selected and leased by BII. Franchise Agreement, Section I(C). For Franchisee Developed Stores, you select the site, subject to BII's approval. Franchise Agreement, Addendum. No scientific or standard formula or method for selection or approval of sites is used. Such matters as population density, traffic patterns, location and neighborhood, parking, size and layout, ability to lease and existing competition are taken into account. For Self Developed Stores,

16

satellites and carts, you may be required to either exercise your option to renew, assign use of the premises to us, or refrain from operating a similar business for one year. For Self Developed Stores, satellites and carts, following expiration of your renewal term, you must either refrain from operating a similar business for one year or you must (i) accept a new franchise at prevailing terms or (ii) assign us the right to use the premises at prevailing terms capped at 10% of gross sales, triple net, if you own or control the property.

   G.  For Franchisor Developed Stores, the typical length of time between signing of the Franchise Agreement (at which time the initial payment is made) and the opening of the business is approximately 60- 120 days. Factors such as slow delivery of equipment, delays in remodeling, decorating, installation of signs, delays in the permitting process and the like, may effect the length of time required for opening. Sites requiring construction or major renovations may require longer periods before opening.

   H.  As of the date of this Offering Circular, BII's training program:

  (i) Takes place at HDA's training facility in Massachusetts or at such site or sites as BII determines and is intended to provide the basics of all areas of your responsibilities under the Franchise Agreement: Baking (cooking and finishing), customer service, cleaning, and administrative management.

  Training generally consists of a full time six day work week for six weeks, at such hours and at such times as the instructor shall determine. Attendance at all training sessions determined by the instructor is mandatory. Trainees must be available to work at whatever shifts are requested, including overtime work.

  The Brockton facility is a company owned store operated by HDA for use as a training facility. Thus, training is available at all times.

  BII recommends that trainees undergo and pass a complete physical examination prior to starting the training program. BII does not recommend that the program be undertaken by persons who are not in good physical health, including heart, back, leg or other health problems. BII does not recommend that the program be undertaken by anyone who is pregnant. The training will include, without limitation, work on wet and/or slippery floors, long hours, exposure to chemicals and cleaning solvents, heavy lifting and physical labor.

TRAINEES MUST EXECUTE A RELEASE AND WAIVER AGREEMENT IN THE FORM ATTACHED AS EXHIBIT H.

  Where you are a partnership or corporation, you must designate a trainee to undergo training. If more than one store is to be operated, BII may require additional persons to pass its training course.

17

If you or your trainee do not successfully complete the training, in the sole discretion of BII, the Franchise Agreement will be canceled, except that the Covenant Not to Compete and the Covenant to Protect Trade Secrets and Proprietary Information shall remain in full force and effect, and all funds paid to BII by you will be refunded, with the exception of $4,500.

(ii)  The length and scope of the training program will vary, based on the individual needs of the trainee.

(iii)  The person responsible for training is chosen by BII and has at least two (2) years of satisfactory experience in all areas of donut shop operation.  Certain aspects of training may be delegated to other persons, in the discretion of the person responsible for training.

(iv)  BII will pay the salary and costs, if any, of the instructor.  You are liable for the salary and costs, if any, of the trainee.

(v)  This training program is mandatory for all Franchisees and may be waived only by your request, with BII's consent, if you already have satisfactory experience in donut shop operations.

(vi)  HDA has, from time to time, provided forums with speakers pertaining to a variety of operational issues. HDA may, from time to time, provide additional reference materials or training as to preparation of specific items.  There are no other additional training programs or refresher courses.

F.      The training consists of experience in donut shop operations, on site.  HDA provides a training booklet, as well as its Operational Excellence Procedure Manual, and a Counter Help Training Manual for use by your employees. A table of contents for the Operational Excellence Procedure Manual and the Counter Help Training Manual are attached hereto as Addendum D.   There is no charge for the materials provided.  Training involves "on the job" activities and there are no classroom training.  Training must be successfully completed before a store may be opened by you or, if already open, turned over to you.

The Operational Excellence Procedure Manual provides detailed information concerning day to day operations and the requirements of HDA and BII to which you must adhere, including standards and specifications necessary for approved operations and production of product, such as the variety and number of products to be available and, in some circumstances, particular products which must be produced, as requirements concerning freshness, display and the like. The training outlines the various training activities in which the trainee will be involved including (a) Maintaining and cleaning the store, (b) donut finishing, muffin baking and pastry baking; (c) familiarization with equipment, (d) product production, (e) customer service, (f) completion of paperwork required by BII, (g) ordering supplies, (h) register training and cash-out procedures, and (i) scheduling employees.  The Counter Help Training Manual is designed for use by you in training your employees and established a training schedule and process we recommend.

See Franchise Agreement, Section V.

18

## 12. Territory

A.      We have established and may establish another franchisees using our trademarks. In this section, when we say "trademarks", we mean all our names, trademarks, logos and other commercial symbols.

B.      We may establish and we have established company-owned outlets and we may, but have never, established other channels of distribution using our trademarks.

Your Franchise Agreement is limited to a specific approved site. The establishment of additional franchised outlets requires execution of additional Franchise Agreements. Cart locations with sales insufficient to justify continued operations are allowed to close. Exhibit C, Addendum for Cart Operation.

You do not receive an exclusive territory. You do not receive the right to acquire additional franchises within any specific area. However, with the exception of Cart Operations, you will be provided an area in which you have a right of first refusal if another store is to be opened. This area is the area within a circle drawn around your store (usually one-half mile in radius) with your store as the center (the "First Refusal Area"), but the area may be altered in urban areas, in areas of planned expansion at the time your franchise documents are negotiated or where special circumstances exist. Any shop within your area, open at the time you sign your franchise documents, and any store to operate in an institutional setting, will be exempt. Our right to sell pre-packaged goods in any location is not restricted.

With the exception of Cart Operations, which may not engage in wholesale sales, you will have no territorial restrictions limiting your sales base or the area from which you may seek to attract retail or wholesale business.

We have sold franchises within the First Refusal Radius of a franchisee. We may, but have not to date, opened a company-owned store within the First Refusal Radius of a franchisee. The decision to open another location within your First Refusal Radius is within our sole discretion. In making this determination, we look at whether the new site area has a sufficient traffic flow to justify a store. In such a situation, you are given a right of first refusal to operate the offered location. Where a proposed location is within the exclusive area of two or more franchisees, the senior franchisee has a right of first refusal, the second senior franchisee has a right of second refusal and so on. If you own more than one franchise, and a proposed location is within the exclusive area of two or more of them, you are only given one right of refusal.

C. Neither we, nor HDA, have ever established other franchises or company-owned outlets or another channel of distribution selling or leasing similar products or services under a different trademark, but both we and HDA have the right to do so. However, neither we nor HDA has any present plans to do so.

D. Continuation of the First Refusal Area is only contingent upon the continued existence of your franchise.

19

**13. Trademarks**

A. Pursuant to the Franchise Agreement, we grant to you the right to operate a shop under the name Honey Dew Donuts® and under any other trade names, trademarks, service marks and logos currently used or that may hereafter be used in the operation of such Shops.

The principal trademark and service mark we have used since February, 2002, is attached hereto as Addendum E.   This Mark is pending registration with the U.S. Patent and Trademark Office

"Always Fresh, Always Good"® is a registered service mark in Rhode Island. This mark is also registered as a trademark and service mark with the U.S. Patent and Trademark Office and is on the principal register, Registration Number 2,108,962, approved October 28, 1997.

The name Honey Dew Donuts® was registered with the U.S. Patent and Trademark Office and is on the Principal Register as Reg. No. 2,382,230.  In Rhode Island, the Service Mark "Honey Dew Donuts" was registered on June 9, 1995 as document 95-6-8.

HDA has obtained federal trademark registration for the mark Chillerchino®, which is on the principal register as Registration Number 2,164,133 , approved June 9, 1998. Chillerchino® was registered in Rhode Island as Registration Number 970701 on July 1, 1997.  HDA has obtained a federal trademark registration for the mark and logo Froosh™, which is on the principal register as Registration Number. 2,437,879.  The Froosh™ name and logo were also registered in Rhode Island on July 10, 1998 as Registration Numbers 980711 and 980712.

You must follow our rules when you use these marks.  You can not use a name or mark as part of a corporate name or with modifying words, designs or symbols except for those which we license to you.

B.  There are no currently effective material determinations of the patent and trademark office, trademark trial and appeal board, the trademark administration of any state or any court and there is no pending infringement,  opposition or cancellation proceeding and no pending litigation involving the principal trademarks.  However, the words "Honey Dew" have previously been registered as a trademark by other corporations and the words "Honey Dew" are not be exclusive to the use of HDA. No claim is made to the exclusive right to the term "Donuts" apart from the Mark.

The inability of HDA to obtain a registration in the United States Patent and Trademark Office regarding the words "Honey Dew" permits others to establish rights to use of the name in territories in which HDA or its franchisees are not operating or advertising or which are not within the natural zone of expansion for future Honey Dew Donuts® Shops, provided such others do so in good faith and without actual knowledge of the existence of HDA or its franchisees.  If others do so establish rights to the name and such territories, HDA may be restricted in its ability to expand into such territories.

C. There are no agreements currently in effect which significantly limit our rights to use or license the use of trademarks listed in Item 13 in a manner material to you.

D. Neither we nor HDA are under any obligation to protect your right to use any trademarks or other commercial symbols from claims of third parties, nor to protect you from claims of infringement or unfair competition with respect to the same, but either may, at its option, do so. We and HDA, are not obligated to participate in the defense of any such action nor to indemnify you if you are a party to such an action. In our sole discretion, you may be required to discontinue use of any name or mark and/or use one or more additional or substitute names or marks. If so, we must reimburse you for all tangible costs of complying.

You must notify us of any known infringement of, challenge to or threatened challenge to your use of any name or mark or of any lawsuit to which you are a party involving any said name or trademark.

Pursuant to the Franchise Agreement, you, during the operation of the Franchise Agreement and thereafter, agree not to directly or indirectly contest or aid in contesting the validity or ownership of any such names or trademarks or any other commercial symbol used by us.

E. We know of no superior prior rights or infringing uses which could materially affect your use of the principal trademarks in Rhode Island.

## 14. Patents, Copyrights and Proprietary Information

We own no rights in any patents or copyrights. The formulae for products sold are trade secrets and the methods of operating a franchised shop are proprietary information. See paragraph 15, infra., regarding protection of said trade secrets and proprietary information. You must promptly tell us when you learn about unauthorized use of these trade secrets and/or proprietary information. We are not required to take any action but will respond as we believe appropriate.

## 15. Obligation to Participate in the Actual Operation of the Franchised Business

You or an approved manager are obligated to participate fully in person in the operation of the franchised business. The manager may, but need not be, a part-owner of the franchise. If you designate a manger, it is anticipated that the manager would be designated for our training program. You or your manager need not be personally present on the premises during all hours of operation. It is recommended that you or your manager exercise the maximum degree of personal supervision possible. Operation of a Honey Dew Donuts® Shop requires personal attention and the investment of considerable time. You or your manager should be prepared to work at least one full shift each day, although, if profits are high, this may not be required.

21

You must agree to protect the formulae for its product and other proprietary information as trade secrets. You must sign a Covenant to Protect Trade Secrets (Exhibit F), by which you agree not to contest directly or indirectly HDA's ownership and exclusive right to said formulae and information and not to utilize said formulae or information except in the operation of a Honey Dew Donuts® Shop. You are also required to have employees with access to such formulae and information also execute the Covenant.

You and your manager must execute Covenants Not to Compete with BII and other Honey Dew Donuts® Shops are set forth in Paragraph 17N, infra. It is your responsibility to have this covenant signed by your manager.

If you are an entity, your owners must execute a Liability Agreement, Exhibit G, by which they accept joint and several liability with you for all obligations to BII.

## 16.  Restriction on What the Franchisee May Sell

You are required by the Franchise Agreement to maintain and display an adequate supply of products and merchandise, and may not sell any product outside of donuts and usual Honey Dew Donuts® Shop products. Operational standards are utilized to govern the number, types or flavors of individual products which must be available, in order to promote uniformity or to assist in system-wide marketing. Additional items may only be sold with the advance written approval of BII. BII's current policy does not allow the sale of lottery tickets. You are not limited as to the customers to whom you may sell your goods, except that Cart operations are prohibited from engaging in wholesale sales.

## 17.  Renewal, Termination, Transfer and Dispute Resolution

This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this offering circular.

