UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BOWEN INVESTMENT, INC. ) | |
| HONEY DEW ASSOCIATES, INC. ) | C.A. No. 05 – 11709 NMG |
|     Plaintiffs and Counterdefendants ) | |
| ) | Judge Nathaniel M. Gorton |
| v. ) | |
| CARNEIRO DONUTS, INC and ) | |
| MANUEL M. CARNEIRO ) | |
|     Defendants and Counterclaimants ) | |

## DEFENDANTS' CONCISE STATEMENT OF THE MATERIAL FACTS OF RECORD AS TO WHICH THERE EXISTS A GENUINE ISSUE TO BE TRIED

Below is the Defendants' direct response to the Plaintiffs' statement of undisputed material facts pursuant to Local Rule 56.1. For convenience, the numbering system will track the numbering system set forth in the Plaintiffs' statement of undisputed material facts submitted with their 12/09/05 Motion for Summary Judgment:

1. **DISPUTED**: The Plaintiffs' have yet to produce the agreement by which they have been granted the right to franchise coffee and donut shops, known as Honey Dew Donuts Shops, in Rhode Island. They have admitted that such a written agreement exists and have been Ordered by the Court to produce a copy of the subfranchise agreement between HDA and BII to the Defendants on or before January 3, 2006. Until this written agreement to subfranchise Honey Dew Shops in Rhode Island is produced and examined, Bowen Investment, Inc.'s ("BII") status as a subfranchisor is in dispute. After this document is produced, BII's status may well still be in dispute and remain as a genuine material issue to be tried. See 05-11709NMG Judge Gorton's <u>Order</u> ( Document 42) ( 12/19/05).

2.  Defendants' have not verified that HDA owns the proprietary marks that are used by Honey Dew Donuts Shops.

3.  **ADMITTED.**

4.  **DENIED/DISPUTED**:  Plaintiffs' make no page references to affidavits, depositions or other documents for the statement that Defendants have no contractual relations with Honey Dew Associates, Inc.'s ("HDA").   Defendants' are third-party beneficiaries of HDA's exclusive management and control of the Honey Dew Advertising Fund and point to the franchise agreement which states at Section X(d): "HDA's obligations with respect to administration of the Advertising Fund shall be contractual and not fiduciary".  See Verified Complaint, ¶ 8, Exhibit "B".  The UFOCs disclosed to the Defendants (See Manuel Carneiro Aff. at ¶'s 24; 27) and the franchise agreement at Section X state that "…HDA shall retain sole control over the use of the Advertising Fund and all issues relating thereto.".

The Defendants', like franchisees in other franchise chains, are clearly third-party beneficiaries of the Advertising Fund.  See Oil Exp. Nat., Inc. v. Latos, 966 F.Supp. 650 (N.D. Ill., 1997) ("[f]ranchisees of Oil Express are the clear beneficiaries of such advertising, and they are consequently direct beneficiaries under the Citgo-Oil Express agreement.").  Additionally, the franchise agreement directly references the Ad Fund Policy Statement which is contained in the disclosed UFOCs as Addendum C.   See Manuel Carneiro Aff. at ¶'s 24; 27.  The Ad Fund Policy Statement is the document which created the Ad Fund and defines the relationship between HDA and all franchisees.  The Defendants point to these documents to show that HDA has a direct contractual obligation to the Defendants in addition to the third party beneficial relationship.

5. **ADMITTED.**

6. **DISPUTED**: On November 5, 2003, the Defendants signed for receipt of the February 6, 2003 Offering Circular – their original date of physical possession is yet to be determined.

7. **DISPUTED**: On November 5, 2003, the Defendant signed for receipt of the February 6, 2003 Offering Circular and accordingly he was on notice as to its contents. See Robert Bowen Aff, ¶ 3.

8. Defendant CDI admits executing the referenced Agreement Regarding Transfer of Honey Dew Donut Franchises and Addendum to Franchise Agreements, Franchise Agreement and Lease and all dated June 1, 2004.   With regard to the "Liability Agreement", Defendants say that the document speaks for itself.

