UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO.  05-11709-NMG

BOWEN INVESTMENT, INC. and
HONEY DEW ASSOCIATES, INC.,
                    Plaintiffs,

v.

CARNEIRO DONUTS, INC. and
MANUEL M. CARNEIRO,
                    Defendants.

## **MOTION OF BOWEN INVESTMENT INC. FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO F.R.CIV.P. 50(a)**

Now comes the Plaintiff, Bowen Investment, Inc. ("BII"), and moves for Judgment

as a Matter of Law pursuant to F.R.Civ.P. 50(a), entering Judgment for BII on all Counts

of the First Amended Counterclaim.  In support of this Motion, BII states as follows:

There has been no legally sufficient evidentiary basis for a reasonable jury to find

for the Defendants on the following claims:

### **Payment Claim**

The Franchise Agreement, Exhibit 4b, required defendant Carneiro Donuts, Inc.

("CDI") to make weekly payments to BII which included 7% of gross sales for royalties

and 2% to be paid to the Honey Dew Advertising Fund.  BII was then required to send the

Honey Dew Advertising Fund a matching 2% contribution.

The trial evidence was undisputed that BII requested that CDI write its checks 5%

to BII and 4% to the Honey Dew Advertising Fund.  This saved BII the step of writing a

matching contribution check, but made no monetary difference.  Under both payment

schemes, CDI paid 9%; BII netted 5%, and the Honey Dew Advertising Fund received 4%.

Defendants claims that this request triggered a series of statutory and common law violations, including: a claim that BII changed the terms and rates in the franchise agreement for advertising fees, Amended Counterclaim at ¶17, demanded advertising fees in sums not required under the Franchise Agreement, Amended Counterclaim at ¶16, demanded that Defendants pay BII's obligations to the advertising fund, Amended Counterclaim at ¶18, violated the FTC Franchise Rule by failing to accurately disclose the terms and rates by which advertising and franchise fees were to be paid. Amended Counterclaim at ¶20, failed to provide an annual audit of the advertising fund as required by the Franchise Agreement, Amended Counterclaim at ¶21, required Defendants to pay BII's obligations to the Advertising Fund, Amended Counterclaim at ¶38, failed to make accurate disclosures pertaining to the payment of advertising and royalty fees, Amended Counterclaim at ¶43, failed to disclosure that payments would be 5% plus 4% instead of 7% + 2%, Amended Counterclaim at ¶44, failed to accurately disclose the royalty fee and advertising fee percentages to be paid to BII, Amended Counterclaim at ¶61, 62, violated the RIFIA by failing to properly disclose the fees upon which Defendants relied, Amended Counterclaim at ¶¶67, 72, and violated Mass. G.L. c. 93A, Amended Counterclaim at ¶¶82-84, 87, 91-92. These claims are included within Count I as a breach of contract, Count II as a breach of the implied covenant of good faith and fair dealing, Count III as fraud through material misrepresentation, in Count IV as fraud through failure to disclose material facts, in Count V as a violation of RIFIA, and in Count VI as a violation of Mass G.L. c. 93A.

Defendants' mischaracterize this time saving request as somehow changing the payment obligations, or requiring CDI to pay BII obligations to the Advertising Fund. It

does neither. CDI's royalty remains at 7% and its Advertising Fund contribution remains at 2%; it is merely deducting what would be BII's matching contribution and including that sum in its check to the Advertising Fund. Judgment as a matter of law should enter on all claims arising out of this factual pattern.

**Wrongful Termination**

Defendants claim that BII terminated the Franchise Agreement upon manufactured and fictitious grounds, Amended Counterclaim at ¶19, illegally defaulted and terminated the franchise agreement, Amended Counterclaim at ¶29, pretextually defaulted, sent illegal cease and desist notices and terminated the franchise agreement for wrongful and bad faith purposes, Amended Counterclaim at ¶30, terminated the franchise agreement upon manufactured and fictitious grounds, Amended Counterclaim at ¶33, pretextually defaulting, sending cease and desist letters and illegally terminating the Defendants as franchisees, Amended Counterclaim at ¶34 and violated Mass. G.L. c. 93A. Amended Counterclaim at ¶93. This claim is included in Count I as a breach of contract and in Count II as a breach of the warranty of good faith and fair dealing.