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| a. Term of the franchise | §III(A) | Usually ten years |
| b. Renewal or extension of the term | §III(B) | If you are in good standing and pay renewal fee-Store and equipment must be brought up to date |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| c. Requirements for you to renew or extend | §III(B) | On written notice, for fee, sign new agreement- usually ten years |
| d. Termination by you | None | |
| e. Termination by BII without cause | None | |
| f. Termination by BII | §XX | For your default with cause |
| g. "Cause" defined- defaults which can be cured | §XX(A)(3)(4)(7) | 7 day notice to cure payment defaults; 5 day notice to cure other defaults |
| h. "Cause" defined- defaults which cannot be cured | §XX(A)(1-2,5-6, & 8-13), and §XX(B) | Non-curable defaults include repeated defaults, unapproved transfer, conviction of material crime |
| i. Your obligations on termination/nonrenewal | §XXI | Obligations include: deidentification, payments of amounts due (also see r, below) |
| j. Assignment of contract by BII | §XIV(A) | Not restricted |
| k. "Transfer" by you- definition | §XIV(B) | Includes asset transfer and ownership changes |
| l. BII's approval of transfer by franchisee | §XIV(B) | Required- Not un- reasonably withheld |

23

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| m. Conditions for BII's approval of transfer | §XIV(B) | Payment of transfer fee; new Agreement; Possible release of BII and HDA; Possible continuing liability; Possible change to decor, equipment or other renovations to then current standards; Buyer must satisfactorily complete training See r., below |
| n. BII's right of first refusal to acquire your business | §XVII | BII may match net offer |
| o. BII's option to purchase your business | None | |
| p. Your death or disability | §§XV and XVI | Successor must apply for right of continuation- if not already an owner |
| q. Non-competition covenants during the term of the franchise | §XIII Exhibit E | No involvement in competing business anywhere |
| r. Non-competition covenants after the franchise is terminated or expires | §XIII Exhibit E Sec. XXIX Exhibit L | No competition for one year within 1/2 mile of store; No competition within 3 miles of other franchises subject to same restriction for 1 year; Restrictive Covenant on real estate |
| s. Modification of the Agreement | §XXVIII | None unless in writing |
| t. Integration/merger clause | §XXVI | No representations outside of Agreement. Any other promises may not be enforceable |

24

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| u. Dispute resolution by arbitration or mediation | None | |
| v. Choice of forum | §XXV | At our option, in Massachusetts- See Note |
| w. Choice of law | §XXV | Massachusetts law applies- See Note |

## SUPPLEMENTAL TABLE- OTHER AGREEMENTS

| Provision | Agreement | Summary |
|---|---|---|
| Training | Franchise Agreement ("FA") §V Exhibit H | Must be completed 6 weeks-full time $3000 nonrefundable claims released |
| Sublease termination | FA §XX(B) | Terminates mutually with FA |
| Restrictive covenant | FA §XXIX | If you own the real estate, the location can't house a competing business for the term plus one year |
| Multiple franchises | FA §XXX and Exhibit K | Simultaneous termination of all for default of one; Joint liability |
| BII's cure of your default | FA §IX(D) | Right to remove non-conforming products and repair and clean at your expense |
| Cross Liability | FA §XXX | Owners of franchisees are liable for the obligations of related franchises |

25

Note: Some states may have court decisions or statutes which may supersede the Franchise Agreement in your relationship with BII including the areas of termination and renewal of your franchise. Also, §19-28.1-14 of the Rhode Island Franchise Investment Act provides that "A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

## 18. Public Figures

BII does not use any public figure to promote its franchise.

## 19. Earnings Claims

BII does not furnish or authorize its salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of a Honey Dew Donuts® franchise. Actual results vary from unit to unit and BII cannot estimate the results of any particular franchise. To assist in your business planning, BII has set forth in Exhibit A, projected *pro formas* where sales fall within specific levels, but these are not a representation that sales at a particular location will be at any particular level.

## 20. List of Outlets

### A. FRANCHISED STORE STATUS SUMMARY
### FOR YEARS ENDING OCTOBER 31, 2000, 2001 AND 2002

| Transfers | Cancelled or Terminated | Not Renewed | Reacquired by Franchisor | Left the System-Other |
|---|---|---|---|---|
| 1/1/0 | 1*/1*/2* | 0/0/0 | 0/0/0 | 0/0/0 |

| Total from Above Columns (2) | Franchises Operating at year end |
|---|---|
| 10/2/2 | 26/27/26** |

Each of the franchises referred to in this summary are in Rhode Island, the only state in which we currently operate.

Note that the numbers in the "Total" column may exceed the number of stores affected because several events may have affected the same store. For example, the same store may have had multiple owners.

* In fiscal 2000, the terminated franchisee was allowed to operate through sale of its store. That store is listed as "terminated" in fiscal 2000 and transferred in fiscal 2001. In fiscal 2001, one store was terminated and litigation has been commenced to enforce termination. In fiscal 2002,

26

one store were terminated and allowed to operate p[ending reinstatement and one store was terminated and is being allowed to be sold.

** This total includes Satellite and Cart operations but does not court a Company Owned store at Sandy Lane, Warwick.  All other columns relate to full producing stores only.  Two cart locations were closed in fiscal 2002, one was not successful and the other's term expired.

B. Existing Franchisees

A&R, Inc., 1795 Post Road, Warwick  (Satellite) 736-8783 and 1764-1768  Warwick Avenue, Warwick (full producing);  732-4403  Contact: Joe Garcia

Allens Avenue Donuts, Inc., 460 Allens Avenue, Providence (full producing) 785-4524 Contact: Rick Balasco

Atwood Avenue Donuts, Inc., 300 Atwood Avenue, Cranston (satellite) Contact: Mark Karnes 943-6365

Centerdale Donuts, Inc., 2073 Smith Street (10 Waterman Street), North Providence  (Satellite); Contact: Charlie Tsoumakis 354-4640

C Nineseven, Inc., 355  Broad Street, Central Falls 723-5016 (Satellite) Contact: Vincenzo Ciummo

CST Donuts, Inc., 141 Veteran's Memorial Drive, Apponaug, RI 02886 (satellite); 739-8673; Contact: Charles Tsoumakis

Dala, Inc., 729 Hartford Avenue, Providence   861-8079 Contact: Larry Almagno

Deluca, William and Cynthia, 1745 Main Street, West Warwick 821-8670 (full producing); Contact: Cynthia Deluca

EDC Holdings, LLC, 1085 Waterman Avenue, East Providence; 434-2122 (full producing); 652 Bullocks Point Avenue, East Providence (Satellite)  433-3219; Newport Avenue, Rt. 1A, Gansett Shopping Plaza, East Providence 434-7927 (Satellite); Contact: Edward DaCruz

G & F Bakery, LLC, 1026 Tiogue Avenue, Coventry 822-5181 (full producing)  Contact: Glen Szydlo

G & P Donuts, Inc., 3450 Mendon Road, Cumberland (satellite) Contact: Steve Provazza 658-1141

Maciel, Daniel, 1505-1515 Newport Avenue, Pawtucket (full producing), 723-5580  Contact: Dan Maciel

My Angels', Inc., 690 Oaklawn Avenue, Cranston (full producing) 946-5450 [1] and 1282
          Elmwood Avenue, Cranston (Cart) 781-7986, 3344 West Shore Road, Warwick
          (Cart) 732-6894, 168 River Avenue, Providence (Cart)351-1313  Contact: Charlie
          Tsoumakis

Northbridge Convenience Store, Inc, 670 Jefferson Blvd., Warwick (full producing) 732-2431;
          Contact:.YiHo Cho

Paulo Enterprises, LLC, 8230 Post Road, North Kingstown, (full producing); 736-8783;
          Contact: Antonio Paulo

Ryanchristopher, Inc., 548 Reservoir Avenue, Cranston  467-5030 (full producing); Contact: Al
          Razza

Sahara Donuts, Inc., 695 North Main Street, Providence 401-273-2606 Contact: Hamid and
          Nezha Louaddi

SGB, Ltd., 343 Providence Street, Warwick (Satellite) 821-6751  Contact: Gary Greaves

Smith, Donal, Jr., 935 Park Avenue, Cranston (Satellite); 785-9902  Contact: Donal Smith

Totally Baked, Inc., 107 Franklin Street, Westerly 596-3700  (full producing) Contact: Everett
          Blanchard

Except as otherwise stated, all of the stores listed are franchisor-developed full producing stores.
There was also a company owned store, a satellite operated at 1000 Sandy Lane, Warwick.  The
Westerly store was franchised for a two year term, with significant revisions to usual
requirements, as a replacement for a failed franchisee.  The Westerly franchisee has already
exercised a five year renewal right.

          C.  It is estimated that two franchises will be sold or granted during the one year period
beginning November 1, 2001.

     D.  During the most recently completed fiscal year: Two related stores on Hartford Avenue,
Providence and Eddie Dowling Highway, North Smithfield, terminated in the prior fiscal year,
continue to operate their store pending litigation, sale or resolution;  One full producing store and
one satellite store were terminated, but were allowed to continue in operation for reinstatement;
One full producing store was terminated but was allowed to continue in operation for an
upcoming sale; and two cart locations closed.  No other franchisee has had an outlet terminated,
cancelled, not renewed, or otherwise voluntarily or involuntarily ceased to do business during
our most recently completed fiscal year.  There are no franchisees who have not been in contact
with us within the ten weeks prior to the date of this Offering Circular.

---

[1]   See Exhibit A

28

**21. Financial Statements**

Our Financial Statements are attached hereto as a portion of Exhibit B. We operate in Rhode Island as a subfranchisor of HDA. Financial Statements of HDA are also included as a portion of Exhibit B. HDA is not a guarantor of any of the obligations of BII to you pursuant to the Franchise Documents and has the right, but not the obligation, to take over as your franchisor in certain situations.

**22. Contracts**

The following contracts are attached hereto:

<u>Exhibit</u>

| | |
|---|---|
| C | Franchise Agreement |
| D | Sublease |
| E | Covenant Not to Compete |
| F | Covenant to Protect Trade Secrets and Proprietary Information |
| G | Liability Agreement |
| H | Release and Waiver |
| J | Conditional Assignment of Lease |
| K. | Liability and Cross Default Agreement |
| L. | Agreement Regarding Restrictive Covenant and Restrictive Covenant |

A sample equipment list is attached as Exhibit I.

29

**23. Receipt**

**THIS OFFERING CIRCULAR SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS CAREFULLY.**

**RHODE ISLAND FRANCHISE AND DISTRIBUTORSHIP LAW MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WHICH IS SUBJECT TO REGISTRATION WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, AT THE FIRST PERSONAL MEETING HELD FOR THE PURPOSE OF DISCUSSING THE SALE OR POSSIBLE SALE OR A FRANCHISE, OR AT LEAST TEN (10) BUSINESS DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION BY THE FRANCHISEE OR EXECUTION OF AN AGREEMENT, WHICHEVER OCCURS FIRST, A COPY OF THE OFFERING CIRCULAR, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE FRANCHISE.**

IF BOWEN INVESTMENT, INC. DOES NOT DELIVER THIS OFFERING CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND THE RHODE ISLAND DEPARTMENT OF BUSINESS REGULATION, 233 RICHMOND STREET, SUITE 232, PROVIDENCE R.I. 02903-4232.

The undersigned, personally and/or as an officer or partner of the proposed franchisee do hereby acknowledge receipt of the offering circular of Bowen Investment, Inc., dated February 6, 2003 and Rhode Island Addendum A and Addendums B-E) together with all exhibits thereto (A. Actual, Average, Projected or Forecasted Franchisee Sales, Profits or Earnings, B.  Financial Statements for Bowen Investment, Inc. and Honey Dew Associates, Inc., C.  Franchise Agreement, D.  Sublease, E.  Covenant Not to Compete, F.  Covenant to Protect Trade Secrets and Proprietary Information, G. Liability Agreement, H. Release and Waiver, I.  Sample Equipment List, J.  Conditional Assignment of Lease,  K. Liability and Cross Default Agreement, L. Agreement Regarding Restrictive Covenant and Restrictive Covenant.

Date: _____        _____

_____
Print name

_____
(Address)

The name and address of the Franchisor's registered agent in this state authorized to receive service of process is: CT Corporation System, 111 Westminster Street, Providence, Rhode Island 02903.

## RHODE ISLAND ADDENDUM A

§19-28.1-14 of the Rhode Island Franchise Investment Act provides that "A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

31

**Addendum C**

HONEY DEW ASSOCIATES, INC.
ADVERTISING FUND POLICY STATEMENT
JANUARY 1, 1998

*Background*

During 1997, franchisees of the Honey Dew Donuts® system were solicited for volunteers to participate in a Franchisee Advisory Advertising Committee (the "Committee") for the purpose of making non-binding recommendation to Honey Dew Associates, Inc. ("HDA") as to advertising, public relations, marketing and related issues. The Committee concluded that increased marketing, public relations and advertising (hereinafter, collectively, "advertising") would likely increase sales and increase the value of franchises, although it was specifically noted that (i) the results of any particular campaign could not be guaranteed and (ii) the benefits of any campaign could vary considerably from store to store. The Committee recommended that HDA establish a fund to which existing franchisees could contribute for expanded advertising activities.

Based on the recommendations of the Committee, the Honey Dew Associates, Inc. Advertising Fund was created. Existing franchisees have been requested to voluntarily amend their Franchise Agreements to contribute to the Advertising Fund, and HDA has agreed to (i) contribute a matching amount; (ii) contribute 4% of sales from company owned stores, and (iii) contribute all cash advertising cooperative monies received from suppliers.

The Advertising Fund is to be administered in accordance with this Advertising Fund Policy Statement, as it may be amended, from time to time. This Policy Statement may be amended as HDA deems necessary, in its sole reasonable discretion, with prior notice to and taking into account the recommendations of the Committee. It is expressly anticipated that the Policy Statement will be updated from time to time based on the experience of utilizing the Advertising Fund, the level of effectiveness of the campaigns, and the growth of the Honey Dew Donuts® system.

*The Advertising Fund*

The Advertising Fund shall be held by HDA in separate segregated accounts to be used for promotional, public relations, marketing and advertising expenses. The Advertising Fund may be utilized for expenses in the nature of, but, without limitation, market research for advertising and marketing, preparation of advertising, creative work, production work, trafficking and shipping of creative materials, public relations activities and purchase of advertising time, space and/or other costs, all consistent with our then-existing Advertising Fund Policy Statement, which may be changed from time to time in our sole reasonable discretion. The term "Advertising Fund" is utilized for convenience only and is not intended to prohibit the use of the said Fund for related marketing and public relations activities.

33

To the extent that the Advertising Fund is used for marketing materials which are shared with franchisees, HDA may withhold such marketing materials from any franchisee which does not make a contribution to the Advertising Fund.

To the extent the Advertising Fund is used for the payment of commissions on media placements, the commissions shall be based on rates negotiated by HDA with notice to and the assistance of the Advertising Committee.

Proceeds of the Advertising Fund may not be paid to HDA or its employees, except as follows: (1) HDA shall be entitled to reimbursement for its reasonable costs in administering the Advertising Fund; and (2) HDA shall be entitled to reimbursement for its costs of collecting any sums due to the Advertising Fund by its franchisees. The monies in the Advertising Fund are the sole property of HDA and may not, under any circumstances, be refundable to contributors. Any monies not distributed in any year shall be carried forward to the next succeeding year.

*Franchisee Advisory Advertising Committee*

HDA and its franchisees desire to maintain a Franchisee Advisory Advertising Committee to (i) provide recommendations as to selection of an advertising agency (ii) provide input as to promotional campaigns and select products for such campaigns; (iii) to serve as liaison between HDA and the franchisees relating to Advertising Fund issues; and (iv) to make recommendations as to uses of the Advertising Fund in the best interests of HDA and its franchisees. The Franchisee Advisory Advertising Committee shall consist of between 6-10 members, who may be volunteers or appointed by vote of participating franchisees. HDA desires to have all geographic and media market areas represented.