9. **DISPUTED**: The Franchise Agreement states that the Defendants are to pay 7% to BII and 2% as a contribution to the Honey Dew Associates, Inc. Advertising Fund each week.  See Verified Complaint, ¶ 8, Exhibit "B" (Section II of franchise agreement).

10. **DENIED/DISPUTED**:   The Plaintiffs' claim that, "for convenience", BII requests that its franchisees issue two checks, 5% to BII and 4% to the Advertising Fund instead of 7% and 2% as required by the franchise agreement.  Robert Bowen Aff. at ¶ 6.".  However, BII does not request but tells franchisees that they have to pay their weekly franchise and advertising fees in this manor despite contrary language in the franchise agreement.   The Defendants point to the deposition testimony of Donal Smith, the franchisee from whom the Defendants purchased their franchise, for clear testimony that Bob Bowen, President of BII, told Mr. Smith that he had to pay his weekly fees as 5% and 4% instead of the 7% and 2% called for in the franchise agreement.   See Donal Smith

3

Deposition, McCarthy Aff., Tab 3 line 18 at page 53 until line 24 at page 55.  The Defendants also point to the Joseph Garcia Deposition, McCarthy Aff., Tab 2 at page 54, lines 5- 21.   These depositions show that BII tells franchisees that they "have to" to pay their weekly fees as 5% and 4% and that BII actually trains their new franchisees to pay their fees as 5% and 4% - thus they do not "request" this of their franchisees, rather they tell them they must pay their fees as 5% and 4% and train them to do so.

 11.  **DENIED/DISPUTED**:  The Defendants deny that they were routinely late in making weekly payments.   See Manuel Carneiro Aff. at ¶'s 5; 6.   The Defendants point to the following depositions, affidavits and other documents that respond to # 11 a-d of the Plaintiffs' statement of undisputed material facts and which also show that there remains at least several material, disputed and triable issues regarding whether the Defendants violated their payment obligations:

**11. (a)**:  A Notice of Default dated January 27, 2005 was sent to the Defendants calling for the fees due for week ending 1/09/05.   As 1/27/05 is a Thursday, the only week that could possibly have been due was 1/09/05 as the 1/22/05 payments would have been due at the earliest on 1/28/05.   Defendants point to the Second Affidavit of Manuel Carneiro ¶ 21 and related Exhibit E  which contains copies of the actual checks dated 1/20/05 for the weekly  advertising, rent and royalty fees due for 1/09/05.   At a minimum, these checks present a genuine dispute as to when the 1/27/2005 default notice was cured – assuming it was legitimate, for they are dated before the time to cure and the Plaintiffs make no showing to the Court as to when they were received by the Plaintiffs.   Also, the Robert Bowen., Aff.  ¶ 7 (a) relied upon in the Plaintiffs' Statement of Material Facts states that at

4

the time of the 1/27/05 default notice the Defendants were two (2) weeks in arrears, however the Defendants have already shown above that to be impossible.

**11. (b) and 11 (d)**:   Paragraph 11(b) of the Plaintiffs' Statement of Undisputed Material Facts states that " A Notice of Default was served on the Defendants, on or about February 22, 2005, for failure to make required payments.  Defendants did not timely cure the Default.  Verified Complaint,  ¶ 26, Robert Bowen Aff., ¶ 7(b)."   However, the Defendants point to the Second Affidavit of Manuel Carneiro, ¶ 17 and related Exhibit A which contains copies (front and back) of the actual checks dated 2/10/05 and 2/20/05 for the royalty fees, rent and taxes that are the subject of the 2/22/05 default notice.   As the default notice was sent on 2/22/05, two (2) of the weeks which were allegedly in default were the weeks ending 1/30/05 and 2/6/05 as stated in the default letter.  See Verified Complaint, ¶ 26,  Exhibit I.   However, the two dated checks for the royalty fees to Bowen Investment, Inc. ("BII")   show that they were sent on 2/10/05 and 2/20/05 respectively and most importantly the fronts show the bank's stamp showing that they were deposited on 3/01/05 which is clear material proof that the Defendants cured the 2/22/07 default letter within 7 days because 7 days from 2/22/05 is 3/01/05 and thus these checks were received and deposited by the Plaintiffs within 7 days of the date of their default notice.[1]   The default letter provided seven (7) days to cure per the franchise agreement.  Id.   This brings into serious question and dispute whether the termination notice of 5/27/05 ( Id. at Exhibit K) is a valid and legal termination as it is predicated on an allegedly valid uncured 2/22/05 default notice which, in fact, had been timely cured.   As well, this is assuming the Defendants even received the default letter on 2/22/05, which is improbable because it's