The undisputed evidence was that CDI was always late in its payments.[1] There is no dispute that CDI failed an inspection and re-inspection. There is no dispute that CDI received more than three notices of default within a twelve month period. All were reasons for termination pursuant to the Franchise Agreement. Consequently, BII's motive in exercising the right to terminate CDI is irrelevant since there are clear undisputed violations of the franchise agreement and a valid reason for termination. McDonald's

---

[1] Mr. Carneiro testified that he signed the checks each Friday and either mailed them to BII or held them until he had sufficient funds. In either case, the payments could not have been received by BII, as they were due on the day they were signed. As the earliest date they were mailed was the due date, the payments could not have been on time.

Corp. v. C.B. Management Co., 13 F. Supp 2d 705 (1998) (ulterior motive for franchise termination irrelevant as long as legitimate grounds for termination exist); Tuf Racing Products, Inc. v. American Suzuki Motor Corp. , 223 F.3d 585, 589 (7th Cir. 2000) (emphasizing that "if a party has a legal right to terminate [a] contract ... its motive for exercising that right is irrelevant"); Russell W. Zeidler, Nancy Zeidler and R. W. Hospitality Corporation v. A & W Restaurants, Inc; 2001 U.S. Dist. Lexis 653.

Defendants also claim that BII defaulted them and threatened litigation if they did not make full payment on an equipment note which was not in default, Amended Counterclaim at ¶35, and terminated the franchise agreement for purported non-payment of an equipment note which was not in default and which was not an obligation under their Franchise Agreement, Amended Counterclaim at ¶36, and threatened litigation if full payment was not made on an equipment note resulting from financing not properly disclosed in BII's Offering Circular, Amended Counterclaim at ¶37. This claim is included in Count II as a breach of the warranty of good faith and fair dealing. It is not a breach of warranty to suggest that litigation will be initiated to collect sums due. See Speakman v. Allmerica Fin.Life Ins. & Annuity Co., 367 F. Supp. 2d 122, 132 (D.Mass. 2005) (the covenant is does not apply where the defendant has exercised an express contractual power in good faith -- that is, in a manner that comports with the parties' reasonable expectations as to performance); citing Dunkin' Donuts, Inc. v. Gav-Stra Donuts, Inc., 139 F. Supp. 2d 147, 156 (D. Mass. 2001) (no breach of covenant where franchise agreement expressly gave defendant the right to terminate the contract under the circumstances, and there was no evidence of fraud, deceit, or misrepresentation by defendant); Chokel v. Genzyme Corp., 2003 Mass. Super. LEXIS 417, 17 Mass. L. Rep.

83, at *10 (Mass. Super. 2003) (no breach of covenant where defendants adhered to specific contract provisions in calculating stock transfer price, there was no evidence of bad faith, and defendants disclosed pertinent information to plaintiffs).

It is undisputed that BII promised litigation (and followed through on its promise) if a reinstatement could not be negotiated. However, the litigation was to collection sums due and to re-obtain possession of its real estate. There was no evidence that BII defaulted or terminated the franchise agreement for non-payment of the $100 per week equipment reimbursement, except when those payments were in arrears. Although defendants contend that BII was not allowed to do so, the Franchise Agreement expressly provides that the notice of default and termination procedure would be used if CDI failed to make any payment due to BII "pursuant to the Franchise Agreement, Lease or any other contract." Franchise Agreement, Exhibit 4b at ¶XX(A)(3). Therefore, the claim may not be sustained as a matter of law.

## JOINT LIABILITY CLAIM

Defendants assert that BII bears joint and several liability for the wrongful acts of HDA for HDA's FTC Rule violations. Amended Counterclaim at ¶85. This claim is included in Count VI as a violation of Mass. G.L. c. 93A. There is no provision of law which supports this contention and no factual basis for the claim has been introduced into evidence.

## MASS G.L. C. 93A

To the extent not dismissed on other grounds, judgment on the law for BII is appropriate for any surviving claims pursuant to Mass. G.L. c. 93A. Mass. G,L, c. 93A, §11 expressly provides: "No action shall be brought or maintained under this section

unless the actions and transactions constituting the alleged unfair method of competition or
the unfair or deceptive act or practice occurred primarily and substantially within the
Commonwealth". The claim relates to a donut shop operated in Rhode Island, sold to a
corporation incorporated in Rhode Island which was owned by a resident of Rhode Island,
pursuant to an Offering Circular mandated by the laws of Rhode Island, and pertains to
inspections which occurred in Rhode Island, meetings which occurred in Rhode Island,
training which occurred primarily in Rhode Island, and notices served in Rhode Island. It
is undisputed that all of the actions complained of occurred in Rhode Island and related to
assets in Rhode Island. All damages were sustained in Rhode Island. The only
relationship to Massachusetts is two pre-transaction meetings and the closing. For this
reason, by its terms, Mass. G.L. c. 93A is not applicable to this transaction. See e.g., *M&I
Heat Transfer Products, Ltd. v. Gorchev,* 141 F.3d 21, 23 (1st Cir. 1998)(company
allegedly injured by letters generated in Massachusetts were not subject to statute, since the
impact and harm occurred in Tennessee); *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass.
622, 638, 473 N.E.2d 662, 672 (Mass. 1985)(no 93A claim where misrepresentations made
in Massachusetts were alleged to have been received in New York and all damages
occurred in New York).