The Franchisee Advisory Advertising Committee may make recommendations but HDA shall retain sole control over the use of the Advertising Fund and all issues relating thereto.

HDA cannot guaranty the success of any particular advertising program, nor the impact of the Advertising Fund on any particular store. HDA desires that the Franchisee Advisory Advertising Committee monitor the use of funds to make recommendations as to the fair allocation of proceeds from the Advertising Fund.

34

# Bowen Investment, Inc.
2 Taunton Street, Suite #5
Plainville, MA 02762
Tel: 508-695-3666 • Fax: 508-643-2429

Exhibit I

July 26, 2004

Mr. Manny Carneiro
Honey Dew Donuts
460 Allen's Avenue
Providence, RI 02905

Dear Manny:

Enclosed are two invoices for equipment ordered for your franchise and paid for by me.

As we discussed, you agree to pay me back the money (interest free). The total bill expected is $9,428.00. I suggest you remit $100.00 per week for 94 weeks with $28.00 due at the end. If this is agreeable to you, please sign the bottom of this letter and return to me at your earliest convenience.

As always, if you have any questions, please call me at once.

Very truly yours,

Robert P. Bowen
President

RPB/rjp

Enc.

_____    Date 8 · 2 · 0 4
I, Manuel Carneiro agree with the terms of this letter.



Enjoy
The Local
Flavor

# RHODE ISLAND RESTAURANT EQUIPMENT COMPANY, INC.

350 Kinsley Avenue
Providence, RI 02903
Phone: (401) 751-4433 • Fax: (401) 751-8444

| BUYER | | DATE | |
|---|---|---|---|
| BOB BOWEN | | 8-6-2004 | |

**SOLD TO:**
HONEY DEW DONUTS
460 ALLENS AVE.
PROVIDENCE, R.I.

**SHIP TO:**

PHONE: BOB: 965-0239    785-4524 MANNY

| DEPT | START | COMPLETE | NOTES | | TERMS |
|---|---|---|---|---|---|

| QUANTITY | DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 1 ea. | BELSHAW TZ-17 THERMALIZER | | 3570. 00 |
| 24 ea. | SCREENS | | 480. 00 |
| | | | 4050. 00 |
| | TAX | | 283. 50 |
| | | | 4333. 50 |

$23\b6
8/24/04

NO ELECTRICAL

A SERVICE CHARGE OF 1% PER MONTH WITH AN ANNUAL RATE OF 21% WILL BE APPLIED TO ALL OVERDUE AMOUNTS. NO RETURNS WITHOUT WRITTEN AUTHORIZATION. THERE ARE NO WARRANTIES



**DMX MUSIC - BOSTON**
300 W. MAIN STREET
NORTHBORO, MA 01532
PHONE#:

| INVOICE : 153018 | | | |
|---|---|---|---|
| COMP | ACCOUNT# | INV-DATE | INV-AMOUNT |
| 461 | 375115 | 07/30/04 | 5,146.35 |

| REMIT AMOUNT: | |
|---|---|
| DUE: 07/30/04 | TERMS: |
| LATE FEE OF: | 1.500%/MONTH |

BOWEN INVESTMENTS
2 TAUNTON STREET
SUITE #5
PLAINVILLE, MA 02762

REMIT TO: DMX MUSIC - BOSTON
P.O. BOX 34230
SEATTLE, WA 98124-1230

461202422181822200407301822201718250110051463 58

DETACH AND REMIT TOP PORTION WITH PAYMENT, KEEP BOTTOM PORTION FOR YOUR RECORDS.

**FROM: DMX MUSIC - BOSTON  300 W. MAIN STREET    NORTHBORO, MA 01532**
**SITE: 375115 HONEY DEW/PROVIDENCE, 460 ALLENS AVENUE, PROVIDENCE, RI 02903**
**SHIP: DMX461 DMX/SOUND & MEDIA, 300 WEST MAIN STREET, NORTHBORO, MA 01532**

| ACCT# | INVOICE | INV-DATE | ORDERED | COMPLETE | PO/REFER. | SHIPTO | REP. | INV-TYPE | PAGE |
|---|---|---|---|---|---|---|---|---|---|
| 375115 | 153018 | 07/30/04 | 07/06/04 | 07/29/04 | C1060 WIRELES awhitlingu | DMX461 | AW06 | INSTALL | 1 |

| LINE | SC | DESCRIPTION | TAX% | QTY | UNIT | EXTENDED |
|---|---|---|---|---|---|---|
| 1. | 1111 | 3M HEADSET STORAGE RACK | 7.0000 | 1 | .00 | .00 |
| 2. | 1111 | 3M C1060/960 PWR SUP BASE STAT | 7.0000 | 1 | .00 | .00 |
| 3. | 1111 | 3M C1060 BATTERY | 7.0000 | 6 | .00 | .00 |
| 4. | 1111 | 3M C1069 PROGRAM CORD/DEVICE | 7.0000 | 1 | .00 | .00 |
| 5. | 1111 | 3M C1060 HEADSET | 7.0000 | 3 | .00 | .00 |
| 6. | 1111 | 3M C1060 3 SLOT BATTERY CHARGE | 7.0000 | 1 | .00 | .00 |
| 7. | 1111 | 3M C1060/960 PWR SPLY BATT CHA | 7.0000 | 1 | .00 | .00 |
| 8. | 1111 | 3M C1060 TRAINING INSTRUCTIONS | 7.0000 | 1 | .00 | .00 |
| 9. | 1111 | 3M C1060 BASE STATION C922AA | 7.0000 | 1 | .00 | .00 |
| 10. | 1111 | PRICE PER QUOTE | 7.0000 | 1 | 4,305.00 | 4,305.00 |
| 11. | 1111 | 3M C1060 HEADSET | 7.0000 | 1 | .00 | .00 |
| 12. | 1111 | 3M SPEAKER MIC & CABLE ASSEMBLY | 7.0000 | 1 | .00 | .00 |
| 13. | 2103 | INSTALL LABOR (SUB) | 7.0000 | | | 540.00 |
| 14. | TX | SALES TAX | | | | 301.35 |

TOTAL:    5,146.35

Serial #'s: Headset; 0930043939, 0930043938, 0930043937. Bttry chgr;
0933007085. Base stat; 0922002983.

# JACK MIKELS & ASSOCIATES

**1 BATTERYMARCH PARK • SUITE 309 • QUINCY, MA**
*Telephone: (617) 472-5600 • Telecopier: (617) 472-5875 • E-Mail: jmik........*

JACK J. MIKELS
ROCHELLE NELSON MIKELS
MICHAEL A. WIRTZ
*ATTORNEYS AT LAW*

February 23, 2004

Kevin McCarthy, Esq.
155 Fair Oaks Lane
Cohasset, MA 02025

     Re:    Honey Dew Donuts, Cranston & Providence

Dear Kevin:

    I understand that you are representing Manual Caineiro in his purchase of Honey Dew Donut Franchises in Providence and Cranston, RI. Enclosed please find the updated Offering Circular of Bowen Investment, Inc., along with an extra Receipt page and a self addressed envelope. Please have the Receipt page signed by your client and returned to me. Upon receipt, draft franchise closing documents will be circulated for review.

    Very truly yours,

Jack J. Mikels

JJM/tk

Enclosure

F:\eve\J\HDA\020404

**EXHIBIT K**

# FRANCHISING OFFERING CIRCULAR



The Franchisor is Bowen Investment, a Massachusetts corporation with a principal place of business at 2 Taunton Street, Plainville, MA 02762. The phone number is 508-695-3666. This is an offering of a franchise to operate a Honey Dew Donuts® Shop. The Franchisee will manufacture and sell donuts and other donut shop products to the general public.

The types of shops franchised are full producing shops, and, for franchisees of full producing shops, satellite shops, in which product is not cooked, and kiosk locations, smaller units for locations within convenience marts, gas stations and the like. The initial franchise fees are $35,000 for a full producing shop, $20,000 for a satellite and $50.00 per week for a Kiosk. The estimated initial investment required ranges from approximately $240,000- $540,000 for a full producing shop, $185,000-$475,000 for a satellite and approximately $50,000-$60,000 for a kiosk. These sums do not include rent for the business location. The cash investment does not represent the Franchisee's total investment. The Franchisee should refer to Disclosure Items 5-7 inclusive in the Offering Circular for further information regarding the investment.

Information comparing franchisors is available. Call the state administrators at the RI Dept. of Business Regulation, 233 Richmond Street, Suite 232, Providence, RI 02903-4232 or your public library for sources of information.

Registration of this franchise by a state does not mean that the state recommends it or has verified the information in this offering circular. If you learn that anything in the Offering Circular is untrue, contact the Federal Trade Commission and the RI Dept. of Business Regulation, 233 Richmond Street, Suite 232, Providence, RI 02903-4232.

THE FRANCHISE AGREEMENT PERMITS THE FRANCHISOR TO ELECT TO HAVE ANY LITIGATION WITH THE FRANCHISEE SUBMITTED TO THE COURTS OF THE COMMONWEALTH OF MASSACHUSETTS. OUT OF STATE LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST MORE TO SUE BOWEN INVESTMENT, INC. IN MASSACHUSETTS THAN IN YOUR HOME STATE. UNDER RHODE ISLAND LAW, THIS PROVISION MAY NOT BE APPLICABLE IN ALL CASES. SEE THE RHODE ISLAND ADDENDUM A ATTACHED HERETO.

THE FRANCHISE AGREEMENT STATES THAT MASSACHUSETTS LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS. EVEN THOUGH THE FRANCHISE AGREEMENT PROVIDES THAT MASSACHUSETTS LAW APPLIES, RHODE ISLAND LAW MAY SUPERSEDE THIS PROVISION. SEE THE RHODE ISLAND ADDENDUM A ATTACHED HERETO.

THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

The effective date of the offering circular is: February 6, 2004

OFFERING CIRCULAR TABLE OF CONTENTS

| Item | Heading | Page |
|---|---|---|
| 1. | The Franchisor, its Predecessors and Affiliates | 1 |
| 2. | Business Experience | 2 |
| 3. | Litigation | 2 |
| 4. | Bankruptcy | 4 |
| 5. | Initial Franchise Fee | 4 |
| 6. | Other Fees | 6 |
| 7. | Initial Investment | 8 |
| 8. | Restrictions on Sources of Products and Services | 10 |
| 9. | Franchisee's Obligations | 13 |
| 10. | Financing | 14 |
| 11. | Franchisor's Obligations | 15 |
| 12. | Territory | 21 |
| 13. | Trademarks | 22 |
| 14. | Patents, Copyrights and Proprietary Information | 23 |
| 15. | Obligation to Participate in the Actual Operation of the Franchise Business | 23 |
| 16. | Restrictions on What the Franchisee May Sell | 24 |

| Item | Heading | Page |
|------|---------|------|
| 17. | Renewal, Termination, Transfer and Dispute Resolution | 24 |
| 18. | Public Figures | 28 |
| 19. | Earnings Claims | 28 |
| 20. | List of Outlets | 28 |
| 21. | Financial Statements | 31 |
| 22. | Contracts | 31 |
| 23. | Receipt | 32 |

Addendums

| Addendum A | Rhode Island Law Addendum | 33 |
| Addendum B | Honey Dew Associates, Inc. Multi-Unit Development Qualification Guidelines | 34 |
| Addendum C | Honey Dew Associates, Inc. Advertising Fund Policy Statement | 38 |
| Addendum D | Table of Contents for Operational Excellence Procedure Manual and Counter Help Training Manual | 40 |
| Addendum E | Trademark and Service Mark | 46 |

Exhibits

| A. | Actual, Average, Projected or Forecasted Franchisee Sales, Profits or Earnings | 47 |
|----|----|----|
| B. | Financial Statements (Internal Pages are not numbered) | 50 |
| C. | Franchise Agreement | 51 |
| D. | Sublease | 85 |
| E. | Covenant Not to Compete | 104 |
| F. | Covenant to Protect Trade Secrets and Proprietary Information | 106 |
| G. | Liability Agreement | 108 |
| H. | Release and Waiver | 110 |
| I. | Sample Equipment List (Internal pages are not numbered) | 112 |
| J. | Conditional Assignment of Lease | 113 |
| K. | Liability and Cross Default Agreement | 119 |
| L. | Agreement Regarding Restrictive Covenant and Restrictive Covenant | 122 |

**1. The Franchisor, its Predecessors and Affiliates**

The Franchisor is Bowen Investment, Inc. To simplify the language in this Offering Circular, "BII" or "we" or "us" means "Bowen Investment, Inc." "You" means the person who obtains rights to operate a franchise.

BII franchises Honey Dew Donuts® Shops in Rhode Island. BII has no predecessors. BII operates in Rhode Island pursuant to an agreement with the owner of the "Honey Dew" name, Honey Dew Associates, Inc. ("HDA"). The owner of HDA is also an owner of BII. Although he is not an officer or director of BII, and although he is not involved in the management or day to day activities of BII, his partial ownership of BII may give him the right to do so. Accordingly, HDA and BII may be considered to be under "common control" and may be considered "affiliates" for the purposes of this offering circular. HDA operates and franchises "Honey Dew Donuts® Shops" but is not registered to franchise shops in Rhode Island.

BII does business only under its own name. BII has no predecessors.

BII's principal business address is 2 Taunton Street, Plainville, MA 02762. HDA's principal business address is 35 Braintree Hill Office Park, Braintree, MA. BII's agent for service of process within Rhode Island is CT Corporation System, 111 Westminster Street, Providence, Rhode Island 02903.

BII is a Massachusetts corporation incorporated November 1, 1985. We are engaged solely in the business of offering and selling Honey Dew Donuts® franchises, including all related activities such as overseeing the franchises we sell in accordance with the terms of the Franchise Agreement. Although BII does not generally operate donut shops, it may, from time to time do so, such as when a shop is opened in advance of a franchise sale or if an owner is terminated, or otherwise. The general market for the products sold is the general public. Sales tend to be higher in fall and spring. You will have to compete with other donut, coffee and food-service shops, sandwich and take out food shops and bakeries, including both local and national businesses, which may possibly include other Honey Dew Donuts® Shops (company owned or franchised) which may draw some customers from the same area.