---

[1] Actually the backside shows a date of "02282005" under Citizens Riverside so the original deposit date was probably 02/28/05 making the Defendants' cure even sooner than 3/01/05.

dated 2/22/05 – thus they had even more time to cure, but there is nothing on the record as to when they received the 2/22/05 Notice to Cure – which would be another triable material factual issue.

Additionally, the 2/22/05 default notice should have specified each payment (at least the specific weeks that were due) that were being defaulted.  See <u>Verified Complaint:</u> at Exhibit B (Franchise Agreement,  XX (3) (Termination) which states:  "However, in the event of a Payment Default, we will, prior to termination, forward to you a Notice of Default, specifying each payment overdue".   This specification was not made in the 2/22/05 Notice of Default with regard to what weeks fees and royalties were actually due.  However, if the default notice were found to cover the weekending 2/13/04 (making 2/18/05 the due date) the Defendants' point to the <u>Second Affidavit of Manuel Carneiro</u> ¶ 18 and related Exhibit B which contains copies of the actual checks dated 2/24/05 and 2/25/05 which were sent to the Plaintiffs' attorney in response to the 2/22/05 "default letter" (along with a letter from the Defendants showing that the water and sewer bills noted in the 2/22/05 default letter had been paid and that the supposedly delinquent real estate bill had not been sent to the Defendants).   The dates of the checks in Exhibit B are within the default cure period of seven (7) days which, at a minimum, is document evidence that a material dispute viably exists as to the triable issue of whether the Defendants cured the 2/22/04  "default" in a timely manor.   The bank stamp on these checks indicate they were deposited on 3/15/05 but bear in mind these checks were sent to the Plaintiffs' attorney who is located in Quincy, MA.   These weekly fee, rent and tax payments were usually sent to the Defendants' office in Cranston, RI. so there was an

unknown lag time until they were deposited by the Defendants after receiving them from their Massachusetts attorney.

The above clearly shows that, at minimum, there are material factual issues related to whether the Defendants' timely cured the "defaults" noted in the 2/22/05 Default Notice, or whether they were even in default, and thus making the validity of the May 27, 2005 Notice of Termination a material, genuine and triable issue because it is predicted on a valid uncured 2/22/05 Notice of Default.  Furthermore, the Robert Bowen Aff., ¶ 7 (b) relied upon in the Plaintiffs' Statement of Material Facts regarding the 2/22/05 Default Notice states: "Not only was the arrearage not timely cured, but by the cure date, the arrearage had not been reduced.  As a result, a Notice of Termination dated May 27, 2005 was served on the Defendants."   However, the document evidence the Defendants are pointing to above conclusively demonstrates this to be false – or at a bare minimum to clearly be in dispute.

**11. ( c)**:   Paragraph 11(c) of the Plaintiffs' Statement of Material Facts states that  "A Notice of Default was served on the Defendants, on or about May 27, 2005, for failure to make required payments.  Defendants did not timely cure the Default.  Verified Complaint, ¶ 26, Robert Bowen Aff., ¶ 7(c)." This purported default notice (See Verified Complaint; Exh. J) states that it is for failure "… to make timely payments of royalties , service fees and rent due for the weeks (sic) ending May 15, 2005."   This default notice was sent for (1) one week of back royalties, rent and service fees.   However, the Robert Bowen., Aff. ¶ 7 (c) relied upon in the Plaintiffs' Statement of Material Facts states: "At the time of the issuance of the Notice of Default, the Defendants were two weeks in arrears.  Not only was