## EQUIPMENT FINANCING

Following CDI's opening for business, BII offered to pay for the purchase of two
items of new equipment for CDI, if CDI would reimburse them for the purchase price,
without interest. Although there is a factual dispute over whether BII insisted on the
purchase or not, the underlying claim is not based on this distinction. Instead, Defendants
assert that BII failed to make required disclosures regarding equipment financing,

6

Amended Counterclaim at ¶¶45-47, 53 and 63-64, violated the RIFIA by failing to properly disclose the equipment sales practices, Amended Counterclaim at ¶68, and violated Mass. G.L. c. 93A, Amended Counterclaim at ¶89-90, all upon which Defendants reasonably relied, Amended Counterclaim at ¶¶54, 72. This claim is included within Count III as fraud through Material Misrepresentation, in Count IV as fraud through failure to disclose material facts and Count V as a violation of RIFIA.

These claims involve a failure of BII to disclose in its Uniform Offering Circular that it would provide this interest free advance. The instructions for completion of a Uniform Offering Circular prepared by the North American Securities Administrators Association[2] are seven pages long, a copy of which is attached hereto as Exhibit "A". In general, all "financing arrangement" offered to the franchisee must be disclosed.

The interest free transaction in which BII and CDI engaged is not a "financing arrangement." Moreover, there is no evidence that BII intended, before the closing, to offer this deal or that it generally offered such a deal to its franchisees.

There is no prohibition from a franchisor and a franchisee engaging in any sort of post-closing transaction which they negotiate between them. The existence of a transaction does not, by itself, create a retroactive obligation to disclose.

Moreover, Defendants could not have relied on the absence of this information to their detriment. There was no testimony that Defendants would not have bought the franchise had they known that BII offered interest free advances for equipment purchases.

Judgment should enter as a matter of law on all claims arising out of a failure to disclose relating to the equipment advance.

---

[2] Under Rhode Island law, franchisors must provide a UFOC prepared subject to the NASAA instructions. R.I. Stat. §19-28.1-3.

7

## Training

Defendants assert that BII failed to provide proper training called for in Section V of their franchise agreement, <u>Amended Counterclaim</u> at ¶¶28, 39. This claim is included within Count I as a breach of contract and Count II as a breach of the implied covenant of good faith and fair dealing.

Although there is a factual dispute as to the training which was provided, this dispute is not material. Regardless, no contractual provision was breached. Section V of the Franchise Agreement provides that BII has no obligation to provide training ("Prior to the opening of the Premises for your Franchise, *unless waived by us*, you must complete training . . ."). <u>Franchise Agreement</u>, Exhibit 4b at ¶V(A) (emphasis added). The Agreement further provides that BII may "tailor or limit the required training to suit your individual needs, based on such factors as . . . (ii) the business and/or donut shop experience of (the franchisee)." <u>Id</u>.

There could be no breach of such a provision. Moreover, in light of the undisputed experience of the Defendant in the business, his passing grade on the second inspection, and his failure to ever contend until this litigation that training was inadequate, preclude a claim against BII for a breach of any implied covenant of good faith and fair dealing.

## LITIGATION

Defendants assert that BII failed to properly disclose material litigation in its 2004 Offering Circular. <u>Amended Counterclaim</u> at ¶48 and 58, including the Yazbek, Cohen and A&F cases, <u>Amended Counterclaim</u> at ¶48, and 15 lawsuits against franchisees by HDA between 1998 and 2004 filed in the Norfolk Superior Court, <u>Amended Counterclaim</u> at ¶59, wrongfully represented that no other litigation was required to be disclosed,

Amended Counterclaim at ¶52, violated the RIFIA by failing to properly disclose the material litigation, Amended Counterclaim at ¶70, and violated Mass. G.L. c. 93A, Amended Counterclaim at ¶88, all upon which Defendants reasonably relied, Amended Counterclaim at ¶¶54, 60 and 72. This claim is included within Count III as fraud through material misrepresentation, in Count IV as fraud through failure to disclose material facts, in Count V as a violation of RIFIA and in Count VI as a violation of Mass G.L. c. 93A.