There are no specific regulations specific to the donut industry. As with any food shop, appropriate licenses are required.

BII was incorporated solely to engage in the franchising of Honey Dew Donuts[TM] Shops, has been so engaged since its incorporation and has no prior business experience. HDA has operated Honey Dew Donuts[TM] Shops since 1974 and has sold Honey Dew Donuts[TM] franchise locations since 1974. Neither BII nor HDA has ever offered any other types of franchise for sale.

1

## 2. Business Experience

President, Treasurer and Director: Robert P. Bowen.

Mr. Bowen is the chief executive and chief operating officer and the financial, franchise marketing, training and service officer. He is the sole executive with management responsibility in connection with the operation of BII's business relating to the franchises offered by this Offering Circular. Since 1980, in addition to his duties for Bowen Investment, Inc., Mr. Bowen has, from time to time, been owner of and employed by Bowen Brothers, Inc., a Massachusetts corporation, operating donut shops known as Ole Fashioned Donuts, as well as Honey Dew Donuts$^{TM}$ Shops. He is also the owner and chief executive officer of R.B. Donuts, Inc., a Massachusetts corporation also involved in Honey Dew Donuts$^{TM}$ Shops.

Director: Kate Bowen

Kate Bowen, has served as a Director since October, 1995. Ms. Bowen is currently employed as a psychological counselor within the Massachusetts state prison system. She has worked, from time to time, in various areas of donut shop operations.

All franchises are granted directly by BII. Michael George Dutra of 70 Bittersweet Drive, Seekonk, MA 02771, a former franchisee, is a franchise broker. Mr. Dutra was a Field Representative for BII from March, 1997 to October, 1997, and has been an independent broker from March, 1997 to date. Prior to March, 1997, Mr. Dutra was a Honey Dew Donuts® franchisee for more than five years. He also owned a Honey Dew Donuts® franchise from March, 1998 to January, 1999. **Only Mr. Bowen, as President of BII, has authority to grant franchises. The franchise brokers may introduce prospective franchisees to Mr. Bowen and show prospective locations only.** Mr. Dutra is not an officer, director, shareholder or employees of BII and has no management responsibility for employee of BII. **Mr. Dutra has no authority to make representations to prospective franchisees on behalf of BII.** From time to time, we may pay other third parties for referrals of qualified franchisees, including franchisees, brokers, and others.

## 3. Litigation

Neither BII, nor Robert P. Bowen nor Kate Bowen, nor Michael George Dutra, nor HDA:

A. Has any administrative, criminal or material civil actions pending against them alleging a violation of any franchise, antitrust or securities law, fraud, unfair or deceptive practices, or comparable allegations, except for the following cases against HDA: (1) Litigation is pending in the Norfolk Superior Court, Dedham, MA, Honey Dew Associates, Inc. v. Creighton Muscato Enterprises, Inc. and Muscato Development Corporation, Civil No; 99-481. This was originally a suit for Declaratory Relief to determine if the Defendant-franchisees were required to contribute to HDA's Advertising Fund. Defendants have filed a

2

counterclaim alleging fraud, misrepresentations, violation of franchise laws and unfair and deceptive trade practices in the granting of two franchises. This case is pending trial; (2) Litigation is pending in the Federal District Court for the District of Massachusetts, in Boston, MA, <u>Honey Dew Associates, Inc., v. Joseph Youshaei, Nesher, Inc. and American Strong Safety Foods Corporation</u>, Civil No: 03-10579-RCL. This suit was originally filed against a terminated franchisee for monies owed. Defendants have filed a counterclaim alleging breaches of contract, breaches of warranty of good faith and fair dealing, interference with advantageous relations, interference with contractual relations, conversion, and unfair and deceptive trade practices. This case is in the initial stages; and (3) Related litigation is pending in the Federal District Court for the District of Massachusetts, in Boston, MA, <u>B&M Donuts, Inc., JM2 Company, Inc., American Strong Safety Foods Corp., Time After Time, Inc., Nesher, Inc. and E & M Donuts, Inc. v. Honey Dew Associates, Inc.</u>, Civil No: 03-10965-RCL, in which corporations owned by a defaulted franchisee and corporations owned by the same terminated franchisee in the related case, claim breaches of contract, breaches of warranty of good faith and fair dealing, anti-trust violations, conversion, and unfair and deceptive trade practices. This case is in the initial stages.

Other than routine litigation (such as personal injury claims by patrons for slipping and falling in a shop, and the like) there is no other pending litigation which is significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system or its business operations.

Other than as specified, no litigation is required to be disclosed in this offering circular.

B. Has ever been convicted of a felony nor pleaded <u>nolo contendere</u> to a felony charge nor been liable in a civil action by final judgment nor been the subject of a material action involving a violation of any franchise, antitrust or securities law, fraud, unfair or deceptive practices, or comparable allegations, except as follows: (1) Litigation was settled in the United States District Court for the District of New Hampshire, <u>J.K.S. Donut Shop, Inc., et al. v. Honey Dew Associates, Inc.</u>, Civil Action No. 1:96-CV-00448-M. Plaintiffs were J.K.S. Donut Shop, Inc., Edward J. Palmer and Gladys M. Tauriac, operators of a Honey Dew franchise, who alleged that HDA made misrepresentations and breached contracts regarding the granting of a Honey Dew franchise. HDA terminated the franchise for nonpayment and counterclaimed for damages. All claims of all parties were voluntarily dismissed. As part of the resolution, HDA purchased from the plaintiffs some of the equipment they had used in the shop; and (2) claims by M&S Donuts, Inc., a franchisee, that HDA breached implied obligations of good faith and fair dealing, intentionally interfered with contractual relations and committed unfair and deceptive trade practices were voluntarily dismissed. The litigation was <u>M&S Donuts, Inc., et al. v. Honey Dew Associates, Inc., et al.</u> in the Plymouth Superior Court as Civil No: 96-0369B. The plaintiffs were M&S Donuts, Inc. and Maria R. Cohen, Trustee of Kingsley Street Realty Trust. The defendants were HDA, Fast Lane Foods, Inc. and Lawrence Leavitt. After the dismissal, the Plaintiff was allowed to buy out of its Franchise Agreement.

3

C. Is subject to any currently effective injunctive or restrictive order or decree relating to the franchise or under any federal, state, or Canadian franchise, securities, antitrust, trade regulation or trade practice law as a result of a concluded or pending action or proceeding brought by a public agency.

## 4. Bankruptcy

No person previously identified in Items 1 or 2 of this Offering Circular has been involved as a debtor in proceedings under the U.S. Bankruptcy Code required to be disclosed in this Item.

## 5. Initial Franchise Fee

BII offers several types of units, as follows:

(1) A Full Producing Shop may be developed either by you or by us at your expense. Development includes leasing the subject premises and arranging for construction or remodeling of the premises into a Honey Dew Donuts® Shop. Whoever develops the shop obtains all building and occupancy permits, licenses and approvals and prepares the shop for operation. The Franchise Fee for a Full Producing Shop is $35,000;

(2) A Satellite Shop, a smaller version of a Honey Dew Donuts® Shop in which baking is not required and product is delivered from a full producing shop, may be developed by you or by us at your expense. Development includes leasing the subject premises and arranging for construction or remodeling of the premises into a Honey Dew Donuts® Shop. Whoever develops the shop obtains all building and occupancy permits, licenses and approvals and prepares the shop for operation. The Franchise Fee for a Satellite Shop is $20,000. A Satellite Shop is only available to owners of full producing units;

(3) A Kiosk Operation, a smaller sales location, usually within another business such as a gas station or in a convenience shop, in which baking is not required and product is delivered from a full producing shop, may be developed by you or us at your expense. The Franchise Fee for a Kiosk Operation is $50.00 per week of operations during the initial term. A Kiosk Operation is only available to owners of full producing units.

*For full producing shops and satellites we develop, you must also reimburse us for the development costs, including rehabilitation and construction, at cost. Such expenses are approximately $100,000- $350,000 for a full producing shop or satellite. Costs may vary depending on factors such as the amount of necessary sitework, such as raising or lowering the land, whether a sewer hookup is required, the existence of environmental contamination or the necessity of environmental test borings, zoning factors and legal fees,* or whether the location is merely an existing building which required renovation. *These amounts vary for each location and are provided in full detail on a shop by shop basis.*

4

For new shops, you are required to pay us a "Grand Opening Fee" of $5,000.00 for a full producing shops or satellite shops and $2,500.00 for a kiosk or kiosk location. We will arrange grand opening services, that may include special advertising, personal appearances, special decorations and a grand opening ceremony and we will incur any costs in excess of your Grand Opening Fee.

In addition to our specified transfers of franchise rights, other transfers may occur where (i) existing operators transfer their franchise rights (in compliance with their Franchise Agreement and subject to our right of first refusal) or (ii) where we transfer franchise rights to a shop we have operated as a company operated shop or shops we have reacquired from a franchisee. Such transfers may be at varying prices and terms. Factors which may affect the terms include the remaining length of any underlying lease, the condition of the shop, its age, rent, location and operating history, whether the price is paid in cash or financed, the price for similar shops in similar locations, and the negotiation between the parties.

From time to time, we reserve the right to vary the term upon which a franchise may be granted, in connection with testing any new marketing, operational or branding programs. In these circumstances, concessions or incentives may be made which are not generally available to our franchisees. We reserve the right to lower the amount due for the franchise fee on a shop by shop basis due to any special circumstances. We do not offer payment terms for the franchise fee, but reserve the right to do so on a case by case basis, upon such terms as may be negotiated. The franchise fee, including unpaid interest and principal if paid in installments, is non-refundable in whole or in part.

We will review your qualifications to operate a Honey Dew Donuts® franchise including, without limitation, your experience in the food service industry, in managing and operating a business, in handling financial data, your orientation toward customers, your suitability to the Honey Dew Donuts ® system, your financial status and history, and your capitalization for the proposed business.

Prior to the opening of your first Honey Dew Donuts® Shop, you are required to successfully complete our training program. If you do not successfully complete the training program, the Franchise Agreement is terminated and we will refund all but $4,500 of the Franchise Fee you have paid. There are no refunds under other circumstances. In addition to passing our training course, you must have proficiency in English, pass any assessment tests, and meet any other requirements we may impose. Our approval of you as a prospective franchisee is not a guarantee of your success.

All sums paid by you shall be deposited to the escrow account of our attorney. Upon the opening of your Honey Dew Donuts® Shop, such sum and any accrued interest shall be paid to us.

Purchase of additional franchises by owners is governed by HDA's then-current Multi-Development Qualification Guidelines. A copy of the current Multi-Development Qualification Guidelines are included herein in Addendum B.

In our last fiscal year prior to the date of this Offering Circular (November 1, 2002 to October 31, 2003, one full producing shop (Hartford Avenue, Providence), which had been terminated, was resold for no franchise fee, but a service fee of $430 per week for twenty years, and an obligation to renovate up to $200,000 after two years; and a company owned full producing shop (Sandy Lane, Warwick) was sold for no franchise fee, but a service fee of $127 per week for twenty years.

## 6. Other Fees

The other recurring or isolated fees or payments that you must pay to use are listed below. No fees or payments are required to be made by you to HDA, nor do we or HDA impose or collect any fees or payments on behalf of third parties. All the fees listed below are paid to BII and are not refundable.

As utilized below, gross sales include all sales at your business premises, whether at retail, wholesale or otherwise made. In the transfer fee, the gross sale price includes all sums incidental to the sale or in connection therewith including, without limitation, the cost of all equipment, goodwill, covenants not to compete, personal service contracts, and all other assets.

| Name of Fee | Amount | Due Date |
| --- | --- | --- |
| Royalty | Seven (7%) percent on total gross sales | Weekly |
| Rent | Base rental of ten (10%) percent on total gross sales triple net | Weekly |
| Advertising Fee | Two (2%) percent on total gross sales | Weekly |
| Transfer Fee | The greater of $15,000 or ten percent (10%) of your gross sale price | At transfer |
| Renewal Fee | Full shop- $10,000 Satellite- $ 5,000 Kiosk- $ 2,500 | At execution of Renewal Agreement |

Note 1: The rent figure only applies to shops we develop only. We have, from time to time, negotiated base rent amounts. Where you develop the location, you will be responsible for negotiating your own rent payable to your landlord. Leases are often triple net, requiring you to make such payments as for real estate taxes, common area maintenance and insurance.

6

<u>Note 2</u>:  For a Kiosk, as defined in Item 5, the transfer fee is the greater of $5000.00 or 10% of the gross sale price.  No transfer fee is required if you are an individual and you transfer the franchise to an entity you own.

<u>Note 3</u>:  The usual term for a full producing shop or satellite is 10 years with a 10 year renewal, but this may vary depending on the remaining term of the underlying Lease. The usual term for a Kiosk is 3 years with a three year renewal, but this may vary.  Franchise fees and the renewal fee, if any, may be increased or decreased if the term or renewal term is lengthened or shortened.  For all shops, the length of your term may be less than the usual where we have operated the shop prior to your purchase, thereby utilizing a portion of the term of the underlying lease, or where you are not the first franchisee to purchase the location (such as where we have reacquired a location).  Where you develop your own site, our documentation requires that your landlord agree that we may take over as the tenant, at our option, in the event you default in either your lease or franchise obligations.  Also, if you are continuing in business at the site after expiration of your Franchise Agreement, you are required to either renew your existing Franchise Agreement or, if you have no renewal rights, enter into a new franchise arrangement at our then-prevailing terms. If you do not desire to continue as our franchisee, the site may not be used for the same purposes for one year.

<u>Note 4</u>: Honey Dew franchises include no renewal rights, but many franchises include rights to obtain a new franchise, at the end of the term, for one half the then-standard Franchise Fee.

<u>Note 5</u>:  If you develop a site yourself then, after expiration of your Franchise Agreement, you are required to either (i) not utilize the premises for the same or a similar business for one year or (ii) enter into a new franchise arrangement at our then-prevailing terms (or, if you have such rights, at one half our then-existing Franchise Fee- See Note 4).  If you do not qualify for a new franchise, but the premises will be used for the same or a similar business, then we have the option to utilize the premises at 10% rent, triple net (or for a Kiosk, 10% gross).