7

the arrearage not timely cured, but by the cure date, the arrearage had not been reduced. As a result, a Notice of Termination dated June 8, 2005 was served on the Defendants." First, the default notice was dated May 27, 2005 which means the Defendants could not have been more that one week late in fees which would have been for the week ending 5/15/05.  At a minimum, the weekly fees for the week of May 22, 2005 would have been due by end of day May 27, 2005 – thus the default notice was written and dated before the week of 5/22/05 could have even been in default.   Additionally, Defendants point to the <u>Second Affidavit of Manuel Carneiro</u> ¶ 19 and related Exhibit C which contains copies of the actual checks dated 5/26/05 which, as indicated on the checks, were for the 5/15/05 advertising, rent and royalty fees cited in the "default letter".   The dates of the checks are well within the default cure period of seven (7) days from 5/27/05 which, at a minimum, is document evidence that a material dispute viably exists as to the issue of whether the Defendants cured the 5/15/05 "default" in a timely manor - thus putting into dispute the validity of the 6/8/05 "Notice of Termination".

   Finally, the 5/22/05 weekly advertising, rent and royalty fees from the Defendants is paid and dated 6/01/05 which would have been within the 7 day cure period even if they were late and a legitimate part of the 5/27/05 default notice.   Defendants point to the <u>Second Affidavit of Manuel Carneiro</u> ¶ 20 and related Exhibit D that contains copies of the actual checks dated 6/01/05 which, as indicated on the checks, were for the 5/22/05 advertising, rent and royalty fees.

**11(d):**   This 5/27/05 Notice of Termination directly references and relates to the 2/22/05 Notice of Default discussed above and is invalid for the reason stated in 11(b) and  11(d) above.

12. **ADMITTED.**

13. **DENIED/DISPUTED**:   The July 26, 2004 document is a loan for the financing of certain equipment not a "letter agreement".   See <u>Second Affidavit of Manuel Carneiro</u> ¶ 25 and related Exhibit I.

14. **DENIED/DISPUTED**:    See <u>Manuel Carneiro Aff.</u> at ¶ 25 which is documentation of equipment financing initiated by BII.   The cover letter clearly calls for re-payment of monies to Bowen Investment by the Defendants.  The subject of the document is shop equipment.   The Rhode Island Restaurant invoice of 8/06/04 designates Bob Bowen as the buyer.   The DMX invoice of 7/30/04 shows Bowen Investments as the buyer.    Also, see <u>Robert Bowen/BII Deposition</u>, <u>McCarthy Aff.</u>,  <u>Tab 1</u>  at page 84, lines 5-15, and  page 85, lines 1-8, where Bob Bowen/BII clearly testify to providing equipment financing to franchisees.    As well, <u>See Manuel Carneiro Deposition</u>, <u>McCarthy Aff.</u>, <u>Tab 4</u>  at starting at page 27, line 2 to page 29 line 17 which describes how Bob Bowen, President of BII, forced equipment purchases on the Defendants and  then arranged to finance that equipment.  Also see  <u>Mario Carneiro Deposition</u>, <u>McCarthy Aff.</u>, <u>Tab 5</u> at page 99 starting at line 6 to page 106 ending at line 3 for even more factual details as to how and when BII finances equipment purchases for other franchisees as well as the Defendants.   Clearly, BII is provides "equipment financing" to its franchisees or, at a

9

minimum, there is a genuine dispute as to the material issue of whether or not BII provides equipment financing to its franchisees (and to the Defendants) as well as to whether or not BII sold equipment to the Defendants.

                                        Respectfully,
                                        MANUEL M. CARNEIRO
                                        CARNEIRO DOUNTS, INC.
                                        By their Attorney,

                                        /s/ Kevin R. McCarthy
                                        Kevin R. McCarthy
                                        (BBO # 640788)
                                        155 Fairoaks Lane
                                        Cohasset, Ma  02025
                                        781-383-0639

Date:   12/23/05