As for the Norfolk actions, identified as collection cases, the instructions for the UFOC consists of four pages, a copy of which is attached hereto as Exhibit "B". In relevant part, the instructions provide "include actions other than ordinary routine litigation incidental to the business which are significant in the context of the number of franchisees and the size, nature or financial condition of the franchise system and its business operations." On the average, this represents 1.9 cases per year, which represents 1% of the franchised shops in any year. Thirteen collection cases in seven years for a franchise chain of approximately 150 shops is, as a matter of law, "routine".

The instructions to the UFOC require disclosure of cases in which franchisor misconduct is alleged if the case is pending or if the franchisor lost the case. No disclosure is required if the franchisor wins the case. No disclosure is required if the case is settled, unless the settlement involves "material consideration" or "obligations which are materially adverse to its interests". The undisputed testimony of Richard Bowen was that the Cohen case was settled on terms so favorable to Honey Dew Associates, Inc. that the franchisee attempted twice to overturn the settlement agreement. The undisputed testimony of Robert Bowen was that the A&F case was settled so the franchisee could sell the shop. There has been no evidence submitted that either settlement involved material

consideration or obligations adverse to either HDA or BII. In the absence of such evidence, the claim cannot prevail, as a matter of law.

As for the Yazbek case, the undisputed evidence was that the case began as a routine collection case and that the counterclaim was not known to the Plaintiffs at the time BII's 2004 Offering Circular was prepared. There was no evidence to the contrary. There can be no liability to fail to disclose something that was unknown.[3]

Additionally, there is no evidence that Defendants ever received the 2004 Offering Circular. The only two Offering Circular Receipts (Exhibits 51 and 52) signed by the Defendants indicate that he received two copies of the 2003 Offering Circular, but not the 2004 Offering Circular. Moreover, the Defendant testified that he had not read the Offering Circular, which negates any argument of reliance.

Finally. Defendants could not have relied on they 2004 Offering Circular. By the end of 2003, they were already contractually obligation to complete the purchase (Exhibit 2). Only the 2003 Offering Circular was provided prior to their execution of the Purchase and Sale Agreement.

> BOWEN INVESTMENT, INC.
> By their Attorneys,

Date: January 20, 2005

> Jack J. Mikels, BBO# 345560
> Michael A. Wirtz, BBO# 636587
> JACK MIKELS & ASSOCIATES, LLP
> 1 Batterymarch Park, Suite 309
> Quincy, MA 02169-7454
> Tel: 617.472.5600

Judgment matter law- bii

---

[3] Richard Bowen testified that the HDA Offering Circular, prepared directly after the BII Offering Circular was completed, did include the Yazbek litigation.

10



## Item 3

### LITIGATION

DISCLOSE WHETHER THE FRANCHISOR, ITS PREDECESSOR, A PERSON
IDENTIFIED IN ITEM 2 OR AN AFFILIATE OFFERING FRANCHISES UNDER
THE FRANCHISOR'S PRINCIPAL TRADEMARK:

A.  HAS AN ADMINISTRATIVE, CRIMINAL OR MATERIAL CIVIL ACTION
PENDING AGAINST THAT PERSON ALLEGING A VIOLATION OF A FRANCHISE,
ANTITRUST OR SECURITIES LAW, FRAUD, UNFAIR OR DECEPTIVE
PRACTICES, OR COMPARABLE ALLEGATIONS.  IN ADDITION, INCLUDE
ACTIONS OTHER THAN ORDINARY ROUTINE LITIGATION INCIDENTAL TO THE
BUSINESS WHICH ARE SIGNIFICANT IN THE CONTEXT OF THE NUMBER OF
FRANCHISEES AND THE SIZE, NATURE OR FINANCIAL CONDITION OF THE
FRANCHISE SYSTEM OR ITS BUSINESS OPERATIONS.  IF SO, DISCLOSE THE
NAMES OF THE PARTIES, THE FORUM, NATURE, AND CURRENT STATUS OF
THE PENDING ACTION.  FRANCHISOR MAY INCLUDE A SUMMARY OPINION OF
COUNSEL CONCERNING THE ACTION IF A CONSENT TO USE OF THE SUMMARY
OPINION IS INCLUDED AS PART OF THIS OFFERING CIRCULAR.