<u>Note 6</u>:  The Advertising Fee is contributed to the Honey Dew Advertising Fund, for uses as set forth in the Honey Dew Advertising Policy in effect from time to time.  A copy of HDA's currently effective Advertising Policy Statement is attached hereto as Addendum C.  Your payment to the advertising fund may increase, if an increase is supported by a majority of Honey Dew Donuts® Shops, regionally for any increase which your region implements and throughout the chain for any global increases.

<u>Note 7</u>:  In special circumstances, the amount of a fee may be negotiated.  In varying fees, we may consider factors including the experience and financial strength of the operator, the number of units to be developed, and our ability to obtain or develop sites in a particular area.

7

<u>Note 8</u>: Interest accrues on overdue payments at a rate of 18% per annum, from the date due to the date paid.  Costs of collection, including reasonable counsel fees, must also be reimbursed.  You are responsible for the costs of the audit if a 3% discrepancy is discovered, or if you have not forwarded required records, or, in circumstances where you have not prepared and/or maintained all required records.

**7.  Initial Investment**

YOUR ESTIMATED INITIAL INVESTMENT

| | AMOUNT | METHOD OF PAYMENT | WHEN DUE | TO WHOM PAYMENT IS TO BE MADE |
|---|---|---|---|---|
| Initial Franchise Fee | $35,000-Full* $20,000-Sat $50/wk-Kiosk | Lump sum | At closing | BII |
| Grand Opening Fee | $5000- Full /Sat $2500- Cart/Kiosk | Lump Sum | At closing | BII |
| Real Estate And Improvements | $100,000- $350,000 Full and Sat only | As incurred/ Lump Sum | Prior to Opening | BII/Vendors |
| Equipment | $75,000-$125,000- Full $35,000-$75,00- Satellite $20,000-25,000- Kiosk | Lump sum | Prior to opening | Vendor/BII |
| Signs | $20,000-$30,000-Full/Satellite $3,000-$10,000-Kiosk | Lump sum | Prior to opening | BII/Vendor |
| Misc. Opening Costs | $7,000- Full/Sat $1,000-Kiosk | As incurred | Prior to opening | Suppliers/ Municipality, Vendors, Etc. |
| Opening Inventory | $3,000- Full/Sat $1,000-Kiosk | As incurred | Prior to opening | Vendors |
| Additional Funds 3 months | $75,000- Full/Sat $23,000-Kiosk | As incurred | As incurred | Employees/ Vendors/ Suppliers/ Utilities |

You may have to pay additional fees to third parties such as governmental entities, lessors, vendors, contractors, subcontractors, utility companies, and the like.

*The franchise fee is nonrefundable except that, if you or your designated manager do not pass our training course, all but $4,500 of the franchise fee is refunded.

If we develop the shop, all real estate and improvements costs, signage costs and equipment costs are reimbursed by you. If you develop the shop, the real estate and improvement costs, equipment and signage costs will be paid by you.

Regardless of who develops the shop, costs vary from site to site depending on factors such as the location, shop size, layout, zoning ordinances, building codes, construction costs, necessary sitework, such as raising or lowering the land, whether a sewer hookup is required, the existence of environmental contamination or the necessity of environmental test borings, zoning factors, legal fees and other factors beyond our control. Depending on whether a site is leased or purchased, real estate and improvement costs vary depending on the arrangements made with landlords, contractors and the like including, without limitation, whether a building and fixtures are in place, whether a working hvac system exists, whether sufficient electrical service exists, and the condition of the building. If you purchase a site, your acquisition and carrying costs must be added to your expenses and are not included in the figures set forth above.

For shops you develop, you are required to retain an architect and present plans for our approval. In general, you are required to conform the premises to our specifications and all items of interior finish, including cases and counters, are subject to our approval. Prior to opening, your shop must pass our final inspection and obtain approval for opening.

Honey Dew Donut Shops are generally in strip centers and in free standing buildings adjacent to malls, located in small and midsize towns. A shop size of approximately 1600 square feet is required for a full producing shop, 500-1000 square feet for a satellite shop and approximately 225 square feet for a kiosk. You are required to purchase or rent all equipment for the operation of the franchise. The costs will vary depending on the size of the shop, the existence of a drive-thru window, requirements of landlords, requirements of governmental authorities and other factors beyond our control. As for signage, the placement, size and amount of signage is determined by us. Signs revert to BII upon termination or conclusion of the franchise.

Deposits include electric, gas and/or telephone security deposits, as well as the costs of obtaining necessary licenses and permits such as a milk license, common victualar's license and occupancy permit. Additional costs will occur if you incorporate and if you utilize an attorney for these matters. Also included are the costs of a "grand opening", including advertising, special decorations, special appearances and the like.

***BII has relied on its experience in the donut shop business to compile these estimates. You should review these figures carefully with a business advisor before making any decision to obtain rights to the franchise.***

BII cannot guarantee that you will not have additional expenses starting the business. Your costs will depend on factors such as: the extent to which you follow BII's methods and procedures, your management skill, your experience and business acumen, local economic conditions, the local market for our product, the local wages required to be paid, competition and the sales level reached during the initial period.

9

Certain of your expenses will be based on the amount of sales you generate. The amount you purchase, your payroll, your advertising budget, your utility costs, your insurance costs, payroll taxes, rent, and royalties will all be directly impacted by your sales. For this section seven, we have estimated costs based on sales of $350,000. However, this should not be interpreted as a representation that your sales will be in any specific amount. To assist you in determining the projected costs, we have included in Exhibit A projected costs assuming sales of different levels. However, the projected costs are merely estimates, based on normal market conditions, of the relative allocation of expenses toward which you should be working, and should not be considered as more than a guide. Various factors can significantly alter cost projections, such as labor shortages increasing labor costs or oil shortages increasing utility costs. On a shop by shop basis, you should consider economic factors and local conditions, as well as other factors, in preparing your own estimates. We recommend you utilize the services of a C.P.A. or similar advisor in determining whether a specific site is likely to be viable.

*If you are financing the franchise fee or your purchase of equipment, signage or other business expenses, the costs of such financing must be included in your projections.*

## 8. Restrictions on Sources of Products and Services

A.     For Franchisor Developed Shops (including satellite and kiosk locations we develop) only, we locate and lease a suitable location and arrange for leasehold improvements to our specifications. You are obligated to sublease the selected site from us. We receive income from the subleases. If we develop a Satellite or Kiosk location, you must reimburse us for our costs in doing so, including the costs of signage and equipment. We, Mr. Bowen, and/or a corporation or other entity owned in whole or in part by him may be the owner or lessee of the real estate and, if so, he and/or the entity will receive income from its lease with us and, indirectly, through your Sublease. For Franchisee Developed Shops, Satellite Shops and Kiosk Operations, you are responsible for the purchase or lease of real estate, upon terms you negotiate. We must approve all locations, but we receive no revenue or other consideration as a result of your lease arrangements unless we are leasing the premises to you. All items of leasehold improvements must conform to our standards and are subject to our approval.

In general, every item within the shop, from equipment and fixtures to paper goods to food products must be approved by us and purchased from suppliers approved by us.

You are required to purchase an equipment package, cash registers and signage from suppliers approved by us. A sample equipment package for a full producing shop is set forth in Exhibit I, infra. The amount, content, colors and wording of signage must be approved by us. The quality and amount of equipment must be approved by us.

You must purchase cups, plates, paper goods, containers, bags, menus, flour, sugar and all other usual articles and ingredients used for or in connection with the sale, dispensing or

10

display of donuts and donut shop products from a provider of such goods approved by us as conforming to our standards and specifications which, in turn, must conform to HDA's standards and specifications. You will deal directly with us regarding such standards and specifications. Insofar as ingredients and similar supplies are concerned, the specifications and standards are designed to insure quality control and uniformity of product. Insofar as paper, glass, equipment and signage and similar items and supplies are concerned, the specifications are designed to insure quality and uniformity and to promote goodwill by display of the name and/or symbols of HDA. To the extent branded and labeled product is available, they must be utilized by you. As uniformity of products sold is of great importance to the chain, you will have no discretion in the products you sell.

During the term of a franchise, your shop may have to be renovated at our request and at your expense in accordance with our specifications. Without limiting our right to request renovations, it is anticipated that, by the end of ten years, the premises should have undergone at least one major renovation to conform to our current specifications and design requirements.

Approved suppliers have been selected through experience and have served and/or are currently serving other Honey Dew Donuts® franchisees or us. The names of approved suppliers will be provided to you. We will consider, but we are not required to approve, products or services of suppliers not approved by HDA.

B.    We are required to adhere to specifications and standards, and utilize suppliers, as mandated by HDA, as required to suit the purposes set forth in subparagraph A, supra. Franchisee recommendations and requests are considered in this process. To be approved, a supplier must demonstrate to our satisfaction that it can meet our standards, specification and requirements, and has the capacity to meet the needs of the franchisees' quantity and delivery needs, which will usually include an ability to maintain uniformity by an ability to provide services for all shops. Approved suppliers may be required to execute contracts. We may also consider factors including, without limitation, consistency of product, production of branded product, product development capacity, and pricing. Approval of suppliers involves consideration of the interests of the chain of shops, which means that, in some cases, a franchisee may have costs in excess of those which would be required to make such purchases from an unapproved supplier. HDA reserves the right to withhold approval of any supplier for any reason. Approval of any supplier may be withdrawn at any time. HDA reserves the right to change our standards, specifications and qualifications for suppliers at any time. HDA reserves the right to limit the number of suppliers it will approve for any category of product.

Written specifications and standards, to the extent they exist, will be furnished to you upon written request therefor. You will be notified in writing of any modifications. HDA's specifications and standards may be released to specific suppliers or potential suppliers only with HDA's consent. Approval of the use of any non-approved supplier or product must be in writing by us. You are notified of all decisions in a reasonably prompt manner. Suppliers, potential suppliers and each article and ingredient are judged on quality of product and ability to meet and maintain the specifications and standards. HDA may not unreasonably withhold

11

approval of any supplier or item. However, to the extent HDA does not disapprove of a supplier, but the supplier of the item is governed by an existing contract, HDA's approval shall consist of its allowing the non-approved supplier to be involved in the next bidding process for the item.

To be considered as a supplier, a vendor must apply through HDA's supplier qualification program by which detailed data must be provided concerning the supplier's operation, quality control, production and delivery methods. In general, the supplier qualification program consists of an initial questionnaire, a follow up meeting to clarify issues and, where necessary, obtain supplemental information, and an examination of the supplier's facility for quality control purposes. Approved suppliers may be subject to additional inspections up to twice a year. The extent of the investigation may vary depending on the product(s) to be produced, with particular care devoted to food products.

C. Neither we nor anyone affiliated with us sells or leases any of the items set forth above, with the exception, in certain situations, of the real estate, as set forth above in subsection A; and from time to time, HDA or BII may obtain from suppliers labels or other materials involved in the shop including, without limitation, advertising point of purchase materials. When labels or other such items are purchased from HDA or BII, HDA and BII sell such items at their cost.

D. BII does not derive income from purchases made from approved suppliers, receive any payment as a result of or related to sales to you, or negotiate price terms or purchase arrangements with the approved suppliers. HDA has negotiated prices with certain suppliers. For quality and consistency purposes, HDA has negotiated with certain suppliers for exclusivity within the chain, which may include rebate programs to shops and contributions to the Honey Dew Advertising Fund. Most approved suppliers provide vendor rebates to HDA calculated by chain-wide sales, although payment of vendor rebates has not been a prerequisite to approval. A listing of the current vendor rebate schedule is available to prospective franchisees upon reasonable request and execution of the Covenant to Protect Trade Secrets and Proprietary Information, a copy of which is attached hereto as Exhibit F. HDA currently pays all such vendor rebates to the Honey Dew Advertising Fund, and is under contractual obligations to continue doing so in the immediate future. Other than the vendor rebates, neither we nor any affiliate derives income from purchases made from approved suppliers, or receives any payment as a result of or related to sales to you. HDA, BII, Richard Bowen or Robert Bowen may receive, from time to time, *de minimus* promotional items from approved suppliers, such as paid visits to restaurant shows, paid visits to plants, sports tickets, game travel arrangements and meals. We may receive, from time to time, contributions for charity events or vendor payments for contest prizes, discounts for promotions, monies for franchisee sales contests or the like.

E. The items to be purchased or leased which must conform to our standards will constitute every item within your business premises.

F. No purchasing or distribution cooperatives currently exist.

12

## 9. Franchisee's Obligations

THIS TABLE LISTS YOUR PRINCIPAL OBLIGATIONS UNDER THE FRANCHISE AND OTHER AGREEMENTS.  IT WILL HELP YOU TO FIND MORE DETAILED INFORMATION ABOUT YOUR OBLIGATIONS IN THESE AGREEMENTS AND IN OTHER ITEMS OF THIS OFFERING CIRCULAR

| Obligation | Section in Agreement | Item in Offering Circular |
|---|---|---|
| a. Site selection and acquisition/ lease | Section I/ Addendums | Sections 6 and 11 |
| b. Pre-opening purchases | Section I/ Addendums | Section 8 |
| c. Site development and other pre-opening requirements | Section I/ Addendums | Sections 6,7 & 11 |
| d. Initial and ongoing training | Section V | Section 11 |
| e. Opening | N/A | Item 11 |
| f. Fees Sections | II, III and XIV | Sections 5 & 6 |
| g. Compliance with standards and policies/ Operating Manuel | Sections VI and VII | Section 11 |
| h. Trademarks and proprietary information | Sections VI and XII | Sections 13 & 14 |
| i. Restriction on products/services offered | Section VII | Section 16 |
| j. Warranty and customer service requirements | N/A | N/A |

13

| Obligation | Section in Agreement | Item in Offering Circular |
|---|---|---|
| k. Territorial development and sales quotas | N/A | N/A |
| l. Ongoing product/service purchases | N/A | N/A |
| m. Maintenance, appearance and remodeling requirements | Section VII | Section 11 |
| n. Insurance | Section XI | Sections 6 & 8 |
| o. Advertising | Section X | Section 11 |
| p. Indemnification | Sections VI & XIX | Section 13 |
| q. Owner's participation management/staffing | N/A | Section 15 |
| r. Records/reports | Section VIII | Section 11 |
| s. Inspections/audits and IX | Sections VIII | Section 11 |
| t. Transfer | Sections XIV, XV | Sections 6, 17 |
| u. Renewal | Section III | Section 6 |
| v. Post-termination Obligations | Section XXI | Section 17 |
| w. Non-competition covenants | Section XIII and XXIX | Section 17 and Ex. L |
| x. Dispute resolution | Section XXV | Section 17 |

## 10. Financing

BII does not offer direct or indirect financing, but may allow for payment of franchise fees over time, upon such terms and conditions as may be negotiated. BII does not guarantee your note, lease or obligation.