B.  HAS DURING THE 10 YEAR PERIOD IMMEDIATELY BEFORE THE DATE OF
THE OFFERING CIRCULAR BEEN CONVICTED OF A FELONY OR PLEADED NOLO
CONTENDERE TO A FELONY CHARGE; OR BEEN HELD LIABLE IN A CIVIL
ACTION BY FINAL JUDGMENT OR BEEN THE SUBJECT OF A MATERIAL ACTION
INVOLVING VIOLATION OF A FRANCHISE, ANTITRUST OR SECURITIES LAW,
FRAUD, UNFAIR OR DECEPTIVE PRACTICES, OR COMPARABLE ALLEGATIONS.
IF SO, DISCLOSE THE NAMES OF THE PARTIES, THE FORUM AND DATE OF
CONVICTION OR DATE JUDGMENT WAS ENTERED, PENALTY OR DAMAGES
ASSESSED AND/OR TERMS OF SETTLEMENTS.

C.  IS SUBJECT TO A CURRENTLY EFFECTIVE INJUNCTIVE OR RESTRICTIVE
ORDER OR DECREE RELATING TO THE FRANCHISE OR UNDER A FEDERAL,
STATE OR CANADIAN FRANCHISE, SECURITIES, ANTITRUST, TRADE
REGULATION OR TRADE PRACTICE LAW RESULTING FROM A CONCLUDED OR
PENDING ACTION OR PROCEEDING BROUGHT BY A PUBLIC AGENCY.  IF SO,
DISCLOSE THE NAME OF THE PERSON, THE PUBLIC AGENCY AND COURT, A
SUMMARY OF THE ALLEGATIONS OR FACTS FOUND BY THE AGENCY OR COURT
AND THE DATE, NATURE, TERMS AND CONDITIONS OF THE ORDER OR
DECREE.

### Item 3 Definitions:

i.  For purposes of these instructions to Item 3, "franchisor"
includes the franchisor, its predecessors, persons identified in
Item 2 and affiliates offering franchises under the franchisor's
principal trademarks.

ii.  Action:  Action includes complaints, cross claims,
counterclaims, and third party complaints in a judicial

-15-                          Adopted by NASAA on
                              April 25, 1993

proceeding, and their equivalents in an administrative action or
arbitration proceeding.  The franchisor may disclose its
counterclaims.  Omit actions that were dismissed by final
judgment without liability of or entry of an adverse order
against the franchisor.

iii.  Included in the definition of material is an action or an
aggregate of actions if a reasonable prospective franchisee would
consider it important in making a decision about the franchised
business.

iv. In this Item, settlement of an action does not diminish its
materiality if the franchisor agrees to pay material consider-
ation or agrees to be bound by obligations which are materially
adverse to its interests.

v. "Ordinary routine litigation" means actions which ordinarily
result from the business and which do not depart from the normal
kinds of actions in the business.

vi. "Held liable" includes a finding by final judgment in a
judicial, binding arbitration or administrative proceeding that
the franchisor, as a result of claims or counterclaims must pay
money or other consideration, must reduce an indebtedness by the
amount of an award, cannot enforce its rights, or must take
action adverse to its interests.

vii.  "Currently Effective": An injunctive or restrictive order
or decree is "currently effective" unless it has been vacated or
rescinded by a court or by the issuing public agency.  An order
that has expired by its own terms is not "currently effective."
If the named party(s) have fully complied with an order (for
example, through registration of its franchise offer), the order
is not "currently effective."  A party has not fully complied
with an order to act or to refrain from an act (for example to
comply with the franchise law or to refrain from violating the
franchise law) until the order expires by its own terms.

Item 3 Instructions:

Civil litigation, or Injunctive or Restrictive Order:

viii.  Use sample answer 3-1 for a negative response to Item 3 if
the franchisor has never been named in litigation or if the only
litigation naming the franchisor is outside the scope of Item 3.

ix. Disclose in the same order as the instructions below
appear.

x. Title each action and state its case number or citation in
parentheses.  Underline the title of the action.

-16-

Adopted by NASAA on
April 25, 1993

xi. For each action state the action's initial filing date and the opposing party's name and relationship with the franchisor. Relationships include competitor, supplier, lessor, franchisee, former franchisee, or class of franchisees.

xii. Summarize the legal and factual nature of each claim in the action.

xiii. Summarize the relief sought or obtained. Summarize conclusions of law or fact.

xiv. State that other than these (list number of actions) no litigation is required to be disclosed in this offering circular.

Criminal convictions or Pleas:

xv. Disclose in the same order as the following instructions appear.

xvi. Title each action and state its citation in parentheses. Underline the title of the action.

xvii. Name the person convicted or who pleaded.

xviii. Next, state the crime or violation and the date of conviction.

xix. Next, disclose the sentence or penalty imposed.

xx. Lastly, state that other than these (list the number of actions) actions, no litigation is required to be disclosed in this offering circular.