14

**11. Franchisor's Obligations**

Except as listed below, BII need not provide any assistance to you prior to the opening of your shop:

A. Before you open your business, BII will provide the following services:

(i) For shops we develop, we will research and locate a shop location, lease the premises for sublease to you, make leasehold improvements to conform the premises to the design specified, and arrange, if necessary, for installation of any fixtures, and will conform the premises to local ordinances and building codes and obtain all required health, sanitation, building, driveway, utility and sign permits.  You will pay us rent, buy all the equipment and signage, and reimburse us for the land development costs including construction, rehabilitation, decoration and finish work.  You will reimburse us for all signage and equipment, at cost. You must also purchase initial supplies and ingredients, all of which you must  purchase or lease from approved suppliers. Franchise Agreement, Section I(C). There are no written specifications for the items to be purchased such as ingredients, but, generally, more than one approved supplier is provided, unless exclusivity within the chain of shops has been provided to a supplier in exchange for system-wide pricing concessions or to insure uniformity. The owner of the site may be an affiliate of HDA or BII.  You or your designated trainee will undergo our training program.  As part of the training we provide a Counter Help Training Manual for use by your employees, but we do not hire nor train your employees. See, subsection H, infra.  Franchise Agreement, Section VII.

For shops you develop, your proposed site requires our approval.  The development, construction, rehabilitation, licensing, decoration and finish work are your obligation, subject to our approval.  Approval of the site is contingent upon the execution by you and your lessor of  our Conditional Assignment of Lease, Exhibit J, infra..  However, this requirement is not a limitation on our discretion to approve or disapprove of any site. Franchise Agreement, Addendum.  If necessary, BII will attend a planning meeting with your Architect.

BII will provide any documents necessary for your Architect to prepare plans and specifications which will be acceptable to BII for your Honey Dew Donuts® Shop. At least two days prior to opening, BII will perform a final inspection and, if changes are required, will re-inspect your premises before they open.

(ii) Prior to the opening of the shop, BII will arrange to have you or, if you are an entity, your designated trainee, trained.  Franchise Agreement Section V. See Section E, infra.

B.     After your shop is open, BII need not provide any assistance to you except as follows:

15

(i) BII will arrange a "Grand Opening" and will pay all costs of same in excess of your Grand Opening Fee. The costs of grand openings may include special advertising, personal appearances, special decorations and a grand opening ceremony. This provision applies only the first time a franchise is granted for a site. <u>Franchise Agreement Section V(E)</u>.

(ii)    For full producing shop franchises granted by us, in-shop training shall be provided for a minimum of one week. This training consists of a full time (40 hour instructor) at your premises. <u>Franchise Agreement Section V(B)</u>.

(iii)    For all shops, BII provides HDA's Operational Excellence Procedure Manual, the provisions of which are, as amended from time to time, incorporated into the Franchise Agreement and other "operating standards", and we may, from time to time, advise you, either in writing or orally, of additional "operating standards" to which you must adhere.

(iv)    We will collect a 2% advertising fee from you, <u>Franchise Agreement Section II(C)</u>, and contribute that money to an Advertising Fund which HDA administers. HDA has set up a Franchisee Advertising Advisory Committee, currently made up of franchisee volunteers, to provide non-binding input into how the Advertising Fund should be spent and to serve as liaison between the franchisees and HDA as to promotional and product issues. All franchisees of HDA and BII were invited to participate and all volunteers were appointed by HDA to serve specific terms, with replacements to be appointed from future volunteers or, if the number of volunteers exceed the number of available positions, the replacements are to be determined by franchisee election. The monies in the Advertising Fund, plus any monies contributed to the Advertising Fund by HDA or BII, plus any advertising cooperative monies which HDA or BII receives and contributes to the Advertising Fund, is held in separate and segregated accounts and is used for promotional, marketing, public relations and advertising expenses, consistent with HDA's then-existing Advertising Fund Policy Statement, a current copy of which is attached hereto as Addendum C. <u>Franchise Agreement Section X(D)</u>.

    C.    HDA presently advertises and utilizes print, billboard, radio and has, from time to time, used television advertising on local and/or regional stations and in local and/or regional media, produced by local advertising agencies, using funds contributed to the Advertising Fund. You and any other shops operated by you or, if you are an entity, any other shop sharing common ownership, in whole or in part, with you, are required to participate in any promotional and/or marketing programs, we initiate. <u>See</u>, items 6, 8 and 9. For each such contribution you make to the Advertising Fund, BII will allocate a matching amount to be utilized for advertising, public relations and/or marketing activities, which sums may, in whole or in part, be contributed to the Advertising Fund or applied to other activities, including, without limitation, grand opening expenses, payment of personnel for advertising, marketing and/or public relations activities, product development costs, market research, local advertising contributions to assist one or more franchisees and the like. <u>Franchise Agreement Section II(C)</u>.

16

Franchisees may engage in their own advertising, subject to BII's prior written approval of the placement and content of all such advertising.  <u>Franchise Agreement Section X(A).</u>

In 1998, HDA established the Honey Dew Advertising Committee (HDAC), consisting of franchisees and, from time to time, non-voting management participants, to provide recommendations as to how the Advertising Fund should be utilized and to serve as liaison between the franchisees and HDA as to promotional and product issues.  All franchisees were invited to participate and all volunteers were appointed by HDA to serve specific terms, with replacements to be appointed from future volunteers or, if the number of volunteers exceed the number of available positions, the replacements are to be determined by franchisee election. There are no other advertising councils, cooperatives or funds in which you participate or to which you contribute. There are presently no local or regional advertising cooperatives, but HDA reserves the right to divide the Honey Dew Advertising Funds into Regional Funds and to expand or contract any geographical area covered by any Regional Fund.  HDA reserves the right to create a National Advertising Fund. HDA may determine to which of the Funds monies shall be contributed and in what proportion.

The HDAC does not have operational or decision making power and serves in an advisory capacity only.  The HDAC has adopted its own operational by-laws.  HDA, but not BII,  has the power to form, change, or dissolve the HDAC.

As of the date of this Offering Circular, HDA and BII contribute 4% of gross sales of company operated shops to the Advertising Fund and also contributes all vendor rebates received to the Advertising Fund.  When the Honey Dew Advertising Fund was established, in 1998, existing franchisees were requested to voluntarily amend their Franchise Agreements to participate in the Advertising Fund.  To induce franchisee contributions, HDA contractually committed to (i) match those franchisee's 2% commitment, (ii) contribute 4% of gross sales from HDA operated shops and (iii) contribute all vendor rebates to the Advertising Fund.  These contractual commitments last until termination or expiration of the last of the Franchise Agreements which were so amended.  Since initiation of the fund, all new franchisees are required to participate at the 2% level.  All BII franchised shops which contribute to the fund, contribute 2% of gross sales.

The Advertising Fund is the sole property of and is administered by HDA.  The HDAC is intended to have oversight of the use of the Advertising Fund and statements are provided, at least annually, as to the Fund's receipts and expenditures.  <u>Franchise Agreement Section X(D).</u>  The Advertising Fund is separately audited, effective in fiscal 2003, and is an asset of HDA and is also audited as part of HDA's audit.

Expenditures of the Advertising Fund are confidential and proprietary, but will be provided to prospective franchisees upon reasonable request and execution of the Covenant to Protect Trade Secrets and Proprietary Information, a copy of which is attached hereto as Exhibit F.

17

Neither HDA, BII, nor any affiliate of either receives payment for providing goods or services to the Advertising Fund, except that the Advertising Fund Policy State does allow and HDA does reimburse itself for (a) its reasonable costs in administering the Advertising Fund, (b) its marketing personnel; and (c) its costs of collecting any sums due to the Advertising Fund by franchisees.

There are currently no requirements that Advertising Funds be spent in any particular geographic area or territory but, as the recommendation of the HDAC, the advertising agency planning HDA's media buy has been instructed to generally attempt to allocate the budget equitably to the various market areas, based on franchisee contributions.

Monies in the Advertising Fund at the end of HDA's fiscal year are carried over in the Fund to the following fiscal year.

Presently, all advertising is used for solicitation of customers for shops, but such advertising has an incidental effect in providing name recognition and thereby assists in solicitation for the granting of franchises. No portion of the Advertising Fund is currently utilized for advertising which is primarily intended as a solicitation for the granting of franchises.

D.     In connection with your obtaining rights to operate, the equipment package you purchase or lease must include an electronic cash register, without resetting devices. Franchise Agreement, Section VIII(D). Presently, the only approved cash registers are (i) a CRS 3000 Quick Service System available only through Cash Register Sales, Inc., 2909 Anthony Lane, N.E. Minneapolis, Minnesota 55418 (800-333-4949), which owns the software program or (ii) a Samsung Model 5100, from Northeast ERC, 51 Commerce Way, Woburn, MA 01801 (800-830-9372; 617-937-1801) . The Cash Register package required from Cash Register Sales, Inc. has been in use in Honey Dew Donuts® shops since January, 1994. Northeast ERC has been an approved supplier since 1996. The cash register package is included in the costs of your equipment. Included is a standard Honey Dew Donuts® program which tracks the various items sold. The cash registers will accumulate sales and provides a statistical analysis of sales and taxes by product sold. HDA has the right to independent access to all information therein. HDA may utilize your financial and operating information as we may elect, but we will not use your name or specific location without your permission. Franchise Agreement, Section VIII(B).

E.     It is currently the policy of BII to engage in periodic inspections of the franchised locations and to assist franchisees in operating problems they encounter. Franchisees are provided with our current Operational Excellence Procedure Manual and our operational standards, and shops which do not pass our inspections are assisted in improving and given an opportunity to improve their performance.

F.     For Franchisor Developed Shops, the franchise is granted for a specific location selected and leased by BII. Franchise Agreement, Section I(C). For Franchisee Developed Shops, you select the site, subject to BII's approval. Franchise Agreement, Addendum. No scientific or standard formula or method for selection or approval of sites is

18

used. Such matters as population density, traffic patterns, location and neighborhood, parking, size and layout, ability to lease and existing competition are taken into account. For Self Developed Shops, satellites and kiosks, you may be required to either exercise your option to obtain a new Franchise Agreement, assign use of the premises to us, and/or refrain from operating a similar business for one year. For Self Developed Shops, satellites and kiosks, following expiration of any renewal term, you must either refrain from operating a similar business for one year or you must (i) accept a new franchise at prevailing terms or (ii) assign us the right to use the premises at prevailing terms capped at 10% of gross sales, triple net (or for a kiosk, 10% gross), if you own or control the property.

     G.     For Franchisor Developed Shops, the typical length of time between signing of the Franchise Agreement (at which time the initial payment is made) and the opening of the business is approximately 60- 90 days. For Franchisee developed shops, approximately one year is typical from buying the real estate through opening.  Factors such as slow delivery of equipment, delays in remodeling, decorating, installation of signs, delays in the permitting process and the like, may effect the length of time required for opening.  Sites requiring construction or major renovations may require longer periods before opening.

     H.     As of the date of this Offering Circular, BII's training program:

     (i) Takes place at HDA's training facility in Plainville, Massachusetts or at such site or sites as BII determines and is intended to provide the basics of all areas of your responsibilities under the Franchise Agreement: Baking (cooking and finishing), customer service, cleaning, and administrative management.

     Training generally consists of a full time six day work week for six weeks, at such hours and at such times as the instructor shall determine. Attendance at all training sessions determined by the instructor is mandatory. Trainees must be available to work at whatever shifts are requested, including overtime work.

     The Plainville facility is a company owned shop operated by HDA for use as a training facility. Thus, training is available at all times.

     BII recommends that trainees undergo and pass a complete physical examination prior to starting the training program.  <u>BII does not recommend that the program be undertaken by persons who are not in good physical health, including heart, back, leg or other health problems</u>. BII does not recommend that the program be undertaken by anyone who is pregnant. The training will include, without limitation, work on wet and/or slippery floors, long hours, exposure to chemicals and cleaning solvents, heavy lifting and physical labor.

TRAINEES MUST EXECUTE A RELEASE AND WAIVER AGREEMENT IN THE FORM ATTACHED AS EXHIBIT H.

19

Where you are a partnership or corporation, you must designate a trainee to undergo training.  If more than one shop is to be operated, BII may require additional persons to pass its training course.

If you or your trainee do not successfully complete the training, in the sole discretion of BII, the Franchise Agreement will be canceled, except that the Covenant Not to Compete and the Covenant to Protect Trade Secrets and Proprietary Information shall remain in full force and effect, and all funds paid to BII by you will be refunded, with the exception of $4,500.

(ii)  The length and scope of the training program will vary, based on the individual needs of the trainee.

(iii)  The person responsible for training is chosen by BII and has at least two (2) years of satisfactory experience in all areas of donut shop operation.  Certain aspects of training may be delegated to other persons, in the discretion of the person responsible for training.

(iv)  BII will pay the salary and costs, if any, of the instructor.  You are liable for the salary and costs, if any, of the trainee.

(v)  This training program is mandatory for all Franchisees and may be waived only by your request, with BII's consent, if you already have satisfactory experience in donut shop operations.

(vi)  HDA has, from time to time, provided forums with speakers pertaining to a variety of operational issues. HDA may, from time to time, provide additional reference materials or training as to preparation of specific items.  There are no other additional training programs or refresher courses.