-17-

Adopted by NASAA on
April 25, 1993

## Sample Answer 3-1

No litigation is required to be disclosed in this offering circular.

## Sample Answer 3-2

Doe v. Belmont Muffler Service, Inc. (cite)  On March 1, 1985, our franchisee, Donald Doe, sought to enjoin us from terminating him for nonpayment of royalty fees.  Doe alleged _____.  On April 3, 1986, Doe withdrew the case when we repurchased his franchise for $90,000 and agreed not to enforce non-compete clauses against him.

Indiana v. Belmont Muffler Service, Inc. (cite)  On April 1, 1985, the Attorney General of Indiana sought to enjoin us from offering unregistered franchises and from using false income representations.  The Attorney General alleged that the earnings claims were false because . . ..  The court found that we had offered franchises, that the offers were not registered and that we had made the alleged false representations in our earnings claims.  The court enjoined us from repeating those acts.

Other than these 2 actions, no litigation is required to be disclosed in this offering circular.

-18-

Adopted by NASAA on
April 25, 1993



EXHIBIT

B

## Item 10

### FINANCING

DISCLOSE THE TERMS AND CONDITIONS OF EACH FINANCING ARRANGEMENT THAT THE FRANCHISOR, ITS AGENT OR AFFILIATES OFFERS DIRECTLY OR INDIRECTLY TO THE FRANCHISEE, INCLUDING:

Item 10 Instructions:

i.  "Financing" includes leases and installment contracts.

ii.  Payments due within 90 days on open account financing need not be disclosed under this Item.

iii.  A written arrangement between a franchisor or its affiliate and a lender for the lender to offer financing to the franchisee or an arrangement in which a franchisor or its affiliate receives a benefit from a lender for franchisee financing is an "indirect offer of financing" and must be disclosed under this Item.  The franchisor's guarantee of a note, lease or obligation of the franchisee is an "indirect offer of financing" and must be disclosed under this Item.

iv.  If financing of the initial fee is disclosed in the Item disclosure, a cross reference to Item 7 is sufficient if all th disclosure which Item 10 requires is provided in Item 7.

v.  If an affiliate offers financing, identify the affiliate and its relationship to the franchisor.

vi.  The franchisor may summarize the terms of each financing arrangement in tabular form, using footnotes to entries in the chart to provide additional information required by these instructions that does not fit in the chart.

vii.  If a financing arrangement is for the establishment of t franchised business, disclose what the financing covers, including:

a) Initial franchise fee;

b) Site acquisition;

c) Construction or remodeling;

d) Equipment or fixtures; and

e) Opening inventory or supplies.

-36-

Adopted by NAS
April 25, 1993

viii. If the franchisor generally offers financing for the operation of the franchised business, disclose what the financing arrangement covers, including:

a) Inventory or supplies;
b) Replacement equipment or fixtures; and
c) Other continuing expenses.

ix.   Disclose the terms of each financing arrangement, including:

a) The identity of the lender(s) providing the financing  and its relationship to the franchisor (for example, affiliate);

b) The amount of financing offered or, if the amount depends on an actual cost that may vary, the percentage of the cost that will be financed;

c) The annual percentage rate of interest ("APR") charged, computed as provided by Sections 106-107 of the Consumer Protection Credit Act, 15 U.S.C. §§ 106-107.  If the APR may differ depending on when the financing is issued, disclose the APR on a specified recent date;

d) The number of payments or the period of repayment;

e) Nature of security interest required by the lender;

f) Whether a person other than the franchisee (for example spouse, shareholder of the franchisee) must personally guarantee the debt;

g) Whether the debt can be prepaid and the nature of any prepayment penalty;

h) The franchisee's potential liabilities upon default, including any accelerated obligation to pay the entire amount due, court costs and attorney's fees for collection, and termination of the franchise, or other cross default clauses whether directly, as a result of non-payment, or indirectly, as a result of loss of necessary facilities; and

i) Other material financing terms.

x.   Include specimen copies of the financing documents as an exhibit to Item 22.  Cite the section and name of the document containing the financing terms.  Put this information in parentheses at the end of the description of the term.

xi.  Use Sample Answer 10-1 if the franchisor does not offer financing.

-37-

Adopted by NASAA on
April 25, 1993

A.   A WAIVER OF DEFENSES OR SIMILAR PROVISIONS IN A DOCUMENT.

Item 10A Instructions:

i.   Disclose the terms of waivers of legal rights by the franchisee under the terms of the financing arrangement (for example confession of judgment).

ii.   Describe provisions of the loan agreement that bar the franchisee from asserting a defense against the lender, the lender's assignee or the franchisor.

iii.   If the loan agreement does not contain the provisions in (i) or (ii), disclose that fact.

iv.   Cite the section and name of the document containing these terms.  Put this information in parentheses at the end of the description of the term.