F.    The training consists of experience in donut shop operations, on site.  HDA provides a training booklet, as well as its Operational Excellence Procedure Manual, and a Counter Help Training Manual for use by your employees. A table of contents for the Operational Excellence Procedure Manual and the Counter Help Training Manual are attached hereto as Addendum D.   There is no charge for the materials provided.  Training involves "on the job" activities and there is no classroom training.  Training must be successfully completed before a shop may be opened by you or, if already open, turned over to you.

The Operational Excellence Procedure Manual provides detailed information concerning day to day operations and the requirements of HDA and BII to which you must adhere, including standards and specifications necessary for approved operations and production of product, such as the variety and number of products to be available and, in some circumstances, particular products which must be produced, as requirements concerning freshness, display and the like.  The training outlines the various training activities in which the trainee will be involved including (a) Maintaining and cleaning the

20

shop, (b) donut finishing, muffin baking and pastry baking; (c) familiarization with equipment, (d) product production, (e) customer service, (f) completion of paperwork required by BII, (g) ordering supplies, (h) register training and cash-out procedures, and (i) scheduling employees. The Counter Help Training Manual is designed for use by you in training your employees and established a training schedule and process we recommend.

See Franchise Agreement, Section V.

## 12. Territory

     A.     We have established and may establish another franchisees using HDA's trademarks. In this section, when we say "trademarks", we mean all of HDA's names, trademarks, logos and other commercial symbols.

     B.     We may establish and we have established company-operated outlets and we may, but have never, established other channels of distribution using HDA's trademarks.

     Your Franchise Agreement is limited to a specific approved site. The establishment of additional franchised outlets requires execution of additional Franchise Agreements. Kiosk locations with sales insufficient to justify continued operations are allowed to close. Exhibit C, Addendum for Kiosk Operation.

     Our right and HDA's right to sell pre-packaged goods in any location is not restricted. You do not receive the right to acquire additional franchises within any specific area.

     You do not receive an exclusive territory. You do not receive the right to acquire additional franchises within any specific area. BII or HDA may establish other franchised or company operated shops that may compete with your location. We do attempt not to approve or open locations so close together that the market is not adequate to support both. If a franchisee contends that development of a new unit causes a prolonged, material, and adverse impact on sales of an existing unit, HDA has procedures, which may be amended from time to time, to investigate the situation and to allow for methods of franchisee assistance if such an impact exists. Details as to the current procedures are available upon request.

     With the exception of Kiosk Operations, which may not engage in wholesale sales, you will have no territorial restrictions limiting your sales base or the area from which you may seek to attract retail or wholesale business, although wholesale sales are limited to approved customers.

     C. Neither we, nor HDA, have ever established other franchises or company-owned outlets or another channel of distribution selling or leasing similar products or services under a different trademark, but both we and HDA have the right to do so. However, neither we nor HDA has any present plans to do so.

21

### 13. Trademarks

A.  Pursuant to the Franchise Agreement, we grant to you the right to operate a shop under the name Honey Dew Donuts® and under any other trade names, trademarks, service marks and logos currently used or that may hereafter be used in the operation of such Shops.

The principal trademark and service mark we have used since February, 2002, is attached hereto as Addendum E.   This Mark is pending registration with the U.S. Patent and Trademark Office

"Always Fresh, Always Good"® is a registered service mark in Rhode Island. This mark is also registered as a trademark and service mark with the U.S. Patent and Trademark Office and is on the principal register, Registration Number 2,108,962, approved October 28, 1997.

The name Honey Dew Donuts® was registered with the U.S. Patent and Trademark Office and is on the Principal Register as Reg. No. 2,382,230.  In Rhode Island, the Service Mark "Honey Dew Donuts" was registered on June 9, 1995 as document 95-6-8.

HDA has obtained federal trademark registration for the mark Chillerchino®, which is on the principal register as Registration Number 2,164,133 , approved June 9, 1998. Chillerchino® was registered in Rhode Island as Registration Number 970701 on July 1, 1997.  HDA has obtained a federal trademark registration for the mark and logo Froosh™, which is on the principal register as Registration Number. 2,437,879.  An Opposition to the Federal Registration for Froosh was resolved by an agreement by which the name and logo must be used together.
The Froosh™ name and logo were also  registered in Rhode Island on July 10, 1998 as Registration Numbers 980711 and 980712.

You must follow our rules when you use these marks.  You can not use a name or mark as part of a corporate name or with modifying words, designs or symbols except for those which we license to you.

B.  There are no currently effective material determinations of the patent and trademark office, trademark trial and appeal board, the trademark administration of any state or any court and there is no pending infringement,  opposition or cancellation proceeding and no pending litigation involving the principal trademarks.  However, the words "Honey Dew" have previously been registered as a trademark by other corporations and the words "Honey Dew" are not be exclusive to the use of HDA. No claim is made to the exclusive right to the term "Donuts" apart from the Mark.

The inability of HDA to obtain a registration in the United States Patent and Trademark Office regarding the words "Honey Dew" permits others to establish rights to use of the name in territories in which HDA or its franchisees are not operating or advertising or which are not within the natural zone of expansion for future Honey Dew Donuts® Shops, provided such others do so in good faith and without actual knowledge of the existence of

22

HDA or its franchisees. If others do so establish rights to the name and such territories, HDA may be restricted in its ability to expand into such territories.

C. There are no agreements currently in effect which significantly limit our rights to use or license the use of trademarks listed in Item 13 in a manner material to you.

D. Neither we nor HDA are under any obligation to protect your right to use any trademarks or other commercial symbols from claims of third parties, nor to protect you from claims of infringement or unfair competition with respect to the same, but either may, at its option, do so. We and HDA, are not obligated to participate in the defense of any such action nor to indemnify you if you are a party to such an action. In our sole discretion, you may be required to discontinue use of any name or mark and/or use one or more additional or substitute names or marks. If so, we must reimburse you for all tangible costs of complying.

You must notify us of any known infringement of, challenge to or threatened challenge to your use of any name or mark or of any lawsuit to which you are a party involving any said name or trademark.

Pursuant to the Franchise Agreement, you, during the operation of the Franchise Agreement and thereafter, agree not to directly or indirectly contest or aid in contesting the validity or ownership of any such names or trademarks or any other commercial symbol used by us.

E. We know of no superior prior rights or infringing uses which could materially affect your use of the principal trademarks in Rhode Island.

## 14. Patents, Copyrights and Proprietary Information

We own no rights in any patents or copyrights. The formulae for products sold are trade secrets and the methods of operating a franchised shop are proprietary information. See paragraph 15, infra., regarding protection of said trade secrets and proprietary information. You must promptly tell us when you learn about unauthorized use of these trade secrets and/or proprietary information. We are not required to take any action but will respond as we believe appropriate.

## 15. Obligation to Participate in the Actual Operation of the Franchised Business

You or an approved manager are obligated to participate fully in person in the operation of the franchised business. The manager may, but need not be, a part-owner of the franchise. If you designate a manger, it is anticipated that the manager would be designated for our training program. You or your manager need not be personally present on the premises during all hours of operation. It is recommended that you or your manager exercise the maximum degree of personal supervision possible. Operation of a Honey Dew Donuts® Shop requires personal attention and the investment of considerable time. You or your manager should be prepared to work at least one full shift each day, although, if profits are high, this may not be required.

23

You must agree to protect the formulae for its product and other proprietary information as trade secrets.  You must sign a <u>Covenant to Protect Trade Secrets</u> (Exhibit F), by which you agree not to contest directly or indirectly HDA's ownership and exclusive right to said formulae and information and not to utilize said formulae or information except in the operation of a Honey Dew Donuts® Shop.  You are also required to have employees with access to such formulae and information also execute the Covenant.

You and your manager must execute Covenants Not to Compete with BII and other Honey Dew Donuts® Shops are set forth in Paragraph 17N, <u>infra</u>.  It is your responsibility to have this covenant signed by your manager.

If you are an entity, your owners must execute a Liability Agreement, Exhibit G, by which they accept joint and several liability with you for all obligations to BII.

## 16.  Restriction on What the Franchisee May Sell

You are required by the Franchise Agreement to maintain and display an adequate supply of products and merchandise, and may not sell any product outside of donuts and usual Honey Dew Donuts® Shop products. Uniformity is important and you retain no discretion in the products you will sell.  Operational standards are utilized to govern the number, types or flavors of individual products which must be available, in order to promote uniformity or to assist in system-wide marketing.  Additional items may only be sold with the advance written approval of BII.  BII's current policy does not allow the sale of lottery tickets. Kiosk operations are prohibited from engaging in wholesale sales, and other shops may sell wholesale, but only to customers approved by us.  We may not disapprove of a wholesale customer unless the customer is engaged in reselling your products at a location or in a manner competitive with any Honey Dew Donuts® location.

## 17.  Renewal, Termination, Transfer and Dispute Resolution

This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this offering circular.

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| a.  Term of the franchise | §III(A) | Usually ten years |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| b. Renewal or extension of the term | §III(B) | None* |
| c. Requirements for you to renew or extend | §III(B) | On written notice, for fee, sign new agreement- usually ten years |
| d. Termination by you | None | |
| e. Termination by BII without cause | None | |
| f. Termination by BII | §XX | For your default Possible simultaneous termination of any franchise you operate for a default in any one you operate |
| g. "Cause" defined- defaults which can be cured | §XX(A)(3)(4)(7) | 7 day notice to cure payment defaults; 5 day notice to cure other defaults |
| h. "Cause" defined- defaults which cannot be cured | §XX(A)(1-2,5-6, & 8-13), and §XX(B) | Non-curable defaults include repeated defaults, unapproved transfer, violation of law; failure to operate |
| i. Your obligations on termination/nonrenewal | §XXI · | Obligations include: deidentification, payments of amounts due (also see r, below) |

*For most franchisees, if you are in good standing and pay one half then-current Franchise Fee, you may obtain a new Franchise Agreement, if you are qualified.- The shop and equipment must be brought up to date

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| j. Assignment of contract by BII | §XIV(A) | Not restricted |
| k. "Transfer" by you-definition | §XIV(B) | Includes asset transfer and ownership changes |
| l. BII's approval of transfer by franchisee | §XIV(B) | Required- Not unreasonably withheld |
| m. Conditions for BII's approval of transfer | §XIV(B) | Payment of transfer fee; new Agreement; Possible release of BII and HDA; Possible continuing liability; Possible change to decor, equipment or other renovations to then current standards; Buyer must satisfactorily complete training See r., below |
| n. BII's right of first refusal to acquire your business | §XVII | BII may match net offer |
| o. BII's option to purchase your business | None | |
| p. Your death or disability | §§XV and XVI | Successor must apply for right of continuation- if not already an owner |
| q. Non-competition covenants during the term of the franchise | §XIII/ Exhibit E | No involvement in competing business anywhere |
| r. Non-competition covenants after the franchise is terminated or expires | §XIII/ Exhibit E/ Sec. XXIX/ Exhibit L | No competition for one year within 1/2 mile of shop; No competition within 3 miles of other franchises subject to same restriction for 1 year; Restrictive Covenant on real estate |
| s. Modification of the Agreement | §XXVIII | None unless in writing |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| t. Integration/merger clause | §XXVI | No representations outside of Agreement. Any other promises may not be enforceable |
| u. Dispute resolution by arbitration or mediation | | None |
| v. Choice of forum | §XXV | At our option, in Massachusetts- See Note |
| w. Choice of law | §XXV | Massachusetts law applies- See Note |

## SUPPLEMENTAL TABLE- OTHER AGREEMENTS

| Provision | Agreement | Summary |
|---|---|---|
| Training | Franchise Agreement ("FA") §V Exhibit H | Must be completed 6 weeks-full time $4500 nonrefundable claims released |
| Sublease termination | FA §XX(B) | Terminates mutually with FA |
| Restrictive covenant | FA §XXIX | If you own the real estate, the location can't house a competing business for the term plus one year |
| Multiple franchises | FA §XXX and Exhibit K | Possible simultaneous termination of all for default of one; Joint liability |
| BII's cure of your default | FA §IX(D) | Right to remove non-conforming products and repair and clean at your expense |
| Cross Liability | FA §XXX | Owners of franchisees are liable for the obligations of related franchises |

Note: Some states may have court decisions or statutes which may supersede the Franchise Agreement in your relationship with BII including the areas of termination and renewal of

your franchise.  Also, §19-28.1-14 of the Rhode Island Franchise Investment Act provides that "A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

## 18. Public Figures

BII does not use any public figure to promote its franchise.

## 19. Earnings Claims

BII does not furnish or authorize its salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of a Honey Dew Donuts® franchise.  Actual results vary from unit to unit and BII cannot estimate the results of any particular franchise.  To assist in your business planning, BII has set forth in  Exhibit A, projected *pro formas* where sales fall within specific levels, but these are not a representation that sales at a particular location will be at any particular level.

## 20.  List of Outlets

A.  FRANCHISED SHOP STATUS SUMMARY
FOR YEARS ENDING OCTOBER 31, 2001, 2002 AND 2003

| Transfers | Cancelled or   Not Terminated | Reacquired by Renewed | Franchisor | Left the System-Other |
|-----------|-------------------------------|-----------------------|------------|-----------------------|
| 1/0/1 | 1*/2*/1 | 0/0/0 | 0/0/0 | 0/0/1 |

| Total from Above Columns (2) | Franchises Operating at year end |
|------------------------------|----------------------------------|
| 2/2/3 | 27/26/26** |

Each of the franchises referred to in this summary are in Rhode Island, the only state in which we currently operate.

Note that the numbers in the "Total" column may exceed the number of shops affected because several events may have affected the same shop.  For example, the same shop may have had multiple owners.

*  In fiscal 2001, one shop was terminated and litigation has been commenced to enforce termination.  In fiscal 2002, one shop were terminated and allowed to operate p[ending reinstatement and one shop was terminated and is being allowed to be sold.

**  All other columns relate to full producing shops only.  Two kiosk locations were closed in fiscal 2002, one was not successful and the other's term expired.