B.   THE FRANCHISOR'S PRACTICE OR ITS INTENT TO SELL, ASSIGN, OR DISCOUNT TO A THIRD PARTY ALL OR PART OF THE FINANCING ARRANGEMENT.

Item 10B Instructions:

i.   Practice includes past or present practice and future intent to sell or assign franchisee financing arrangements.

ii.   Disclose the assignment terms including whether the franchisor will remain primarily obligated to provide the financed goods or services.

iii.   If the franchisor may sell or assign its rights under the financing agreement, disclose that the franchisee may lose all its defenses against the lender as a result of the sale or assignment.

iv.   Cite the section and name of the document containing the terms.  Put this information in parentheses at the end of the description of the term.

v.   If no disclosure is required by Instruction 10B, disclose that fact.

C.   PAYMENTS TO THE FRANCHISOR OR AN AFFILIATE(S) FOR THE PLACEMENT OF FINANCING WITH THE LENDER.

Item 10C Instructions:

i.   Describe the payments.

-38-

ii.  If no disclosure is required by Instruction 10C(i) for a financing arrangement, disclose that fact.

iii.  Identify the source of the payment and the relationship of the source to the franchisor or its affiliates.

iv.  Disclose the amount or the method of determining the payment.

v.  Cite the section and name of the document containing these arrangements.  Put this information in parentheses at the end of the description of the term.

---

Sample Answer 10-1

Belmont does not offer direct or indirect financing.  Belmont does not guarantee your note, lease or obligation.

Sample Answer 10-2

SUMMARY OF FINANCING OFFERED

| ITEM FINANCED (SOURCE) | AMOUNT FINANCED | DOWN PAYMENT | TERM (YRS) | APR % | MONTHLY PAYMENT | PREPAY PENALTY | SECURITY REQUIRED | LIABILITY UPON DEFAULT | LOSS OF LEGAL RIGHT ON DEFAULT |
|---|---|---|---|---|---|---|---|---|---|
| INITIAL FEE (NOTE 1) (BELMONT) | $10,000 | | 10 | 18 | % | NONE | PERSONAL GUARANTEE | LOSS OF FRANCHISE- UNPAID LOAN | WAIVE NOTICE- CONFESS JUDGMENT |
| LAND/CONSTRUCT | NONE | | | | | | | | |
| LEASED SPACE (NOTE 2) (BELMONT) | | $2,000 (SECUR. DEP.) | 7-10 | N/A | % | NONE | PERSONAL GUARANTEE | LOSS OF FRANCHISE- BACK RENT + 2 MOS.- FRANCHISE RIGHTS- ATTY'S FEES | NONE |
| EQUIPMENT LEASE (NOTE 3) (USA CREDIT CORP.) | $5,000 | NONE | 5 | 15 | % | NONE | EQUIPMENT- PERSONAL GUARANTEE | COST OF REMOVAL | LOSE ALL DEFENSES |
| EQUIP PURCH (NOTE 4) (BELMONT) | $3,750 | $1,250 (25%) | 2-7 | 15 | % | $500 | EQUIPMENT- PERSONAL GUARANTEE | LOSS OF FRANCHISE- ATTY'S FEES | NONE |
| OPENING INVENT. | NONE | | | | | | | | |
| OTHER FINANCING | NONE | | | | | | | | |

-39-

Adopted by NASAA on
April 25, 1993

NOTE 1 - If you meet Belmont's credit standards, Belmont will
finance the $10,000 initial franchisee fee over a 10-year period
at an APR of 18%, using the standard form note in Exhibit A.  The
only security Belmont requires is a personal guarantee of the
note by you and your spouse or by all the shareholders of your
corporation. (Loan Agreement Section ____)  The note can be
prepaid without penalty at any time during its 10-year term.
(Loan Agreement Section ____) If you do not pay on time, Belmont
can call the loan and demand immediate payment of the full
outstanding balance and obtain court costs and attorney's fees if
a collection action is necessary. (Loan Agreement Section ____)
Belmont also has the right to terminate your franchise if you do
not make your payments on time more than three times during the
note term. (Loan Agreement Section ____)  You waive your rights
to notice of a collection action and to assert any defenses to
collection against Belmont. (Loan Agreement Section___)  Belmont
discounts these notes to a third party who may be immune under
the law to any defenses to payment you may have against Belmont.
(Loan Agreement Section ___)