28

B.  Existing Franchisees

A&R, Inc., 1795 Post Road, Warwick  (Satellite) 736-8783 and 1764-1768  Warwick
        Avenue, Warwick (full producing);  732-4403  Contact: Joe Garcia

Allens Avenue Donuts, Inc., 460 Allens Avenue, Providence (full producing) 785-4524
        Contact: Rick Balasco

Atwood Avenue Donuts, Inc., 300 Atwood Avenue, Cranston (satellite) Contact: Mark
        Karnes 943-6365

Centerdale Donuts, Inc., 2073 Smith Street (10 Waterman Street), North Providence
        (Satellite); Contact: Charlie Tsoumakis 354-4640

C Nineseven, Inc., 355  Broad Street, Central Falls 723-5016 (Satellite) Contact: Vincenzo
        Ciummo

CST Donuts, Inc., 141 Veteran's Memorial Drive, Apponaug, RI 02886 (satellite); 739-8673;
        Contact: Charles Tsoumakis

Boyz Donuts, Inc., 729 Hartford Avenue, Providence; 861-8079 (full producing); Contact:
        Charles Tsoumakis

EDC Holdings, LLC, 1085 Waterman Avenue, East Providence; 434-2122 (full producing);
        652 Bullocks Point Avenue, East Providence (Satellite)  433-3219; Newport
        Avenue, Rt. 1A, Gansett Shopping Plaza, East Providence 434-7927
        (Satellite); Contact: Edward DaCruz

G & P Donuts, Inc., 3450 Mendon Road, Cumberland (satellite) Contact: Steve Provazza
        658-1141

Maciel, Daniel, 1505-1515 Newport Avenue, Pawtucket (full producing), 723-5580  Contact:
        Dan Maciel

My Angels', Inc., 690 Oaklawn Avenue, Cranston (full producing) 946-5450 [1] and 1282
        Elmwood Avenue, Cranston (Kiosk) 781-7986, 3344 West Shore Road,
        Warwick (Kiosk) 732-6894, 168 River Avenue, Providence (Kiosk)351-1313;
        1000 Sandy Lane, Warwick 738-9640 (Satellite);   Contact: Charlie
        Tsoumakis

---

[1]   See Exhibit A

Northbridge Convenience Shop, Inc, 670 Jefferson Blvd., Warwick (full producing) 732-2431;  Contact:.YiHo Cho

Paulo Enterprises, LLC, 8230 Post Road, North Kingstown, (full producing); 736-8783; Contact: Antonio Paulo

Phoenix Donuts, Inc., 1745 Main Street, West Warwick 821-8670 (full producing); Contact: Chris Derosiers

Ryanchristopher, Inc., 548 Reservoir Avenue, Cranston  467-5030 (full producing); Contact: Al Razza

Sahara Donuts, Inc., 695 North Main Street, Providence 401-273-2606 Contact: Hamid and Nezha Louaddi

SGB, Ltd., 343 Providence Street, Warwick (Satellite) 821-6751  Contact: Gary Greaves

Smith, Donal, Jr., 935 Park Avenue, Cranston (Satellite); 785-9902  Contact: Donal Smith

Totally Baked, Inc., 107 Franklin Street, Westerly 596-3700  (full producing) Contact: Everett Blanchard

All of the shops listed are franchisor-developed full producing shops.  The Westerly shop was franchised for a two year term, with significant revisions to usual requirements, as a replacement for a failed franchisee.  The Westerly franchisee has already exercised a five year renewal right.

    C.  It is estimated that two franchises will be sold or granted during the one year period beginning November 1, 2003.

    D.  During the most recently completed fiscal year: A franchisee terminated in a prior year was divested of his store in fiscal 2003 and Lawrence and Deborah Almagno, 47 Morgan Avenue Apt. 97, Johnston, RI 02919-6765 left the system; A full producing store in Coventry was allowed, by agreement, to disassociated from the system and Glenn and Frances Szydlo, 22 Moccasin Drive, Warwick, RI left the system; A full producing store in West Warwick was sold and William and Cynthia Deluca, 1 Meredith Drive, Coventry RI 02816, left the system;  One franchisee, S.G.B., Ltd., was terminated but continues to operate.  One franchisee, Marciel, was terminated but was allowed to reinstate.  No other franchisee has had an outlet terminated, cancelled, not renewed, or otherwise voluntarily or involuntarily ceased to do business during our most recently completed fiscal year.  There are no franchisees who have not been in contact with us within the ten weeks prior to the date of this Offering Circular.

**21. Financial Statements**

Our Financial Statements are attached hereto as a portion of Exhibit B.  We operate in Rhode Island as a subfranchisor of HDA.  Financial Statements of HDA are also included as a portion of Exhibit B.  HDA is not a guarantor of any of the obligations of BII to you pursuant to the Franchise Documents and has the right, but not the obligation, to take over as your franchisor in certain situations.

**22.  Contracts**

The following contracts are attached hereto:

Exhibit

| | |
|---|---|
| C | Franchise Agreement |
| D | Sublease |
| E | Covenant Not to Compete |
| F | Covenant to Protect Trade Secrets and Proprietary Information |
| G | Liability Agreement |
| H | Release and Waiver |
| J | Conditional Assignment of Lease |
| K. | Liability and Cross Default Agreement |
| L. | Agreement Regarding Restrictive Covenant and Restrictive Covenant |

A sample equipment list is attached as Exhibit I.

31

**23. Receipt**

**THIS OFFERING CIRCULAR SUMMARIZES CERTAIN PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS CAREFULLY.**

**RHODE ISLAND FRANCHISE AND DISTRIBUTORSHIP LAW MAKES IT UNLAWFUL TO OFFER OR SELL ANY FRANCHISE IN THIS STATE WHICH IS SUBJECT TO REGISTRATION WITHOUT FIRST PROVIDING TO THE PROSPECTIVE FRANCHISEE, AT THE FIRST PERSONAL MEETING HELD FOR THE PURPOSE OF DISCUSSING THE SALE OR POSSIBLE SALE OR A FRANCHISE, OR AT LEAST TEN (10) BUSINESS DAYS PRIOR TO THE PAYMENT OF ANY CONSIDERATION BY THE FRANCHISEE OR EXECUTION OF AN AGREEMENT, WHICHEVER OCCURS FIRST, A COPY OF THE OFFERING CIRCULAR, TOGETHER WITH A COPY OF ALL PROPOSED AGREEMENTS RELATING TO THE FRANCHISE.**

IF BOWEN INVESTMENT, INC. DOES NOT DELIVER THIS OFFERING CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND THE RHODE ISLAND DEPARTMENT OF BUSINESS REGULATION, 233 RICHMOND STREET, SUITE 232, PROVIDENCE R.I. 02903-4232.

The undersigned, personally and/or as an officer or partner of the proposed franchisee do hereby acknowledge receipt of the offering circular of Bowen Investment, Inc., dated February 6, 2004 and Rhode Island Addendum A and Addendums B-E) together with all exhibits thereto (A. Actual, Average, Projected or Forecasted Franchisee Sales, Profits or Earnings, B. Financial Statements for Bowen Investment, Inc. and Honey Dew Associates, Inc., C. Franchise Agreement, D. Sublease, E. Covenant Not to Compete, F. Covenant to Protect Trade Secrets and Proprietary Information, G. Liability Agreement, H. Release and Waiver, I. Sample Equipment List, J. Conditional Assignment of Lease, K. Liability and Cross Default Agreement, L. Agreement Regarding Restrictive Covenant and Restrictive Covenant.

Date: _____

_____
Print name
_____
(Address)

The name and address of the Franchisor's registered agent in this state authorized to receive service of process is: CT Corporation System, 111 Westminster Street, Providence, Rhode Island 02903.

32

## **RHODE ISLAND ADDENDUM A**

§19-28.1-14 of the Rhode Island Franchise Investment Act provides that "A provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under this Act."

**Addendum C**

HONEY DEW ASSOCIATES, INC.
ADVERTISING FUND POLICY STATEMENT
JANUARY 1, 1998

*Background*

During 1997, franchisees of the Honey Dew Donuts® system were solicited for
volunteers to participate in a Franchisee Advisory Advertising Committee (the "Committee")
for the purpose of making non-binding recommendation to Honey Dew Associates, Inc.
("HDA") as to advertising, public relations, marketing and related issues. The Committee
concluded that increased marketing, public relations and advertising (hereinafter,
collectively, "advertising") would likely increase sales and increase the value of franchises,
although it was specifically noted that (i) the results of any particular campaign could not be
guaranteed and (ii) the benefits of any campaign could vary considerably from shop to shop.
The Committee recommended that HDA establish a fund to which existing franchisees could
contribute for expanded advertising activities.

Based on the recommendations of the Committee, the Honey Dew Associates, Inc.
Advertising Fund was created. Existing franchisees have been requested to voluntarily
amend their Franchise Agreements to contribute to the Advertising Fund, and HDA has
agreed to (i) contribute a matching amount; (ii) contribute 4% of sales from company owned
shops, and (iii) contribute all cash advertising cooperative monies received from suppliers.

The Advertising Fund is to be administered in accordance with this Advertising Fund
Policy Statement, as it may be amended, from time to time. This Policy Statement may be
amended as HDA deems necessary, in its sole reasonable discretion, with prior notice to and
taking into account the recommendations of the Committee. It is expressly anticipated that
the Policy Statement will be updated from time to time based on the experience of utilizing
the Advertising Fund, the level of effectiveness of the campaigns, and the growth of the
Honey Dew Donuts® system.

*The Advertising Fund*

The Advertising Fund shall be held by HDA in separate segregated accounts to be
used for promotional, public relations, marketing and advertising expenses. The Advertising
Fund may be utilized for expenses in the nature of, but, without limitation, market research
for advertising and marketing, preparation of advertising, creative work, production work,
trafficking and shipping of creative materials, public relations activities and purchase of
advertising time, space and/or other costs, all consistent with our then-existing Advertising
Fund Policy Statement, which may be changed from time to time in our sole reasonable
discretion. The term "Advertising Fund" is utilized for convenience only and is not intended
to prohibit the use of the said Fund for related marketing and public relations activities.

38

To the extent that the Advertising Fund is used for marketing materials which are shared with franchisees, HDA may withhold such marketing materials from any franchisee which does not make a contribution to the Advertising Fund.

To the extent the Advertising Fund is used for the payment of commissions on media placements, the commissions shall be based on rates negotiated by HDA with notice to and the assistance of the Advertising Committee.

Proceeds of the Advertising Fund may not be paid to HDA or its employees, except as follows: (1) HDA shall be entitled to reimbursement for its reasonable costs in administering the Advertising Fund; and (2) HDA shall be entitled to reimbursement for its costs of collecting any sums due to the Advertising Fund by its franchisees. The monies in the Advertising Fund are the sole property of HDA and may not, under any circumstances, be refundable to contributors. Any monies not distributed in any year shall be carried forward to the next succeeding year.

*Franchisee Advisory Advertising Committee*

HDA and its franchisees desire to maintain a Franchisee Advisory Advertising Committee to (i) provide recommendations as to selection of an advertising agency (ii) provide input as to promotional campaigns and select products for such campaigns; (iii) to serve as liaison between HDA and the franchisees relating to Advertising Fund issues; and (iv) to make recommendations as to uses of the Advertising Fund in the best interests of HDA and its franchisees. The Franchisee Advisory Advertising Committee shall consist of between 6-10 members, who may be volunteers or appointed by vote of participating franchisees. HDA desires to have all geographic and media market areas represented.

The Franchisee Advisory Advertising Committee may make recommendations but HDA shall retain sole control over the use of the Advertising Fund and all issues relating thereto.

HDA cannot guaranty the success of any particular advertising program, nor the impact of the Advertising Fund on any particular shop. HDA desires that the Franchisee Advisory Advertising Committee monitor the use of funds to make recommendations as to the fair allocation of proceeds from the Advertising Fund.

EXHIBIT

**Exhibit L**

FROM : MARIO J.CARNEIRO,C.P.A., Ltd.    FAX NO. : 4014353130    Jul. 22 2005

## Roberta Porter

| | |
|---|---|
| From: | Monica Keatler [mkeatler@honeydewdonuts.com] |
| Sent: | Sunday, July 17, 2005 11:38 AM |
| To: | Roberta Porter |
| Subject: | RE: Advertising Fund |

Hi Roberta,

Just wanted to let you know that I received a check #1623 from store #28, Carneiro Donuts, Inc.. in the last batch that you sent up that paid only 2% of the sales for w/e 6/26/05. Can you check into this and see if maybe the other 2% was paid to Bowen Investments. If it was, it needs to be reimbursed to the ad fund in the amount of $127.38. If it wasn't, can you get in touch with Manuel and let him know that he owes it?

Thanks,

Monica

Manny,

You owe $127.37 Payable to Honey Dew Associates. Please forward to us @ Bowen & we will record & send to Monica.

Thanks,
Roberta

1

**Exhibit M**

## Kevin R. McCarthy
**Attorney at Law**
**155 Fairoaks Lane**
**Cohasset, Massachusetts 02025**

| Telephone | E-mail | Fax |
|---|---|---|
| 781-383-0639 | kemccar68@comcast.net | 781-735-0228 |

MAIL

July 25, 2005

Mr. Jack J. Mikels
1 Batterymarch Park
Suite 309
Quincy, MA 02169-7454

### Re: Carneiro Donuts, Inc. Advertising Fees

Dear Jack:

Apparently, shortly after Mr. Carneiro purchased his Honey Dew franchise, Robert Bowen asked or advised Mr. Carneiro to pay his weekly fees as 5% for royalty and 4 % for advertising instead of 7% for royalty and 2% for advertising as stated in his franchise agreement. As I am not familiar with the practice of paying fees in amounts and percentages other than as required under a franchise agreement, I have advised Mr. Carneiro to immediately begin paying his fees per the percentages stated in the franchise agreement. I believe he began doing so commencing the week ending 6/26/05.

If necessary, please advise your accountant that the weekly fee payments will henceforth be coming as per the terms of the franchise agreement – 7% for royalty and 2% for advertising.

If there is some written or other agreement which requires the weekly fees be paid as requested by Robert Bowen, please contact me immediately so that Mr. Carneiro can continue to conduct himself properly per his franchise agreement. Thank you.

Sincerely,

Kevin R. McCarthy

Cc: Manuel Carneiro
    Robert P. Bowen
    Tracy Botelho