NOTE 2 - In most cases Belmont will sublease the franchised
premises to you but will guarantee your lease with a third party
if you have acceptable credit and that is the only way to obtain
an exceptional location. (Lease Section ____)  The precise terms
of Belmont's standard lease in Exhibit B will vary depending on
the size and location of the premises, but the chart reflects a
typical range of payments for Belmont's standard 6-day franchise
outlet, including payment of one month's rent as a security
deposit. (Lease Section ____)  The only other security Belmont
requires is a personal guarantee of the lease by you and your
spouse or by all the shareholders of your corporation. (Lease
Section ____) The lease can be prepaid without penalty at any
time during its term. (Lease Section ____) If you do not make a
rent payment on time, Belmont has the right to collect the unpaid
rent plus an additional two months rent, as liquidated damages.
(Lease Section ____)  Belmont can also obtain court costs and
attorney's fees if a collection action is necessary. (Lease
Section ____)  If you are late with your rent more than three
times during the lease term, Belmont has the right to terminate
the lease, take over the premises, and terminate your franchise.
If Belmont guarantees your lease, Belmont will require you to
sign the guarantee agreement in Exhibit F (Lease Section ____).
This gives Belmont the same legal rights as the sublease but
requires you to give Belmont the right to approve your lease and
pay the rent for you if you fail to pay on time. (Lease
Section ____)

NOTE 3 - If you want to lease the pipe bending machine and other
equipment you need, Belmont has arranged an equipment lease (see
Exhibit C) from USA Credit Corporation of Las Vegas, Nevada.  If
you choose this option, you will pay $100 a month for 60 months

-40-                          Adopted by NASAA
                              April 25, 1993

(5 years) at an APR of 15% based on a cash price of $5,000, with no money down. (Equipment Lease Section ____) At the end of the lease term, you may purchase the equipment with a one-time payment of $2,500. (Equipment Lease Section ____) USA Credit requires a personal guarantee from you and your spouse or from all the shareholders of your corporation and retains a security interest in the equipment. (Equipment Lease Section ____) The equipment lease can be prepaid at any time, but the interest you might otherwise save will be reduced by application of the Rule of 78's for computing finance charges. (Equipment Lease Section ____) If you do not make a payment on time, USA Credit can demand payment of all past due payments, remove the equipment, and charge you $1,000 as liquidated damages. (Equipment Lease Section ____) USA Credit can also recover its costs of collection, including court costs and attorney's fees. (Equipment Lease Section ____) While Belmont does not know USA Credit's policies, USA Credit may discount the lease to a third party who may be immune under the law to claims or defenses you may have against USA Credit, the equipment manufacturer or Belmont. Belmont receives a referral fee of $500 from USA Credit for every franchisee who leases equipment from it.

NOTE 4 - If you prefer, Belmont will sell you the pipe bending machine and other necessary equipment on time (Equipment Purchase Agreement Section ____). Belmont requires a 25% down payment of $1,250. (Equipment Purchase Agreement Section ____) Belmont will finance the remainder over a 2-7 year period at your option at an APR of 15%. (Equipment Purchase Agreement Section ____) Payments range from $228.11 a month over 7 years to $821.58 a month over 2 years. (Equipment Purchase Agreement Section ____) Belmont's standard equipment financing note in Exhibit D must be personally guaranteed by you and your spouse or by all the shareholders of your corporation, and Belmont will retain a security interest in the equipment. (Equipment Purchase Agreement Section ____) You may purchase the equipment at any time during the lease period by paying the remainder of the principal plus a $500 prepayment penalty. (Equipment Purchase Agreement Section ____) If you do not make a payment on time, Belmont can demand all overdue payments, repossess the equipment, and terminate your franchise. Belmont can also recover its costs of collection, including court costs and attorney's fees. (Equipment Purchase Agreement Section ____)

Except as disclosed in Note 1, Belmont does not offer financing that requires you to waive notice, confess judgment or waive a defense against Belmont or the lender, although you may lose your defenses against Belmont and others in a collection action on a note that is sold or discounted, as disclosed in Notes 2 and 3.

Except as disclosed in Note 3, Belmont does not arrange financing from other sources.

-41-

Adopted by NASAA on
April 25, 1993

Except as disclosed in Notes 1 and 3, commercial paper from franchisees has not been and is not sold or assigned to anyone, and Belmont has no plans to do so.

Except as disclosed in Note 3, Belmont does not receive direct or indirect payments for placing financing.

Except as disclosed in Note 2, Belmont does not guarantee your obligations to third parties.

-42-

Adopted by NASAA on
April 25, 1993